IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION
_____

HON. ELAINE L. CHAO,          §
SECRETARY, UNITED STATES      §
DEPARTMENT OF LABOR,          §
              Plaintiff,      §
                              §          CIVIL NO. 4-05-CV-338-Y
       v.                     §
                              §
ALLIED PILOTS ASSOCIATION,    §
              Defendant.      §


**PLAINTIFF'S BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

Respectfully Submitted,

RICHARD B. ROPER
UNITED STATES ATTORNEY

s/ Tami C. Parker
Tami C. Parker
Assistant United States Attorney
State Bar No. 24003946
Burnett Plaza, Suite 1700
801 Cherry Street, Unit 4
Fort Worth, Texas 76102-6882
Telephone: 817.252.5241
Facsimile:  817.978.6351

Plaintiff's Brief in Support of Summary Judgment

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

UNCONTESTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
             Allied Pilots Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
             Events Leading Up to the Contested Elections . . . . . . . . . . . . . . . . . . . . . . .  2
             2004 Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
             Change Vote Feature of the 2004 Elections . . . . . . . . . . . . . . . . . . . . . . . . .  5
             Run-Off Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
             Union Member Complaint Concerning 2004 National Elections . . . . . . . .  7
             Investigation by the U.S. Department of Labor (DOL) . . . . . . . . . . . . . . .  8

CONTESTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
     A.     This Court has Proper Jurisdiction over the APA and the Matters
             Raised in the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
     B.     The Complainant Properly Exhausted Internal Union Remedies
             Prior to Filing a Timely Complaint with the DOL . . . . . . . . . . . . . . . . . .  10

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

STATUTORY SCHEME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
     A.     The Purposed of the LMRDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
     B.     Ballot Secrecy Requirements of the LMRDA . . . . . . . . . . . . . . . . . . . . . .  14

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
     A.     The Challenged Election - Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
     B.     The Challenged Election - Remote Internet Voting System . . . . . . . . . . .  19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
     A.     The Remote Internet Voting System Used by the APA in its 2004
             National Officer Election and Run off Election Violated the LMRDA
             by Linking the Voters with their Respective Votes. . . . . . . . . . . . . . . . . .  21
     B.     The Violation of the LMRDA in the 2004 National Officer Election
             and Run off Election May have Affected the Outcome of the Election. . .  27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

# TABLE OF AUTHORITIES

## FEDERAL CASES

*America Federation of Musicians v. Wittstein*, 379 U.S. 171 (1964) . . . . . . . . . . . . . . 14

*Bachowski v. Brennan*, 413 F.Supp. 147 (W.D. Pa. 1976) . . . . . . . . . . . . 14, 16, 23, 29

*Brennan v. Local 3489, United Steelworkers of Am., AFL-CIO,*
 520 F.2d 516 (7th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Brock v. International Union of Operating Engineers, Local Union No. 369, AFL-CIO,*
 790 F.2d 508 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Donovan v. Air Transport District Lodge No. 146*, 754 F.2d 621 (5th Cir. 1985) . . . . . 10

*Donovan v. CSEA Local Union 1000, Am. Fed'n of State,* County *and Mun. Employees,*
 *AFL-CIO*, 594 F. Supp.188 (N.D.N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . 14, 15, 23

*Donovan v. Local 6, Washington Teachers' Union*, 747 F.2d 711 (D.C. Cir. 1984) . . . . 18

*Dunlop v. Bachowski*, 421 U.S. 56 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hodgson v. Local Union 6799, United Steelworkers of America, AFL-CIO,*
 403 U.S. 333 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hummel v. Brennan*, 469 F. Supp. 1180 (E.D. Pa. 1979) . . . . . . . . . . . . . . . . . . . . . . 17

*Kelly v. Local No. B-183, Int'l Alliance of Theatrical Stage Employees,*
 566 F. Supp. 1199 S.D.N.Y. (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Local 3489, United Steelworkers of Am., AFL-CIO v. Usery*, 429 U.S.305 (1977) . . . . 25

*Marshall v. American Postal Workers*, 486 F. Supp. 79 (D.D.C. 1980) . . . . . . . . . . . . 18

*Marshall v. Local Union 12447, United Steelworkers of America, AFL-CIO,*
 591 F.2d 199 (3rd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 23, 31-32

*Matsushita v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . 12

*Myers v. Hoisting and Portable Local 513*, 653 F. Supp. 500 (E.D. Mo. 1987) . . . . . . . 16

*Reich v. District Lodge 720, International Association of Machinists and*
    *Aerospace Workers, AFL-CIO*, 11 F.3d 1496 (9th Cir. 1993) . . . . . . . . . . . . 16, 17

*Usery v. Dist. 22, United Mine Workers of Am.*, 543 F.2d 744 (10th Cir. 1976) . . . . . . 25

*Usery v. Int'l Org. of Masters, Mates & Pilots, Int'l Maritime Division*,
    538 F.2d 946 (2nd Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Usery v. Stove, Furnace and Allied Appliance Workers*,
    547 F.2d 1043 (8th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 30

*Wirtz v. Am. Guild of Variety Artists*, 267 F. Supp. 527 (S.D.N.Y. 1967) . . . . . . . . . . 14

*Wirtz v. Hotel, Motel and Club Employees Union, Local 6*,
    391 U.S. 492 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 17-18, 25-27

*Wirtz v. Local 153, Glass Bottle Blowers Assoc.*, 389 U.S. 463 (1968) . . . . . . . . . . 13-15

## DOCKETED CASES

*Donovan v. Local Union 887, United Rubber, Cork, Linoleum and Plastic*
*Workers of Am.*, No. 81-41, 1982 WL 31275 (M.D. Ga. Oct. 14, 1982) . . . . . . . . . . . . 17

*Reich v. United Mine Workers of Am.*, No. 94-1691,
    1995 WL 791950 (D.D.C. Oct. 24, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## FEDERAL STATUTES

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 1702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 1708 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 1709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 U.S.C. § 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

29 U.S.C. § 481 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24

29 U.S.C. § 482 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9, 11-12, 27

29 C.F.R. § 452.97 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

29 C.F.R. § 452.107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION
_____

| | | |
|---|---|---|
| HON. ELAINE L. CHAO, | § | |
| SECRETARY, UNITED STATES | § | |
| DEPARTMENT OF LABOR, | § | |
| Plaintiff, | § | |
| | § | CIVIL NO. 4-05-CV-338-Y |
| v. | § | |
| | § | |
| ALLIED PILOTS ASSOCIATION, | § | |
| Defendant. | § | |

## PLAINTIFF'S BRIEF IN SUPPORT OF SUMMARY JUDGMENT

Plaintiff, Hon. Elaine L. Chao, Secretary, United States Department of Labor

("Chao"), by and through the United States Attorney for the Northern District of Texas

and the undersigned Assistant United States Attorney, in support of her Motion for

Summary Judgment filed on even date, would respectfully show the Court the following:

## I.

## UNCONTESTED FACTS

Allied Pilots Association

1.    The Allied Pilots Association ("APA") is a national labor organization engaged in
      an industry affecting commerce within the meaning of sections 3(i), 3(j) and
      401(a) of the Labor-Management Reporting and Disclosure Act of 1959
      ("LMRDA" or "the Act"), 29 U.S.C. §§ 402(i), (j) and 481(a).

2.    The APA maintains its principal office in Fort Worth, Texas. *See* Appx. 1, p. 001
      (APA responses to Plaintiff's Requests for Production).

3.    APA members are employed as pilots by American Airlines ("AA"), a unit of

AMR Corporation of Fort Worth, Texas.

