# APPENDIX 7

# Declaration of Donna Jolyn Underwood

# Page(s) 094-112

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HON. ELAINE L. CHAO, SECRETARY, UNITED STATES DEPARTMENT OF LABOR, Plaintiff, | § § § § § | |
| v. | § § | CIVIL. NO. 4-05-CV-338-Y |
| ALLIED PILOTS ASSOCIATION, Defendant. | § § § | |

## DECLARATION OF DONNA JOLYN UNDERWOOD

I, Donna Jolyn Underwood, declare the following to be a true and correct statement of facts:

1. I am presently employed as a Senior Investigator with the United States Department of Labor ("DOL"), Office of Labor Management Standards ("OLMS"). The official duties and responsibilities of my current position include investigating labor unions subject to the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA" or "the Act"), 29 U.S.C. §§ 402(i), (j) and 481(a). I served as the lead investigator for OLMS in the investigation of the 2004 national officer election and run-off election of the Allied Pilots Association ("APA"). The predicate for this investigation was a complaint filed with OLMS by Captain Mark Hunnibell, a pilot in good standing with the APA, on October 15, 2004.

2. Pursuant to section 601 of the Act (29 U.S.C. § 521), and in accordance with section 402(b) of the Act (29 U.S.C. § 482(b)), the DOL investigated the complaint of Captain Hunnibell. Although OLMS generally has sixty (60) days within which to complete such investigations, by a series of letters dated October 27, 2004, December 20,

**Declaration of Donna Jolyn Underwood - Page 1**

2004, March 1, 2005, April 7, 2005, and April 22, 2005, the APA agreed that the time within which the DOL could bring suit with respect to the APA's election be extended to May 27, 2005.

3. During the investigation, the APA provided documents to OLMS. Included in those documents was a copy of the "Allied Pilots Association Appeal Board Ruling In Re: Election Appeals - July 2004 National Officer Election." True and correct pages of that document are attached hereto.

4. Prior to the APA's 2004 national officer election and run-off election, in February of 2003, OLMS District Director, Debra Hall, advised APA that the "change vote" feature of the upcoming national election would likely violate Title IV. A true and correct copy Debra Hall's letter is attached hereto.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 4th day of May, 2006.

*Donna Jolyn Underwood*
Donna Jolyn Underwood
Senior Investigator
Department of Labor, Office of
    Labor Management Standards
2320 La Branch, Suite 1107
Houston, Texas 77004

**Declaration of Donna Jolyn Underwood - Page 2**

## APA APPEAL BOARD RULINGS

## NATIONAL OFFICER ELECTION PROTESTS 2004

Attached is the APA Appeal Board Rulings regarding the National Officer Election of June 2004.

For the Appeal Board:

_____
Captain Peter M. Ward, Member

_____
Captain John E. Seski, Member

**ALLIED PILOTS ASSOCIATION**

O'Connell Building • 14600 Trinity Boulevard, Suite 500 • Fort Worth, TX 76155-2512 • 817.302.2272 • www.alliedpilots.org



September 16, 2004

**Certified Mail - Return Receipt Requested**
**Certificate No. 7004 1160 0007 0900 3671**
Mark L. Hunnibell
376 Black Rock Tpke
Redding, CT 06896

  Re: **Appeal Board Election Decision**

Dear Mr. Hunnibell:

  Enclosed please find the decision of the APA Appeal Board addressing election complaints filed regarding the 2004 National Officer Election. According to the APA Constitution, Article IV, § 6, the Appeal Board serves as the Association's internal election appeal body. The election complaints filed in this matter have been reviewed and a decision has been rendered by a two-member panel of the Appeal Board, composed of members Captain Peter M. Ward and Captain John E. Seski.

  Should you have any questions, please feel free to contact us.