4.      The APA elects a national President, Vice President, and Secretary-Treasurer to
        three-year terms.  *See* Appx. 1, pp. 002-003.

5.      The positions of national President, Vice President, and Secretary-Treasurer are
        "officer" positions under section 3(n) of the LMRDA, 29 U.S.C. § 402(n).

Events Leading Up to the Contested Elections

6.      The remote Internet and telephone voting systems used in the 2004 national officer
        election and run-off election at issue in the instant case (collectively "2004
        elections") were developed by the American Arbitration Association ("AAA") in
        New York, NY, and AAA's technology subcontractor, GetAGeek, Inc.  *See* Appx.
        2, pp. 020-023 (Deposition of Jeffrey Zaino); *see also* Appx. 3, pp. 055-056
        (Deposition of Ohmann at pp. 41-42, 53-55).[1]

7.      AAA provides election services to unions by assisting them conduct officer
        elections, contract ratifications, affiliations, and mergers.  *See* Appx. 2, pp. 018-
        019.

8.      Prior to the 2004 elections, the APA had used a remote Internet voting system
        substantially similar to the system used in the 2004 elections.  *See* Appx. 4, p. 070
        (Deposition of Richard Moyed); Appx. 5, p. 089 (APA's Responses to Plaintiff's
        First Set of Interrogatories).

9.      In investigating other aspects of the APA's remote Internet voting system raised in
        a complaint in 2003, the DOL discovered that some features of the remote Internet
        voting system could compromise ballot secrecy.  *See generally* Appx. 6, pp. 090-
        091 (Declaration of Mary Alice Cahir).

10.     Jeff Zaino, Vice President of Elections with the AAA, was aware prior to the 2004
        elections that the change vote feature in AAA's remote Internet voting system
        presented potential voter secrecy problems which could run afoul of Title IV of the
        LMRDA.  *See generally* Appx. 2, pp 051-053.

11.     In 2003, an investigator with the DOL advised Jon Ohmann, Director of Software
        Development for GetAGeek, that the change vote feature presented potential voter
        secrecy problems which could run afoul of Title IV of the LMRDA.  *See* Appx. 3,

---

[1]   Chao's only copy of Ohmann's deposition is in a condensed format.  Therefore, where
Ohmann's deposition is cited, the internal deposition page numbers will also be cited.

**Plaintiff's Brief in Support of Motion for Summary Judgment - page 2**

pp. 066, 068-069 (Deposition of Ohmann at pp. 106-107).

12.   By letter dated February 11, 2004, the DOL's Office of Labor Management Standards (OLMS) District Director, Debra Hall, advised APA that the "change vote" feature of the upcoming national election would likely violate Title IV.  *See* Appx. 7, p. 112.

13.   In the February 11, 2004, letter referenced above, OLMS District Director Debra Hall specifically advised APA that the "change vote" feature of the upcoming national election "would have to link the voter and his or her vote in order to permit any vote change . . . [which] would violate the secrecy requirements of Title IV . . . .   It does not matter that a third party, such as AAA, as opposed to the union, is managing the voting system." *See* Appx. 7, p. 112 .

14.   After receiving Debra Hall's letter regarding the remote Internet voting system proposed for use in the 2004 elections, APA contacted AAA, who represented that the remote Internet voting system was LMRDA compliant.  *See* Appx. 4, pp. 086-087.

15.   After receiving representations from the AAA that the remote Internet voting system proposed for use in the 2004 elections complied with the LMRDA, APA conducted no further inquiries into the system.  *See* Appx. 4, pp. 086-088.

16.   APA did not specify to AAA what requirements were necessary for compliance with the LMRDA, and instead relied upon representations by AAA that their remote Internet voting system was compliant.  *See* Appx. 4, p. 085.

2004 Elections

17.   The AAA was responsible for designing the ballot instructions and mailing those instructions to APA members.  *See* Appx. 2 at pp. 020-021.

18.   Ohmann was the computer technician for AAA-conducted elections.  *See* Appx. 3, p. 055 (Deposition of Ohmann at pp. 44-45); *see also* Appx. 2, p. 020.

19.   Pitney Bowes was AAA's mailing contractor.  *See* Appx. 2, p. 017.

20.   Winson Surnamer was AAA's printing contractor.  *See* Appx. 2, p. 040.

21.   The APA began its 2004 national election process on January 16, 2004, by mailing nomination notices to each member's last known address, by publishing notice in the union's magazine, Flightline, and by posting notices on union bulletin boards.

*See generally* Appx. 7, p. 100.

22.     Nominations were due February 6, 2004.  *See* Appx. 7, p. 100.

23.     To vote in the 2004 national election, union members accessed either the telephone voting system or the remote Internet voting system – http://www.aaaelections.org, a web site operated by the AAA.  *See generally* Appx. 2, pp. 027-028.

24.     On May 3, 2004, AAA's mailing contractor, Pitney Bowes, mailed the ballot instructions, which included a personal identification number (PIN) for the voters, and the voting web site and phone lines were activated.  *Accord* Appx. 7, pp. 100-102; *see also* Appx. 2, pp. 027-028.

25.     The PINs were generated by AAA's printing contractor, Winson Surnamer.  *See* Appx. 2, pp. 042, 048-049.

26.     Specific computers were not designated for voters in the 2004 elections; APA members could vote from any computer with internet access.  *See* Appx. 8, p. 113 (APA responses to Chao's First Set of Requests for Admissions).

27.     Once online, APA members used their employee identification number (EIN) and their AAA-supplied PIN.  *See* Appx. 2, pp. 027-028; *see also* Appx. 3, p. 059 (Deposition of Ohmann at pp. 71-72); Appx. 4, p. 074.

28.     The decision to use EINs as one of the two required personal identifiers was made by the APA.  *See* Appx. 2, p. 038.

29.     Any APA member in good standing could obtain the EINs of any other APA members from the APA's web site.  *See* Appx. 4, p. 072.

30.     Prior to voting, if an APA member lost his or her PIN, or never received one, that member could receive his or her PIN by phone or e-mail by contacting AAA headquarters and identifying him or herself.  *See generally* Appx. 2, p. 043.

31.     Under the established procedure, APA members needing their PINs were to have identified themselves by name, address, telephone number, EIN, Social Security number, or similar information.  *See* Appx. 2, pp. 024-025, 043-044.

32.     Voting was open twenty-four hours a day, and ended at 4 p.m. May 24, 2004.

33.     Two servers were used to conduct the election:  one, AAA's, handled member login and authentication; the other, operated by GetAGeek, generated the web

ballot pages and tallied the votes.  *See generally* Appx. 2, p. 026; *see also* Appx. 3, p. 059 (Deposition of Ohmann at pp. 69-70).

34.     Once Ohmann loaded the APA members' personal information into a database within his server, the system assigned a randomly generated number to the members' name, EIN, and PIN.  *See* Appx. 3, pp. 0059-060 (Deposition of Ohmann at pp. 72-73).[2]

35.     The randomly generated number was also saved in a separate database file with the vote cast.  *See* Appx. 3, pp. 059-060; 062.[3]

36.     The APA was unaware of the details of where or how APA members' information was stored, relying instead upon "representations made to [them] by AAA."  *See* Appx. 4, pp. 075-076; 079, 081-084.

37.     AAA kept APA members' information, including names, addresses, EINs and PINs in a control booklet, which was locked in AAA President Jeff Zaino's office at night, but was available around the AAA office for use during the day by AAA full-time staff.  *See generally* Appx. 2, pp. 015-016, 027-031, 045-046.