              Sincerely,

_____  _____
Captain Peter M. Ward, Member  Captain John E. Seski, Member

      ON BEHALF OF THE APA APPEAL BOARD

# ALLIED PILOTS ASSOCIATION

# APPEAL BOARD RULING

# IN RE:

# ELECTION APPEALS – JULY 2004

# NATIONAL OFFICER ELECTION

## INTRODUCTION

### 1. The Election Protests.

The Allied Pilots Association concluded its National Officers election (President, Vice President, and Secretary Treasurer) on June 22, 2004.[1] On July 1, 2004, APA member Captain Mark Hunnibell protested the election, in which he was defeated for President by Captain Ralph Hunter. The protest was properly filed within the time limits prescribed by the APA Constitution and Bylaws, Article IV, Section 6.[2] Captain Hunnibell's July 1 complaint addressed seven categories of alleged violations in an 18 page, single spaced complaint, attaching 98 pages of supporting "appendices"

---

[1] APA is a national labor organization with its principal place of business at 14600 Trinity Boulevard, Fort Worth, Texas 76155. APA has local labor organizations, called domiciles, at each of the major pilot bases: Dallas-Fort Worth ("DFW"), Chicago ("ORD"), Miami ("MIA"), Washington, D.C. ("DCA"), Boston ("BOS"), LaGuardia ("LGA"), St. Louis ("STL"), Los Angeles ("LAX") and San Francisco ("SFO"). APA elects its national officers through a referendum election under the control and supervision of the American Arbitration Association ("AAA") every three years and its local officers through a AAA supervised referendum election once every two years on a rolling basis.

[2] Article IV, Section 6 provides that APA's Appeal Board "shall also serve as the Association's internal election appeal body. The Appeal Board shall consider all complaints, protests, or appeal[s] concerning APA's elections received in writing from any member in good standing provided they have been received by the Appeal Board within ten (10) days after the later of the completion of the election or the run-off election . . . . The Appeal Board shall issue its written finding or decision as soon as practicable within sixty (60) days of receipt of a written protest, complaint or appeal." The Appeal Board received a number of untimely protests following the election. The Board has considered the July 1 protest in light of these subsequent,

098

1

("Complaint"). We consider and analyze each allegation below. Although some of the alleged infractions are closer calls than others, we have not discovered any electoral violations. Certainly, none of the alleged infractions had any decisive effect on the national officer election. For all the reasons itemized below in pages 9-55, we therefore deny Captain Hunnibell's request to re-run the election.

Captain Hunnibell filed additional, shorter, untimely protests on July 8, July 17, and August 6, 2004. Although Captain Hunnibell styled these protests "Supplemental Detail" to his July 1 Complaint, the latter protests arose from different facts and circumstances than any cited in the July 1 Complaint, circumstances Captain Hunnibell makes no claim to have discovered after July 1. Although the Board has viewed the July 1 Complaint in light of the subsequent allegations, the Board formally denies these latter protests as untimely.

Captain Lloyd Hill filed a protest on June 30, 2004, stating that it "related to APA responsibility for oversight and reasonable expectation of adherence to [Constitution and Bylaws] and Policy Manual provisions, and violations for the restrictions and policies contained therein." This protest alleged, complained of, and/or protested no other facts, actions or circumstances. As a result, the Board has found that Mr. Hill did not file any election complaint that it may reasonably address and has denied the purported protest on that basis.[3]

On July 1, 2004, First Officer Todd Wissing filed a letter of protest substantively identical to Captain Hill's, and therefore similarly devoid of content. Consistent with the

---

untimely complaints, discussed herein. Under these circumstances, the Board is issuing this decision within a time "as soon as practicable" after the 60 day period from the July 1 Complaint.

[3] Captain Hill was notified of the Board's ruling on his protest by "certified" mail on August 27, 2004.

099

2

investigation, formed another staple of newsworthy events and separate political discourse within the Union both before and during the National Officer elections.