38.     AAA employees, specifically Jeffrey Zaino, Maria Gonzalez, and Linda Johnson, all had access to the control booklet referenced above, which contained APA members' PINs, EINs, and other personal information.  *See generally* Appx. 2, pp. 029-031.

39.     The printing service used by AAA, Winson Surnamer, had access to documents containing APA members' PINs, EINs, and other personal information.  *See* Appx. 2, pp. 040-041; Appx. 9, p. 115 (APA's responses to Chao's Second Set of Requests for Admissions at 5).

40.     Ohmann had APA members' PINs, EINs, and other personal information.  *See* Appx. 3, pp. 059-060 (Deposition of Ohmann at pp. 72-73); Appx. 9, p. 115.

Change Vote Feature of the 2004 elections

41.     APA requested that the remote Internet voting system used in the 2004 elections allow members to change his or her vote up until the deadline for voting.  *See* Appx. 3, p. 062 (Deposition of Ohmann at pp. 87-88); Appx. 4, pp. 084, 088.

---

[2]  This database is hereinafter referred to as the "member database."

[3]  This database is hereinafter referred to as the "vote database."

42.   Once an APA member voted initially, the "change vote" feature allowed the member to return to the web site, log in using the same information (i.e., PIN and EIN), and view and/or change his or her vote up until the deadline for voting.  *See* Appx. 2, pp. 032-033; Appx. 3, p. 062 (Deposition of Ohmann at pp. 86-87).

43.   To allow APA members to change their vote, there was a link in the computer system between the voters (member database) and their vote (vote database).  *See* Appx. 2, p. 034; Appx. 3, pp. 063, 065 (Deposition of Ohmann at pp. 91-92, 103-104).

44.   If an APA member chose to log back in and view or change his or her vote, the computer compared the member database and the vote database in order to load the correct vote for viewing and/or changing.

45.   If a APA member logged back in, that login was recorded, as well as whether the member changed his or her vote.  *Accord* Appx. 3, p. 061 (Deposition of Ohmann at pp. 77-78)

46.   Although the AAA and/or GetAGeek could determine whether a vote was re-accessed, they could not determine by looking at the system whether someone other than the rightful APA member accessed and viewed how a specific APA member voted.  *See* Appx. 3, pp. 063, 066 (Deposition of Ohmann at pp. 90, 106).

47.   An APA member could not determine by looking at the system whether someone other than himself or herself had accessed and viewed his or her vote.  *See generally* Appx. 2, pp. 037, 047; Appx. 3, p. 064 (Deposition of Ohmann at p. 93); Appx. 9, pp. 114-115.

48.   Any person with the required information, including the remote Internet voting address, the PIN, and EIN of the APA member, could log into the system with that information and from the website identify APA members with their votes, including whether a particular member had cast a ballot, and if so, for whom the ballot had been cast.  *See generally* Appx. 3, p. 063 (Deposition of Ohmann at p. 90).

49.   The employees of AAA with access to the election control book containing APA members' PINs and EINS could log onto the AAA website and identify APA members with their votes, including whether a particular member had cast a ballot, and if so, for whom the ballot had been cast.

50.   The employee(s) of the printing service, Winson Surnamer, using the APA

members' PINs and EINs in their possession, could log into the AAA website identify APA members with their votes, including whether a particular member had cast a ballot, and if so, for whom the ballot had been cast.

51.   Ohmann, who had access to APA members' PINs and EINs, could log into the AAA website and identify APA members with their votes, including whether a particular member had cast a ballot, and if so, for whom the ballot had been cast.

52.   The link between the APA member and the vote(s) cast in the 2004 elections was maintained until the tally of the votes at the close of the election. *See generally* Appx. 2, p. 036; Appx. 9, p. 115.

53.   Ohmann had access to the membership database as well as the vote database. *See* Appx. 3, p. 065 (Deposition of Ohmann at p. 103).

54.   By cross-referencing the randomly generated numbers between the two databases, Ohmann could determine how APA members voted.

55.   After tallying the votes, the randomly generated numbers were removed from the database containing members' personnel information. *See generally* Appx. 3, p. 063 (Deposition of Ohmann at p. 92).

Run-Off Election

56.   No candidate received a majority of the votes in the initial round of the APA national officer election, thus requiring a run-off election, which was also conducted by the AAA using remote Internet voting and telephone voting. *See generally* Appx. 7, p. 101; *see also* Appx. 2, p. 056.

57.   PINs were again mailed, and voting was open beginning June 1, 2004, through 4 p.m. CST June 22, 2004. *Accord* Appx. 6, pp. 101-102.

58.   The APA released the election results of the run-off on June 22, 2004. *Accord* Appx. 6, p. 102.

Union Member Complaint Concerning 2004 National Officer Elections

59.   The APA's election protest procedures are set forth in its Constitution and Bylaws. Article IV, Section 6, states: "The Appeal Board shall consider all complaints, protests, or appeals concerning APA elections received in writing from any member in good standing provided they have been received by the Appeal Board within ten (10) days after the later of the completion of the election or the run-off

election. . . . The Appeal Board shall issue its written finding or decision as soon a practicable within sixty (60) days of receipt of a written protest, complaint or appeal." *See* Appx. 1, p. 004.

60.     By letter dated July 1, 2004, Captain Mark Hunnibell, the losing candidate for the position of APA President, protested the election results to the APA Appeal Board. *See* Appx. 7, p. 098.

61.     Captain Hunnibell's July 1, 2004, complaint was filed timely under the APA Constitution and Bylaws. *See* Appx. 7, p. at 098.

62.     In his protest to the union, Captain Hunnibell alleged, inter alia, that the APA failed to provide for a secret ballot election in that the remote Internet voting system did not comply with the secret ballot requirements of the LMRDA. Appx. 7, p. 105.

63.     In his protest to the union, Captain Hunnibell alleged that the election servers were not secure, and that EINs, PINs, and votes were not encrypted. He also alleged that PINs were improperly distributed, both in that certain APA members received the PINs of other members stuck to their own PINs in the mail, and that AAA election staff failed to follow their own identification procedures in distributing PINs to those members that did not receive theirs originally. *See generally* Appx. 7, pp. 103, 105, 108-110.

64.     In his protest to the union, Captain Hunnibell specifically referenced the February 11, 2004, letter from OLMS District Director Debra Hall wherein she advised APA that the "change vote" feature of the upcoming national election would likely violate Title IV of the LMRDA. *See* Appx. 7, pp. 106-107; *see also* Appx. 4, pp. 077-078.

65.     By decision dated September 16, 2004, the Appeal Board rejected Captain Hunnibell's protest. *See* Appx. 7, p. 097.

<u>Investigation by the U.S. Department of Labor</u>

66.     Captain Hunnibell filed a timely complaint with the Department of Labor on October 15, 2004, pursuant to section 402(a)(1) of the LMRDA, 29 U.S.C. § 482(a)(1). *See* Appx. 7, p. 094.

67.     The DOL investigated Captain Hunnibell's complaint, and by a series of letters dated October 27, 2004, December 20, 2004, March 1, 2005, April 7, 2005, and April 22, 2005, the APA agreed that the time within which the DOL could bring

suit with respect to the APA's election be extended to May 27, 2005.  *See* Appx. 6, p. 095.

68.    Pursuant to section 601 of the Act (29 U.S.C. § 521), and in accordance with section 402(b) of the Act (29 U.S.C. § 482(b)), the DOL investigated the complaint and, as a result of the facts shown by her investigation, found probable cause to believe that violations of Title IV of the Act (29 U.S.C. §§ 481- 484) had occurred in the conduct of the APA's June 22, 2004, election that may have affected the outcome of the election and that had not been remedied at the time of the institution of this action.  *See* Complaint at 3.