### 3. Election timeline and Candidates

#### a. Nominations and Election

| | |
|---|---|
| 1/16/04: | Notices and required forms mailed to APA membership regarding nominations; |
| 2/6/04: | Deadline for receipt of nomination forms; |
| 2/13/04: | AAA makes available nomination notice and electronic voting instructions; |
| 3/5/04: | AAA deadline for voting in Nomination Round (4 pm); Nomination Election Results available (5 pm). |

The following candidates were nominated:

President:

> Robert R. Ames
> Mark Epperson
> Mark Hunnibell
> Ralph Hunter

Vice President:[5]

> Sam Bertling
> Robert S. Held
> Samuel Mayer
> Doug Pinion
> Mike Rossetti
> Greg Shayman

Secretary-Treasurer:

> David P. Duquemin
> James E. Eaton
> David S. Groves
> Paul Renneisen

---

[5] Robert S. Held and Doug Pinion later withdrew as candidates for Vice President.

100

5

| | |
|---|---|
| 3/12/04: | Deadline for receipt of candidates' final resumes for mailing by Union; |
| 3/19/04: | Union's free mailing of candidates' campaign resumes for all candidates; |
| 5/3/04: | AAA makes available election notice and electronic voting instructions; |
| 5/24/04: | Deadline for voting in first election round (4 pm), election results available (5 pm). |

No candidate received a majority of votes in the first round, therefore the following candidates were scheduled for a runoff election:

President:

>Mark Hunnibell
>Ralph Hunter

Vice President:

>Sam Bertling
>Greg Shayman

Secretary-Treasurer:

>James E. Eaton
>Paul Renneisen

### b. Run-off election

| | |
|---|---|
| 6/1/04: | AAA makes available run-off notice and electronic voting instructions; |
| 6/3/04: | Union facilitated candidate email from Mark Hunnibell, Greg Shayman and Paul Renneisen (in the name of Mark Hunnibell); |
| 6/3/04: | Union facilitated candidate email to members from Ralph Hunter, Sam Bertling and Jim Eaton (in the name of Ralph Hunter); |
| 6/7/04: | Union facilitated candidate email to members from Ralph Hunter, Sam Bertling and Jim Eaton (in the name of Sam Bertling); |

101

| | |
|---|---|
| 6/7/04: | Union facilitated candidate email to members from Greg Shayman with references to Recover 2004 campaign of himself, Mark Hunnibell and Paul Renneisen; |
| 6/9/04: | Union facilitated candidate email to members from Paul Renneisen with references to Recover 2004 campaign of himself, Mark Hunnibell and Greg Shayman; |
| 6/10/04: | Union facilitated candidate email to members from Ralph Hunter, Sam Bertling and Jim Eaton (in the name of Jim Eaton); |
| 6/15/04: | Union facilitated candidate email to members from Ralph Hunter, Sam Bertling and Jim Eaton (in the name of Sam Bertling); |
| 6/17/04: | Union facilitated candidate email from Mark Hunnibell with references to Recover 2004 campaign of himself, Greg Shayman and Paul Renneisen; |
| 6/22/04: | Deadline for voting in run-off election (4 pm), run-off results available (5 pm). |

c. **Results**

| | | | |
|---|---|---|---|
| Ralph Hunter | 3812 | Mark Hunnibell | 2881 |
| Sam Bertling | 3950 | Greg Shayman | 2722 |
| Jim Eaton | 3709 | Paul Renneisen | 2955 |

## INVESTIGATION AND FINDINGS

1. **Witnesses**

The Appeal Board met to investigate the above complaints on July 19-22 and again on August 5-6, 2004. The Board, both in person and through its agents, held discussions with principally the following individuals who had firsthand knowledge of, or responsibility for, the factual areas implicated in the July 1 Complaint:

1. Dave Ahles, APA Executive Director
2. Gary Boettcher, DCA Domicile Chairperson
3. Keith Bounds, STL Domicile Chairperson