69.    During the investigation into the 2004 elections, APA conducted a survey of its members querying whether the members re-entered the remote Internet voting system for any reason and whether there was any evidence of tampering with their vote.  *Accord* Appx. 1, pp. 005-010.

70.    According to the results of the survey provided to Chao, 110 APA members responded to APA's survey.  *Accord* Appx. 1, pp. 005-010.

71.    Four of the members who responded to the survey stated that they re-entered the system due to concerns that persons other than themselves could have changed their vote.  *See* Appx. 1, pp. 011-014.

## II.

## CONTESTED FACTS

Chao believes that there are no material facts in dispute.

## III.

## STATEMENT OF JURISDICTION

**A.     This Court Has Proper Jurisdiction Over the APA and the Matters Raised in the Complaint.**

Section 402(b) of the LMRDA authorizes the Secretary of Labor, upon complaint

by a union member who has exhausted internal union remedies, to file a civil action

against the labor union as an entity, "in the district court of the United States in which

such labor organization maintains its principle office," when an investigation of the

complaint gives the Secretary probable cause to believe that the union election was not

conducted in compliance with the standards prescribed in section 401 of the Act.  29

U.S.C. § 481.  If the Court finds that a violation of section 401 has occurred which "may

have affected the outcome of an election," it "shall declare the election, if any, to be void

and direct the conduct of a new election under supervision of the Secretary." *Id.*  The

Allied Pilots Association ("APA") is a national labor organization engaged in an industry

affecting commerce within the meaning of sections 3(i) and 3(j) and 401(a) of the

LMRDA.  The APA's principal office is in Fort Worth, Texas.  *See* Appx. 1, p. 001. The

Secretary of Labor (hereinafter "DOL" or "Chao") investigated the complaint and, as a

result of the facts shown by her investigation, found probable cause to believe that

violations of Title IV of the Act (29 U.S.C. §§ 481- 484) had occurred in the conduct of

the APA's June 22, 2004, election that may have affected the outcome of the election and

that had not been remedied at the time of the institution of this action.  *See* Complaint at

3.

**B.**     **The Complainant Properly Exhausted Internal Union Remedies Prior to
         Filing a Timely Complaint with the Department of Labor**.

The DOL's authority under section 402 does not authorize the DOL to challenge

*all* violations of section 401 discovered while investigating the member's complaint.  *See*

*Donovan v. Air Transport District Lodge No. 146*, 754 F.2d 621, 627 (5th Cir. 1985).

Rather, in seeking to minimize governmental intrusion into unions, Congress specifically

directed the DOL to confine its efforts to those violations of which the union was fairly

apprised.  *See Hodgson v. Local Union 6799, United Steelworkers of America, AFL-CIO*, 403 U.S. 333, 341 n. 6 (1971) (dicta) (rejecting notion that the DOL can file suit on any violation of the LMRDA uncovered during an investigation of a union's election where that violation was not first raised to the union through the internal grievance procedure).

APA's election protest procedures are set forth in its Constitution and Bylaws. Article IV, Section 6, states:  "The Appeal Board shall consider all complaints, protests, or appeals concerning APA elections received in writing from any member in good standing provided they have been received by the Appeal Board within ten (10) days after the later of the completion of the election or the run-off election. . . . The Appeal Board shall issue its written finding or decision as soon as practicable within sixty (60) days of receipt of a written protest, complaint or appeal."  *See* Appx 1, p. 004.

The APA released the final results of the election challenged herein on June 22, 2004.  *See* Appx. 7, p. 098.  By letter dated July 1, 2004, less than 10 days after the conclusion of the election, Captain Hunnibell protested the election results to the APA Appeal Board.  *See id.*, pp. 098.  By decision dated September 16, 2004, the Appeal Board rejected Captain Hunnibell's protest.  *See id.* at 097.  Having thus exhausted the available remedies under the APA Constitution and Bylaws, the complainant filed a timely complaint with the DOL on October 15, 2004, pursuant to section 402(a)(1) of the LMRDA, 29 U.S.C. § 482(a)(1).  *See* Appx. 7, p. 094.  The DOL investigated Captain Hunnibell's complaint and found probable cause to believe that a violation of the LMRDA had occurred, and that the violation may have affected the outcome of the

election.  Complaint, p. 3.  After securing extensions of time beyond the statutory window for filing suit, Chao ultimately filed the instant Complaint.  *See* Appx. 7, p. 095.

## IV.

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Although the moving party has the burden of demonstrating the absence of genuine issues of fact, the nonmoving party "may not rest upon the mere allegation or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Although the LMRDA language provides for relief "after a trial upon the merits," 29 U.S.C. § 482(c), courts have uniformly agreed that summary judgment can be an appropriate vehicle for resolution of LMRDA actions.  *See Usery v. Int'l Org. of Masters, Mates & Pilots, Int'l Maritime Div.*, 538 F.2d 946, 949 n. 5 (2nd Cir. 1976) (noting that "[t]he language [of 29 U.S.C. § 482(c)] is not to be read literally and summary judgment lies in a proper case") (*citing Brennan v. Local Union No. 639*, 494 F.2d 1092, 1094-98 (D.C. Cir. 1974)).

## IV.

## STATUTORY SCHEME

### A.    The Purpose of the LMRDA

The principal purpose of the LMRDA is to ensure fair and democratic practices in unions.  In the 1950's, Congress investigated the nation's unions and found corruption in union leadership and disregard for the rights of the rank and file members.  *See Wirtz v. Hotel, Motel and Club Employees Union, Local 6*, 391 U.S. 492, 497-98 (1968) ("Local 6"); *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 468-70 (1968) ("Local 153").  Through the LMRDA, Congress sought to "protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government."  *Local 6*, 391 U.S. at 497.  Congress equated the interests of union members in democratic union elections with the public interest in general, and sought "to protect the public interest by assuring that union elections would be conducted in accordance with democratic principles."  *Id.* at 496-97; *see also* 29 U.S.C. 401(a) (LMRDA designed to protect "the rights and interests of employees and the public generally").  The LMRDA was thus expressly designed "to prevent, discourage, and make unprofitable, improper conduct on the part of union officials, employers and their representatives."  S.Rep. No. 187, 86th Cong., 1st Sess., reprinted in 1959 U.S.C.C.A.N., 2318, 2321.  Recognizing that free and fair elections were essential to union self-government, Congress provided the safeguards of Title I and Title IV of the Act, which include, *inter alia*, the right to a secret ballot, a prohibition against campaigning in

the polling place, preservation of the ballot, etc., "to provide a fair election and to

guarantee membership participation." *Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171,

182 (1964); *see also Local 153*, 389 U.S. at 470-71 & n.9 ("Title IV's special function in

furthering the overall goals of the LMRDA is to insure 'free and democratic' elections"

with strict procedural safeguards); *Wirtz v. Am. Guild of Variety Artists*, 267 F. Supp. 527,

544 (S.D.N.Y. 1967) (noting that Congress intended that unions conduct democratic and

scrupulously fair elections).

**B.     Ballot Secrecy Requirements of the LMRDA**

One of the principal election protections of the LMRDA's Title IV is the

requirement that elections be conducted by secret ballot.  29 U.S.C. § 481(a) provides that

"[e]very national or international labor organization, except a federation of national or

international labor organizations shall elect its officers not less often than once every five

years either by secret ballot among the members in good standing or at a convention of

delegates chosen by secret ballot."  A "secret ballot" is "the expression by ballot, voting

machine, or otherwise, but in no event by proxy, of a choice with respect to any election

or vote taken upon any matter, which is cast in such a manner that the person expressing

such choice cannot be identified with the choice expressed."  29 U.S.C. § 402(k).  With

the secrecy requirement, "Congress meant to eliminate any form of potential coercion or

intimidation . . . ."  *Bachowski v. Brennan*, 413 F. Supp. 147, 150 (W.D. Pa. 1976);[4] *see*

---

[4] There is very little Fifth Circuit law addressing LMRDA with respect to ballot secrecy in general, and none that addresses ballot secrecy in the context of the Internet.  Thus, while recognizing that the law of other circuits is not binding on this Court, Chao has cited to the available case law as persuasive authority on the issue of ballot secrecy.