102

7

4. John Bury, former APA Secretary Treasurer
5. John Darrah, former APA President
6. Bob Dunning, SFO Domicile Vice Chairperson
7. Mark Howard, APA IT Director
8. Edgar James, APA General Counsel
9. Rich Moyed, APA Election Administrator
10. James Sovich, BOS Domicile Chairperson
11. Debbie Thorn, APA Election Coordinator
12. Gary Weller, APA Appeal Board Chairman
13. Jeff Zaino, AAA Vice President – Elections
14. Mark Hunnibell, candidate
15. Ralph Hunter, candidate
16. Sam Bertling, candidate
17. James Eaton, candidate

## 2. Allegations and Findings

We discuss below the seven categories of allegations in Mr. Hunnibell's July 1 Complaint, and the Board's findings and analysis regarding each allegation. Before we begin that itemized consideration, however, we would like to address one over-riding theme of Captain Hunnibell's protest. The vast majority of these allegations involve issues of free speech protected under the LMRDA Labor Bill of Rights. In its investigations into these allegations, the Board is troubled by Mr. Hunnibell's persistent contention that issues of relevance – indeed burning significance – to the union should be off limits for discussion by union officers before and during an election. This type of prohibition would hamstring union officers in the performance of their legal duties and undermine their fundamental free speech rights as union members.

Further, the interpretation of election law implicit in much of Captain Hunnibell's protest would allow a candidate to inoculate whole subjects from union comment during an election, simply by raising a topic in his or her campaign. Such an interpretation of the LMRDA would not only leave a union and its officers mute and defenseless against any and all critics (even where those officers are not candidates), but more importantly,

103

would deprive union members of the very free and robust debate that the LMRDA was designed to protect.

**The July 1 Complaint.**

I.  **APA PRESIDENT JOHN DARRAH USED UNION RESOURCES TO "POISON THE WELL."**

Captain Hunnibell cites eight communications in which he alleges that APA President John Darrah used union resources to "identify and discredit those whom he believed to be candidates in upcoming elections" and/or to "create an environment" where the campaign rhetoric of one group of candidates would be "most effective." We address each communication individually.

> 1. **June 2003 blast e-mail. Hunnibell alleges that "John Darrah named First Officer Greg Shayman in an APA e-mail publicly convicting him of a variety of improper activities ...."**

The Board finds that on June 9, 2003, President Darrah sent a short e-mail to APA members (attachment #1) notifying them that "numerous e-mail messages" falsely appearing to originate from APA over the past several days contained a virus, and that "apparently" a PDP member, Greg Shayman, was the origin of the e-mails. Former President Darrah reports to this Board that he had been notified by pilots receiving the infected e-mails and that the APA IT department had identified Greg Shayman as the origin of the infected messages by viewing the email header and by tracing his internet protocol address.[6] The IT department was also aware that Shayman had downloaded the e-mail addresses of a number of APA members from the APA website over the previous year, and that therefore the virus could and most likely did distribute itself to many APA

---

[6] APA IT Director Mark Howard stated that it was relatively easy to trace the origin of the virus back to Mr. Shayman's account because he used a high speed connection and the Internet Protocol addresses on those type of accounts are somewhat static.

104

9

Labor in order to shore up any election concerns centered on C&R, the Board finds that the removal of hotlinks to C&R is in no way an election violation.

## IV. DECISION BY THE APA SECRETARY-TREASURER TO ALLOW MEMBERS TO CHANGE THEIR VOTES.

### 1. Mr. Hunnibell alleges that the DOL objected to APA's voting system

Mr. Hunnibell makes several charges regarding one feature of the voting system. Mr. Hunnibell charges that the DOL warned APA that having the AAA allow members the ability to change their vote might violate DOL secrecy requirements. He further charges that he does "not believe it is a coincidence" that his opponents notified members of this voting feature in their campaign materials.