*also Donovan v. CSEA Local Union 1000, Am. Fed'n of State, County and Mun. Employees, AFL-CIO* ("Local Union 1000 "), 594 F. Supp. 188, 196 (N.D.N.Y. 1984), *aff'd in part and rev'd in part*, 761 F.2d 870 (2nd Cir. 1985) ("The potential chilling effect is at the heart of the [LMRDA] since voters are doubtless reluctant to have their votes attributed to them.").

        The secrecy requirement is construed strictly.  *See Local Union 1000*, 594 F. Supp. at 196 (*citing Marshall v. Local Union 12447, United Steelworkers of Am., AFL-CIO*, 591 F.2d 199, 203 n.10 (3rd Cir. 1978) ("Local Union 12447 ")).  To fulfill the intent of Congress that unions conduct fully democratic elections, courts have interpreted the secrecy requirements of Title IV of the LMRDA to equate the procedures required in union elections to those in political elections.  *See Local 6*, 391 U.S. at 504 (noting that "Congress' model of democratic elections was political elections in this country," and thus rejecting a union's election procedure for qualifying candidates for the ballot where the procedure did not correspond to that of political elections);  *see also Local Union 12447*, 591 F.2d at 203 n.6, 205 (noting that "every reasonable precaution to ensure that the facilities available for balloting are used in a manner similar to their use in political elections in this country, i.e., in such a manner that voters cannot be identified with their choices"); *Brennan v. Local 3489, United Steelworkers of Am., AFL-CIO*, 520 F.2d 516, 521 (7th Cir. 1975) ("Local 3489") (*citing Local 153*, 389 U.S. at 471-472) (noting that "unions must run elections that conform to the democratic principles embodied in the secret ballot mandate.")  In overturning the union's election in *Local 3489*, the Seventh

Circuit made clear that the statute requires all voters to vote in secret, as in a political election: "The statutory mandate is for a vote that 'cannot' be identified with the voter . . . . The act requires a mandatory secret ballot, not one permitting a voter to mark his ballot in secret with the danger of identification implicit in securing that secrecy." 520 F.2d at 522.

The secret ballot right extends beyond the mere act of voting in secret. It also encompasses secrecy after the member casts the ballot, including the collection of ballots and the vote tallying process. *See Reich v. District Lodge 720, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO* ("District Lodge 720"), 11 F.3d 1496, 1500 (9th Cir. 1993) (secrecy mandate encompasses any procedure designed to determine how individuals voted); *see also Bachowski*, 413 F. Supp. at 150 (noting that "[t]he requirement of secrecy would seem to include not only the right to vote in secret . . . but also the right to secrecy after the ballots are cast. Any post-voting device by which it can be determined how a particular voter voted would be a violation of secrecy . . . ."); 29 C.F.R. § 452.97(a) (providing that ballots must not contain any markings upon which examination would enable one to identify it with the voter.) If voters *could* be identified with their votes at any point in the balloting process, even if there is no evidence that they were or that any harm resulted, the election process violated the LMRDA. *See Local Union 12447*, 591 F.2d at 203 n.10; *see also Myers v. Hoisting and Portable Local 513*, 653 F. Supp. 500, 510 (E.D. Mo 1987) ("The fact that no one testified that he saw how another voted or saw anyone vote twice is not sufficient proof to show the outcome was

unaffected because the evidence was clear that under the crowded conditions of the hall, voters could have been identified with their choices."); *Hummel v. Brennan*, 469 F. Supp. 1180, 1193 (E.D. Pa. 1979) (finding voting procedures faulty because voters could have been identified with their choices and noting: "Although no testimony was presented to indicate that voters were actually viewing each other's ballots or that there was a chilling effect on privacy, this showing is not required . . . ."); *Donovan v. Local Union 887, United Rubber, Cork, Linoleum and Plastic Workers of Am.*, No. 81-41, 1982 WL 31275 *1 (M.D. Ga. Oct. 14, 1982) (once it is shown that the election methods allowed voters to be identified with their choices, it is not required that voters actually were identified with their choices) (attached hereto as Appx. 10, pp. 117-118).

"[T]he statute relies upon the special knowledge and discretion of the Secretary for the determination of *both the probable violation and the probable effect*" on the outcome of an election. *Dunlop v. Bachowski*, 421 U.S. 560, 571 (1975) (emphasis in original); *accord Local 6*, 391 U.S. at 506-07*; see also District Lodge 720*, 11 F.3d at 1499 (*citing Local 6*). Once the Secretary has shown a violation of section 401 of the LMRDA, the Secretary has also established a prima facie case that the violation may have affected the outcome of the election. *Accord Local 6*, 391 U.S. at 506-07*; see also Reich*, 11 F.3d at 1499 (*citing Local 6*). An actual effect on the election need not be shown. *See id.*

To defeat the presumption that outcome may have been affected, a union must come forward with "tangible *evidence*" that the outcome was not affected. *See Local 6*, 391 U.S. at 508 (emphasis added). The burden upon a defendant union to show that the

violation did not affect the election outcome is substantial. *See Brock v. International Union of Operating Engineers, Local Union No. 369, AFL-CIO*, 790 F.2d 508, 513 (6th Cir. 1986) (*citing Local 6*). Findings of harmlessness have generally been confined to situations in which the particular violation can clearly be shown to have been isolated in its effect. *See, e.g., Usery v. Stove, Furnace and Allied Appliance Workers*, 547 F.2d 1043, 1046 (8th Cir. 1977); *Marshall v. American Postal Workers*, 486 F. Supp. 79, 82 (D.D.C. 1980); cf. *Donovan v. Local 6, Washington Teachers' Union*, 747 F.2d 711 (D.C.Cir. 1984).

## V.

## BACKGROUND

### A.     The Challenged Election - Process

The APA began its 2004 national election process on January 16, 2004, by mailing nomination notices to each member's last known address, by publishing notices in the union's magazine, Flightline, and by posting notices on union bulletin boards. *See generally* Appx. 7, p. 100. Nominations were due February 6, 2004. *See id.* On May 3, 2004, Pitney Bowes mailed ballot instructions and PINs to APA members and the voting web site and telephone lines were activated. *Accord id.*, pp. 100-102; *see also* Appx. 2, pp. 027-028. These instructions were created by a printing company hired by the AAA, Winson Surnamer. *See* Appx. 2, pp. 042, 048-049. Voting was open twenty-four hours a day, and ended at 4 p.m. May 24, 2004. No candidate received a majority of the votes, thus the top vote recipients for each race advanced to a run-off. *See generally* Appx. 7, p.

101.  The runoff election was also conducted by the AAA using remote Internet voting and telephone voting.  *See* Appx. 2, p. 056.  PINs were again mailed, and voting was open from June 1, 2004, through 4 p.m. CST June 22, 2004.  *See generally*, Appx. 7, pp. 101-102.