Mr. Hunnibell does not explain what non-coincidental relationship he sees between someone at the AAA possibly being able to tell how members voted, and his opponents notifying people they could change their vote. We see none. We do not believe that anyone at AAA looked to see how individuals voted, if they could. We do not believe, and see absolutely no evidence suggesting, that anyone at AAA was conspiring with Mr. Hunnibell's opponents to somehow use any such possible knowledge against him.

The voting system at APA which allows members to change their votes during the election period was first implemented with the advent of electronic voting for the DFW May 2002 domicile election. Electronic voting with appropriate encryption safeguards has been administered at the APA by the AAA since that time. The Board believes that allowing members to change their votes until the close of the election increases voter interest throughout the election, as well as turnout. After a pilot votes, if new information

105

42

becomes available, or something happens that affects their view of the candidates, they are free to change their vote up to the election deadline. In the 2004 national election at issue here, AAA reports that 272 members changed their votes in the run-off election, which is only 3.8% of the votes cast.

Sometimes, this "change vote" feature of the voting system has been helpful in ensuring fairness at APA, such as in ratification elections where the opposition needed to be able to read, understand and develop counter-materials to a proposed tentative contract. Even if a dissident candidate did not get his/her materials to the electorate until late in the ratification period, the materials could still be fully effective because the members who had already voted could change their votes in light of the opposition's arguments.

The Board also believes that Mr. Hunnibell is over-stating the DOL's caution regarding the "change vote" feature. APA had informed the DOL that they had intended to use this system for the upcoming election. DOL's February 11, 2004 letter was a response to APA's notification, and the letter's intent was to inform the union of a potential problem with a system that allowed a voter to change their vote. The DOL is aware of and allows internet and/or telephone voting systems. The DOL had been informed by APA well in advance that the union intended to utilize this system, and was advising them of potential pitfalls to avoid and precautions that should be taken to insure a fair and legal election. However, Mr. Hunnibell only quotes certain lines of this letter, and distorts its meaning.

2. **AAA says there was a link between vote and voter until the election was certified.**

106

Since the institution of electronic voting at APA there have been a total of 10 domicile and one national election at APA.[22] Previous to Mr. Hunnibell's complaint, there is no record of any member voicing or filing a complaint related to electronic voting or the ability to change one's vote during the voting period. Further, the February 11, 2004 DOL letter stated that there was only a "potential" problem with the system, since it would "appear" that such a system had to link voter and vote in a way that would make the link known to someone, in this case, the AAA.

The AAA, however, encrypts this link. Consequently, there does not appear to be any violation of the anonymity requirement. In fact, the AAA system electronic ballot avoids the potential, and obvious remote problem of a physical link between vote and voter by eliminating the paper ballot and its potential for physical linkage by comparing the contents of the ballot envelope to a voter list. This introduces an additional layer of security via the electronic barrier of ballot encryption. Similar to the essential requirement of a mail-in ballot system, the AAA keeps one separate list of "who voted", as is required by law to insure a fair and legal election, and further separates that list by a layer of electronic encryption, making it even more difficult (and thus more secure) to determine "who voted for whom."[23] Mr. Hunnibell creates confusion and distorts

---

[22] AAA has been conducting electronic elections since 2000. To date, AAA has overseen 55 electronic elections. *See* Email from Jeff Zaino, September 14, 2004 re: APA Query.

[23] By contrast, in a mail-in ballot system, a voter must place his/her marked ballot in a self-addressed envelope. Any individual who opens the ballot, by reading its contents, would know "exactly who voted for whom." This is avoided in a mail-in system by a disinterested third party checking the names and other identifying features on the exterior of the envelopes against the eligible voter list. This list, coupled with the ballot envelope, as defined by Mr. Hunnibell's complaint, is a link between vote and voter. By law, this "link" must be retained to insure only individuals on the eligible voter list partake in the election. A second disinterested third party tallies the contents of the envelopes (hopefully, in an accurate manner) for each of the respective candidates. There is nothing preventing either party from communicating with the other about the contents of the envelopes, i.e. "exactly who voted for whom", other than the integrity of the two participating parties.