Captain Hunnibell, the losing candidate for the position of APA President, protested the election.  *See* Appx. 7, p. 098.  In his protest to the union and in his subsequent complaint to the DOL, Captain Hunnibell alleged, inter alia, that the APA failed to provide for a secret ballot election in that the remote Internet voting system did not comply with the secret ballot requirements of the LMRDA.  *See id.*, pp. 103, 105, 108-110.  By decision dated September 16, 2004, the Appeal Board rejected Captain Hunnibell's protest.  *See id*, p. 097.

**B.     The Challenged Election - Remote Internet Voting System**

Most APA members used remote Internet voting, casting their votes through web browsers over the Internet via PC's available at members' homes, libraries, work places or elsewhere, to the election web servers at AAA headquarters in New York.  Two servers were used to conduct the election:  one, operated by AAA, handled member login and authentication; the other, operated by GetAGeek, generated the ballots and tallied the votes.  *See generally* Appx. 2, p. 026; Appx. 3, p. 059 (Deposition of Ohmann at pp. 69-70).  This system had been used by the APA since 2002 to conduct a variety of elections.  *See* Appx. 4, p. 070; Appx. 5, p. 089.

Once an APA member voted initially, the member could return to the web site, log

back in using the same PIN, and change his or her vote up until the deadline for voting. *See* Appx. 2, pp. 032-033; Appx. 3, p. 062 (Deposition of Ohmann at p. 86). When that member logged back in, that login was recorded, as well as whether the member changed his or her vote. After the member submitted his or her vote to the vote database file, the system assigned a randomly generated number to the member's name, EIN, and PIN. *See* Appx. 3, pp. 059-060 (Deposition of Ohmann at pp. 72-73). The randomly generated number was also saved in a separate database file along with the vote cast. *See id.* If a member chose to log back in and view or change his or her vote, the computer compared the two files in order to load the correct vote for viewing and/or changing. While Ohmann denied doing so, Ohmann acknowledges that he had access to both databases, and thus had the ability to cross-reference the randomly generated numbers between the two databases and determine how members voted. *See generally id.* at 060-61 (Deposition of Ohmann at p. 103); *see also* Appx. 9, p. 116. Anyone else in possession of an APA member's PIN and EIN could log into the AAA's website with that information and identify the APA member with his or her vote.

As noted above, the DOL is generally limited in its review of union elections to those issues fairly raised by a complainant to the union. 29 U.S.C. § 481. However, in investigating aspects of the remote Internet voting system raised in a complaint in 2003, the DOL discovered that some features of the remote Internet voting system could compromise ballot secrecy. *See generally* Appx. 7, pp. 090-091. Prior to the 2004 elections, the DOL advised AAA and its technology subcontractor, GetAGeek, of its

concerns relative to ballot secrecy.  *See generally* Appx. 2, pp. 051-053; Appx. 3, pp. 066, 068-069 (Deposition of Ohmann at pp. 106-107).  By letter dated February 11, 2004, to the APA, OLMS District Director Debra Hall specifically questioned whether the remote Internet voting system to be utilized by the APA in the 2004 national officer elections would preserve ballot secrecy.  *See* Appx. 7, p. 112.  According to the APA, it contacted AAA with respect to Hall's concerns, and was advised that the AAA's remote Internet voting system complied with federal regulations.  *See* Appx. 4, pp. 086-087.  APA took no additional steps to address the DOL's concerns with respect to the remote Internet voting system.  *See id.*, pp. 086-088.

# VI.

## ARGUMENT

**A.    The Remote Internet Voting System Used by the APA in its 2004 National Officer Election and Run off Election Violated the LMRDA by Linking the APA Members with Their Respective Votes.**

The remote Internet voting system and methods used to employ that system in the 2004 elections linked the members to his or her vote, in violation of the secrecy provision of section 401 of the LMRDA.  Specifically, Ohmann, of GetAGeek, had access to databases containing APA members' personnel information, including EINs and PINs for the 2004 election, as well as the database containing the actual vote casts by APA members.[5]  *See* Appx. 3, pp. 059-060, 067 (Deposition of Ohmann at pp. 70-76, 120);

---

[5]  Chao has no evidence, and does not suggest, that Ohmann in fact viewed whether, and/or how, any particular APA member voted.  However, as set forth in more detail *supra*, such evidence is not necessary to establish a violation of the LMRDA.  Rather, the fact that he *could* view such information is a violation of the Act.

Appx. 9,  p. 115.  By cross-referencing the information contained in those databases,

Ohmann could easily identify APA members with their votes cast, thus determining both

whether a particular APA member voted, and how he or she voted.  It would be

*impossible* for the member to know whether his or her vote had been viewed, and

impossible for Chao, upon receiving an appropriate complaint, to determine the same.  In

addition, AAA employees, as well as employees of its printing company Winson

Surnamer, had access to APA members' EINs and PINs.  *See generally* Appx. 2, pp. 029-

031, 040-041; Appx. 9, p. 115 (APA's responses to Chao's Second Set of Requests for

Admissions at 5).  Entering that information into the AAA's website would have allowed

them to identify APA members with their vote, again determining both whether and how

a particular member voted.[6]

        As previously noted, the secret ballot right extends beyond the mere act of voting

in secret.  It also includes secrecy after the member casts the ballot, extending to the

collection of ballots and the vote tallying process, even if that process is conducted by a

third party election administrator.  As such, the APA's utilization of AAA, a purportedly

neutral party, does not negate the breach of secrecy in this case.  Indeed, a union's

reliance on the neutrality of a third party administrator was discussed and rejected in

---

[6]  In addition, through an error in  mailing, some APA members received the PIN of other APA
members. *See, e.g.* Appx. 7, p.110.  By using that information, along with the other members' EINs,
which were available through the APA website, those persons could have identified APA members with
their votes cast.  DOL notes that while Hunnibell complained about members receiving the PINs of other
members as a separate charge of lack of adequate safeguards in the election process, the DOL does not
press this concern as a separate charge against the 2004 election herein, as the number of voters affected
by this irregularity could not have affected the outcome of the election.  It is, however, another example
of the breach of ballot secrecy in the 2004 elections

**Plaintiff's Brief in Support of Motion for Summary Judgment - page 22**

*Local Union 1000. See Local Union 1000*, 594 F. Supp. at 196.  There, the ballot in question was a perforated card, on which the voter signed his or her name for verification on the top half, voted on the bottom half, and mailed the intact card to a third-party election administrator for tallying.  *See id.* at 195.  The identification portion of the ballot was to be separated by the independent third-party election administrator before the votes were tallied.  *Id.*  Despite Local Union 1000's argument that the policy goals of the LMRDA were preserved through the good faith and independence of the third-party administrator, the court ordered a new election, citing the "overwhelming preference for absolute security" expressed in *Local Union 12447* and *Bachowski.  See id*. at 196-7.  The court wrote:  "It is clear . . . that CSEA violated the secrecy provision, since voters were capable of being identified with their ballots" during the tabulation process.  *Id.* at 196.  The union's assurances that the voting method was confidential and that the third-party administrator would tabulate the ballots was accorded no weight in the court's analysis:  "[t]here could be no assurance to the reticent member that his vote would truly remain anonymous."  *Id.*[7]  In sum, "Any violation of the right to secrecy either at the time of voting or by subsequent procedures of handling the ballots constitutes a substantive and material infringement of the voter's rights" and violates Title IV.  *Bachowski*, 413 F.

---

[7]  While perhaps stringent on its face, the rationale for rejecting the neutrality of third-party election administrators is in accordance with Congress' intent to ensure free and fair elections.  The focus of Title IV is on ensuring the rank and file a transparent procedure for voting in union elections.  Although Congress wished to minimize government interference in these elections, by enacting the LMRDA, Congress clearly meant to set forth a clear system for the prevention and/or detection of any actions not in accordance with democratic principles, which includes secrecy of the ballot.  The Union cannot ignore these requirements by hiring a third-party election administrator that does not conduct elections with political-election-grade security.