107

Finally, Mr. Hunnibell's allegations that Mr. Moyed refused to respond to his complaints about the use of Mr. Hunnibell's and other's statements from C&R in campaign materials is also without merit. As Election Administrator, Mr. Moyed could not review the contents of a candidate's election communications. This is an APA policy that is driven by LMRDA rules. Indeed, Mr. Hunnibell advised Mr. Moyed of this precise prohibition when APA objected to an earlier misuse of APA's mailing list by another national candidate.[25] Although use of the statements complained of may be a violation of APA's Acceptable Use policy for the C&R, such use does not implicate the LMRDA and is consequently not an election concern. The proper complaint channel for Mr. Hunnibell in this matter would have been an internal APA Constitution and Bylaws Article VII action.[26]

## VII. A SERIES OF BALLOTING IRREGULARITIES CALL INTO QUESTION THE VALIDITY OF THE RESULTS.

### 1. Many ballots/PIN envelopes sent by AAA were never received by APA members.

Mr. Hunnibell complains that several members never received their ballot/PINs from AAA. Upon investigation, the Board learned that both APA and AAA were aware of this problem. During the course of the election AAA reissued PINs to 354 members in the national election and 524 members in the run-off election by a member's specific request. One hypothesis for this number of PIN requests is that it is due to pilots being a very transient group; the job requires them to be away from their homes, or any specific

---

[25] See Letter to Richard Moyed from Mark L. Hunnibell, dated March 4, 2004, re: campaign mailings. "As I cited in my earlier letter, this entitlement [of a candidate to mail literature to the membership] even includes the right to mail material the union may consider to be libelous, because the union has a statutory obligation to provide for such mailing."

108

mailing address, periodically, and in the case of much international flying, for long periods of time. For many, the domicile where they report for work is distant from their home, requiring air travel. Many of those requesting PINs may simply not have been present at their mailing address during the time frame between the arrival of the PIN and the election deadline. The number of PIN requests increases somewhat in proportion to the number of voters in each phase of the election. It should be noted that AAA reported that of the reissued PINs, 354 in the general election, and 524 in the runoff, only 2 and 1 respectively, were issued as replacements for lost PINS. None of the 134 PINs reissued by AAA in the nomination round were for lost PINs. The Appeal Board is not pleased with the number of duplicates that were issued in this election, but due to well-known and well-established procedures for obtaining another PIN if a member lost or did not receive the original, the Board is convinced that the security of the election was not compromised. Members who wished to exercise their right to vote were not prevented from doing so, therefore this complaint is without merit.

Under APA policy, when a member contacted Debbie Thorn, APA Election Coordinator, regarding a PIN problem, she told him/her to call AAA. The direct hotline to AAA for reporting problems with PINs, etc. was also posted on all election materials sent to members, in all election materials posted in every domicile, on APA's website, and in *Flightline*, the official magazine of APA members. It was published as part of an APA Hotline message and sent out in e-mail blasts by the domicile representatives to their constituents in all domiciles except one. It was also frequently published in candidate emails and mailings. If the member called AAA, they could receive their PIN via email. If there was sufficient time, AAA would send the PIN via U.S. mail. In the

---

[26] Article VII is the internal APA mechanism for bringing charges against a member.

49

109

last days of the election period, a member could receive a PIN via phone from AAA providing they could provide the proper verification information previously mentioned. Due to these multiple avenues for getting a PIN if a member lost or did not receive one, the Board is convinced that the election outcome was in no way impacted.

2. **At least 3 Members received PINS of other members.**

Mr. Hunnibell also cites three incidents where members received the PINs of other members. However, these appear to be isolated incidences which could not impact the outcome of the election. Consequently, this complaint is found to be without merit.