Supp. at 150.

The DOL acknowledges that in any balloting and election process, there may be the *possibility* of linking a voter with his or her physical ballot, and thus his or her vote, at some point in the process.[8]  The DOL does not believe that Congress was blind to the realities that these possibilities exist.  Rather, as noted *supra*, through LMRDA and the regulations promulgated thereunder, Congress, and subsequently the DOL, sought to ensure ballot secrecy through methods and procedures for the prevention of secrecy violations, and the detection of such violations should such occur.  For example, under Section 401(c) of the Act, each candidate is permitted to have an observer at the polls and at the counting of the ballots.  *See* 29 U.S.C. § 481(c); 29 C.F.R. § 452.107(a).  Observers help alleviate concerns of improper conduct at the polling places.  For elections conducted by mail, candidates are permitted to have an observer present at the preparation and mailing of the ballots, the receipt of those ballots by the counting agency, and at the opening and counting of the ballots.  *See* 29 C.F.R. § 452.107(c).  It would be difficult to covertly open and reseal both the sealed outer envelopes, as well as the sealed inner envelopes, and any improper viewing or tampering with the ballots would generally be visible to the observer and to any others.  Further, additional protections also exists for mail balloting, such as postal regulations prohibiting mail theft and tampering with U.S.

---

[8] For example, in an elections where voters vote at specific polling places, the voter can be linked to his or her vote up until the time when the ballot is dropped in the ballot box.  In a political mail ballot election conducted under the double envelope method, there exists the possibility that someone could open both the outer and the inner envelope together, thus improperly linking the voter with his or her vote.

**Plaintiff's Brief in Support of Motion for Summary Judgment - page 24**

mail.  *See, e.g.,* 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1702 (obstruction of

correspondence); 18 U.S.C. § 1708 (theft of mail by non-postal person) and 18 U.S.C. §

1709 (theft of mail by postal employee).  Thus, in a properly run election, the link

between the voter and the actual vote cast is never realized.  However, none of these

protections were part of the APA's 2004 elections.

  In short, courts require the same secrecy standards for a Title IV election,

including one utilizing a remote Internet voting system, as a political election.  *See Local*

*6*, 391 U.S. at 504 (noting that "Congress' model of democratic elections was political

elections in this country").  Although the DOL has not adopted a specific policy with

respect to Internet voting, the absence of such a policy is immaterial.  The requirements of

the Act, including ballot secrecy, have not changed since the enactment of the LMRDA in

1959.  Substantial case law is available interpreting the secrecy provision of the LMRDA,

and the DOL has issued guidelines on polling places and mail ballots, from which

guidance can be easily extrapolated in determining how to fulfill the statutory

requirements of the LMRDA in other types of elections.  APA was required to adhere to

those requirements.  *See Local 3489, United Steelworkers of America, AFL-CIO v. Usery*,

429 U.S. 305 (1977) (rejecting the union's complaint that absence of specific rules by

DOL justified its use of a procedure ultimately deemed to violate LMRDA); *see also*

*Usery v. District 22, United Mine Workers of America*, 543 F.2d 744, 749 (10th Cir.

1976) (rejecting union's argument that "because neither the statute nor the Secretary's

regulations plainly stated its nomination requirements violated the LMRDA and because

the Secretary refused to render an advisory opinion when the Union requested it after

Roybal's complaint" the election should not be overturned).  Although unions may not

always be able to reasonably anticipate breaches of ballot secrecy where a bad actor or

intruder is involved, they must take all available measures to ensure the integrity of the

election system, which includes procedures for the prevention of viewing and/or

tampering with votes, and the detection of such viewing or tampering.  The elections

conducted here did not include these mechanisms to protect voter secrecy and ensure the

honesty of the election administrators.  The system did not allow for observers at the

voting or tallying processes, and the election administrators could, in a manner that would

be undetectable, access the change vote feature and/or otherwise cross-reference the

member database and vote database to identify APA members with their votes.  The fact

that the administrators had such unfettered access, without observers, exacerbates the

concern that the administrators' actions were and are completely undetectable.

Finally, while there has been no suggestion of malfeasance on the part of the APA,

"Congress designed Title IV to curb the possibility of abuse by benevolent as well as

malevolent entrenched leaderships." *Local 6*, 391 U.S. at 503.  The remote Internet

voting system here linked the vote to the voter, and the APA was aware of the DOL's

concerns with that link.  The LMRDA does not permit a union to abrogate its

responsibility to union members by "inquiring" with a contractor as to whether its system

complies with the LMRDA, and relying on representations it did.  Rather, the LMRDA

places the burden on the union to ensure that members vote in secret.  *See* 29 U.S.C.

§ 401(b); accord *Local 12447,* 591 F.2d at 204 (noting that "[i]n [*Local 3486*], the local

union had argued for a permissive interpretation of the [secrecy regulation] but that court

held, as do we, that the union had a duty to assure that the ballots are marked in secret").

Similarly, the DOL's mandate under the LMRDA to investigate complaints of violations

of the LMRDA cannot be fulfilled simply at the word of an election official where it is

clear that the system is created in such a way as to link union members to their votes.

**B.      The Violation of the LMRDA in the 2004 National Officer Election and Run
         off Election May Have Affected the Outcome of the Election.**

The LMRDA states that "[i]f, upon a preponderance of the evidence after a trial

upon the merits, the court finds . . . that the violation of § 481 of this title may have

affected the outcome of an election, the court shall declare the election . . . to be void and

direct the conduct of a new election under supervision of the Secretary . . . ." 29 U.S.C. §

482(c) (emphasis added); *see also Local 6*, 391 U.S. at 506-08 (new election required

where there was a logical inference that the violation "may have affected" an election's

outcome and no "tangible evidence" to contradict that inference).  The strict construction

of ballot secrecy when determining whether a violation occurred under the LMRDA is

also accorded in the analysis of whether that violation may have affected ballot secrecy.

Indeed, once the DOL establishes that a violation in fact occurred, that violation *alone* is

prima facie evidence that the outcome of a union election may have been affected.  *See*

*Usery*, 547 F.2d at 1046 ("We think the language and intention of the Supreme Court [in

*Local 6*] is clear.  A proved violation of § 401 will have the effect of establishing a prima

facie case that the violation may have affected the outcome."); *see also Local 12447*, 591

F.2d at 203, n.10 (noting that while there was no credible testimony presented that voters

actually viewed how others voted, that alone was sufficient to establish that outcome may

have been affected, as

> [i]t is evident from the italicized language [in Section 3(k)] that the
> statutory standard for secrecy focuses on the adequacy of the method by
> which voting was conducted.  Once it is shown that that method was
> deficient because voters *could* have been identified with their choices, there
> is no additional requirement that union members come forward to testify
> that they took advantage of this opportunity to view other voters' ballots.)

(Emphasis added).  Once the prima facie case is established, the burden shifts to the union

to show that the violation had no effect on the outcome of the election.  *Usery*, 547 F.2d at

1046.

As the above suggests, the focus of the courts and the DOL in ballot secrecy cases

is not simply a matter of determining whether any one individual's vote was actually

compromised.  Rather, the focus is on the adequacy of the methods used in determining

ballot secrecy, and consideration is given to the entire scope of the possible affect on

outcome.  *Accord Local 12447*, 593 F.2d at 203 n.10.  As such, notwithstanding the

presumption on its affect in ballot secrecy cases, not every breach of ballot secrecy will

necessitate overturning a union's election.  The DOL seeks to determine whether there

was a localized breach that can be quantified in a reasonable manner, or whether there

was a systemic problem of a nature that cannot be readily quantifiable.  *See* Appx.6, p.