Upon investigation, it was learned that this problem was brought to the attention of APA staff. During the course of the 2004 elections, the Election Coordinator, Ms. Thorn, recalls that about five people reported being mailed someone else's PIN in addition to their own. When alerted to this problem, Ms. Thorn immediately reported it to AAA and requested that they mail another PIN to the correct individual. In addition, Ms. Thorn contacted Mr. Jeff Zaino, APA's representative at AAA, to report the problem and have him investigate the matter. Mr. Zaino did investigate the problem and reported to APA that the mailing house used by AAA to mail the PINs had experienced difficulties with their envelope sealant so that some mailers had gotten stuck to each other and been mailed out attached to the top envelope. However, the mailing house monitored the number of envelopes metered in each batch versus the number of envelopes reportedly provided by the APA in each batch, and would have noticed any large discrepancy with the APA mailing.

A vote in the AAA system can only be cast by using both the PIN and an employee ID number. Thus, simply having access to a PIN number would not be

110

sufficient to cast another individual's vote. Moreover, should a vote be cast by another individual with access to a member's PIN, that member would be aware of such an action when he/she attempted to vote.

The ability to access employee ID numbers on the APA website does exist, so there is a possibility that an individual could cast a vote if he or she had both the PIN and employee ID number. In recognition of this problem, the Board has investigated how many votes were actually changed. In the 2004 national election, there were only 249 changed votes in the run-off election and 240 changed votes in the first national election. Even presuming that all of these votes were somehow orchestrated by some individual as last minute changes from candidate Hunnibell to candidate Hunter, the changed votes would still not have affected the ultimate outcome of the election because Mr. Hunter won the election by a margin of 3812 to 2881, a total of 931 votes. Although the faulty mailing of PINS was an unfortunate problem that must be corrected in the future, we find that its relative rarity could not affect the election – even in the extremely unlikely worst case scenario - and there is no evidence that eligible voters were prevented from voting, therefore we find no violation under the LMRDA.

> 3. **AAA elections system allows access to results as votes are being cast/before ballot box closes and therefore it is possible that someone can gain information about who voted for whom.**

Mr. Hunnibell's contention that by allowing access to results as votes are being cast the AAA election system creates a security concern because it is theoretically possible for someone to enter the system to gain information about who voted for whom is inaccurate, misleading, and purely speculative. The Board has consulted with AAA regarding Mr. Hunnibell's claims and found that they are both generally unfounded and inapplicable to this election.

111



**U.S. Department of Labor**

Employment Standards Administration
Office of Labor-Management Standards
Dallas District Office
A. Maceo Smith Federal Building
525 South Griffin Street, Room 300
Dallas, Texas 75202
(972) 850-2500 / FAX: (972) 850-2501

Sent Via Email and Regular Mail

February 11, 2004

Richard Moyed, Election Administrator
Allied Pilots Association
O'Connell Building
14600 Trinity Boulevard
Suite 500
Fort Worth, TX 76155-2512

Re: Internet/Telephone Voting

Dear Mr. Moyed:

This is in further reference to the upcoming election of officers of the Allied Pilots Association. You have advised that the American Arbitration Association (AAA) will be conducting the election by phone and/or internet voting and that such a system allows a voter to change his or her vote during the election period. I wanted to alert you to a potential problem with allowing for vote changes in a phone and/or internet voting system. It would appear that such a system would have to link the voter and his or her vote in order to permit any vote change. A link between the voter and his or her vote would violate the secrecy requirements of Title IV of the Labor-Management Reporting and Disclosure Act of 1959, as amended (LMRDA). The LMRDA requires a member's vote be cast in such a manner that the person expressing a choice cannot be identified with the choice expressed. At no time should the identity of the voter be linked or connected to the votes that he or she casts. It does not matter that a third party, such as AAA, as opposed to the union, is managing the voting system.

Please contact me if you wish to discuss this or any other issue concerning the upcoming election.

Sincerely,

Debra J. Hall

Cc:  John Darrah
     APA President