092.  If within a disputed election it is clear that only a certain number of ballots could

have been affected, and, after quantifying those infected ballots it is clear that the

outcome was not affected, the DOL could decline to challenge the entire election.  *See id.*

**Plaintiff's Brief in Support of Motion for Summary Judgment - page 28**

However, where the problem is systemic, as it is here, that election must be overturned. *See id.*, pp. 092-093.

For example, in *Bachowski*, the Secretary used a method of calculating the effect of the outcome on scattered ballot secrecy violations that "eliminate[d] the winner's margin of victory, and treat[ed] the result as if the winner and the challenger had obtained an equal number of votes" in each of several separate local voting units. *Bachowski*, 413 F. Supp. at 149-50.  The method was intended to "give the complainant the maximum benefit for which there is a reasonable probability." *Id.* at 150 (internal quotes omitted). The court rejected this method of analysis and directed the Secretary, in assessing the effect on the  outcome of a ballot secrecy violation, to assume that every voter in an affected voting unit would have voted, and voted for the losing candidate.  *See id.* at 151. The court admonished that since lack of secrecy can influence both whether and how a voter votes, "lack of secrecy can not be countenanced in the light of the clear intent expressed by Congress."  *See id.* at 150-51.  Similarly, in *Local Union 1000*, 5,600 ballots were submitted without signatures, and 150,000 ballots were never returned.  *Local Union 1000*, 594 F. Supp. at 195.  While the union produced evidence of considerable margins of victory in all three affected races, the court responded that the vote totals "are meaningless since it remains to be seen whether secret ballots would have encouraged [not only] the 5,600 non-signing voters to cast meaningful ballots, but the nonvoting members as well."  *See id.* at 196.  The court ordered a new election.  *See id.*

The remote Internet voting system used by the APA is particularly analogous to a

voting system that utilizes sequentially numbered ballots with a corresponding voter registry. In instances where a union issues sequentially numbered ballots, the mere existence of a corresponding voting registry, even absent evidence that votes and voters were in fact matched or linked, is enough to establish a secrecy violation and necessitate a new election. For example, in *Reich v. United Mine Workers of America* ("Reich v. UMWA"), No. 94-1691, 1995 WL 791950 at *5-*6 (D.D.C. Oct. 24, 1995) (attached hereto as Appx. 11, pp. 119-125), the court overturned a union election, in part on ballot secrecy grounds, where election officials could determine how some members voted by matching a numbered registry with sequentially numbered ballots that had been issued. The evidence presented there showed that election officials took advantage of this system only once, to invalidate a ballot cast by an ineligible member. *See id.*, at 123; *see also Kelly v. Local No. B-183, Int'l Alliance of Theatrical Stage Employees*, 566 F. Supp. 1199, 1201 (S.D.N.Y. 1983) (setting aside an election where pre-numbered signature lines in an attendance book could be matched with sequentially numbered ballots). However, the fact that the election administrators *could* link the APA members with their votes by comparing the numbered ballots with the corresponding registry was enough to taint the entire election.

In the instant case, the undisputed evidence establishes that, because of the way the election was conducted, it was possible for persons to observe how APA members marked their ballots. Specifically, like comparing the numbered ballots with the registry in *Reich v. UMWA*, Ohmann could determine how APA members voted simply by

comparing the two databases – the member database and the vote database – to which he had access.  This comparison was necessarily made by the system in order to remove ineligible votes just prior to the final tally.  Further, *anyone* who had access to an APA member's PIN and EIN could have logged onto the remote Internet voting system and viewed whether, and how, an APA member voted.  As noted *supra*, several AAA employees, AAA's printing company, Winson Surnamer, and Ohmann all had access to this information.  Thus, it is clear that a violation of ballot secrecy did occur.  Because the voting system itself compromised ballot secrecy, it is impossible for Chao to specifically quantify the extent of the breach.  Further, it is impossible to determine whether fears or concerns with respect to the secrecy of the vote affected how voters actually voted, and impossible to ascertain whether any or all of the voters who did not vote would have voted in an election not infected with the secrecy violation.[9]  Thus, the presumption must be that the outcome was affected, and the tainted election must be re-run under the supervision of the DOL.

Finally, Chao notes that in overturning the union's election in *Local Union 12447*, the Third Circuit noted that "[it had] no doubt that the election procedures under review in the present case represent a great improvement over those considered [in many of the election challenges considered by the Courts].  *Local Union 12447*, 591 F.2d at 204.  It could certainly be argued that an Internet voting system may offer some advantages over mail balloting in some respects.  However, the fact remains that, here, voters could be

---

[9] Results from APA's internal survey of its members suggest that there may have been some concern with the secrecy of the ballot during the 2004 elections.  *Accord* Appx. 1, pp. 011-014.

linked with their votes.  This link is aggravated by the fact that there were no specific

protections to prevent identifying APA members with their votes, and no method for the

voters, or the Secretary, to detect any breaches of secrecy.  Where the election system is

nonetheless infected with a lack of secrecy, that improved method must also fail.  *Accord*

*id.*

## CONCLUSION

The remote Internet voting system utilized by the APA appears, at first blush, like

a method that could improve upon a traditional mail balloting system.  In circumstances

where ballot secrecy is not an absolute requirement, that may perhaps be the case.

However, Congress has mandated political-election-grade security for labor unions

engaged in industries affecting commerce within the meaning of the LMRDA, with the

specific requirement that union members cast their ballots in national officer elections in

secrecy.  The specific system designed for and employed by the APA fundamentally

breached the ballot secrecy requirements imposed by Title IV of the LMRDA in a way

that can not be quantified or cured.  Because the system itself was infected and

compromised ballot secrecy at its core by linking a voter with his or her respective vote,

the outcome of the 2004 elections may have been affected.  Therefore, as there being no

genuine issue of material fact in dispute necessary for the resolution of this matter, Chao

respectfully moves that this Court grant summary judgment in its favor, and to order a re-

run of the APA national officer elections under the supervision of the Department of

Labor.

Respectfully Submitted,

RICHARD B. ROPER
UNITED STATES ATTORNEY

s/ Tami C. Parker
Tami C. Parker
Assistant United States Attorney
State Bar No. 24003946
Burnett Plaza, Suite 1700
801 Cherry Street, Unit 4
Fort Worth, Texas 76102-6882
Telephone: 817.252.5222
Facsimile:  817.978.6351

OF COUNSEL:
HOWARD M. RADZELY
Solicitor of Labor

KATHERINE E. BISSELL
Associate Solicitor, Civil Rights
and Labor-Management Division

SHARON E. HANLEY
Counsel for Labor-Management
Programs

COUNSEL FOR PLAINTIFF
SECRETARY, DEPARTMENT OF
LABOR

DANIELLE L. JABERG
Attorney

EVAN H. NORDBY
Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of May, 2006, I electronically filed the foregoing Appendix to Brief in Support of Motion for Summary Judgment with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing (ECF) system of the Court.  The electronic case filing system sent a Notice of Electronic Filing to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

SANFORD R. DENISON
Baab & Denison, LLP
Stemmons Place, Suite 1608
2777 N. Stemmons Freeway
Dallas, TX 75207

EDGAR N. JAMES
STEVEN K. HOFFMAN
DAVID P. DEAN
James & Hoffman, P.C.
1107 17th Street, N.W., Suite 510
Washington, D.C. 20036-4704


s/ Tami C. Parker
Tami C. Parker
Assistant United States Attorney