## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FT. WORTH DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| ELAINE CHAO, SECRETARY | ) | |
| OF LABOR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4-05CV-338Y |
| | ) | |
| v. | ) | Judge Terry R. Means |
| | ) | |
| ALLIED PILOTS ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT ALLIED PILOTS ASSOCIATION'S
## BRIEF IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

s/ Sanford R. Denison
SANFORD R. DENISON
Texas Bar No. 05655560
Baab & Denison, LLP
2777 N. Stemmons Freeway, Suite 1608
Dallas, Texas 75207
(214) 637-0750; (214) 637-0730 Fax

EDGAR N. JAMES (admitted *pro hac vice*)
D.C. Bar No. 333013
STEVEN K. HOFFMAN (admitted *pro hac vice*)
D.C. Bar No. 384696
DAVID P. DEAN (admitted *pro hac vice*)
D.C. Bar No. 437030
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500; (202) 496-0555 Fax

Counsel for Defendant Allied Pilots Association

Dated:  June 14, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

PRELIMINARY STATEMENT ............................................................................ 1

COUNTER STATEMENT OF MATERIAL FACTS ........................................... 2

    The DOL's Ballot Secrecy Policy and Practice ......................................... 3

    The History, Design and Functions of the AAA Election System Used
    in the 2004 APA Election................................................................................ 9

    PIN Development, Distribution and Security............................................ 18

    The Department of Labor's Experience with and Oversight of Remote
    Internet/Telephone Voting ........................................................................ 22

    The Supervised SWAPA Election................................................................ 22

    The 2003 APA Miami Domicile Election ................................................... 24

    The 2004 APA Dallas/Ft. Worth Domicile Election Complaint............................ 26

    The 2004 APA National Officer Election Complaint ............................................ 27

ARGUMENT....................................................................................................... 29

I. THE GOVERNING LEGAL STANDARDS .................................................. 29

    A. The Summary Judgment Standard.................................................... 29

    B. The Applicable Standard in this Case is Whether the APA Took
       Reasonable Steps/Reasonable Precautions to Assure Ballot Secrecy .............. 31

II.    THE APA TOOK ALL REASONABLE STEPS, APPLIED EVERY
      REASONABLE PRECAUTION TO ASSURE BALLOT SECRECY
      IN THE 2004 ELECTION .................................................................... 38

    A. The AAA System is as Secure as or More Secure than the Double
       Envelope System.............................................................................. 40

B.  None of the Cases Upon Which the DOL Relies to Attack the
     Reasonableness of the AAA System's Ballot Secrecy Protections
     Actually Supports that Effort ............................................................................ 46

CONCLUSION ............................................................................................................... 50

OPPOSITION BRIEF EXHIBITS 1 – 6 (attached)

> McLaughlin v. Int'l Assoc. of Machinists, No. 4-86-620-E, 1989 WL 106711
> (N.D. Tex. Mar. 28, 1989) (Mahon, J.)

> Marshall v. Steelworkers, Local 15015, 98 L.R.R.M. 2493 (BNA) (N.D. Ala.
> 1978)

> Shultz v. Local 420 Aluminum Workers, 74 L.R.R.M. 2281 (BNA) (N.D. NY
> 1970)

> Brock v. District 6, United Mine Workers of Am., 772 F.2d 905 (Table), No. 84-
> 3528, 1985 WL 13586 (6th Cir. Aug. 9, 1985)

> Schade v. Md. State Bd. of Elections, No. C-04-97297 (Md. Cir Ct. of Anne
> Arundel Cty, Sept. 1, 2004), appeal dismissed, 382 Md. 520, 855 A.2d 1245 (Md
> Ct. Ap. 2004)

> Reich v. United Mine Workers of Am., No. 94-1691, 1995 WL 791950 (D.D.C.
> Oct. 24, 1995)

APPENDIX

# TABLE OF AUTHORITES

## Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ..................................................... 30

Brennan v. Local 3489, United Steelworkers of Am., 520 F.2d 516 (7th Cir.
    1975) ..................................................................................................... 34, 35, 46

Brock v. District 6, United Mine Workers of Am., 772 F.2d 905 (Table),
    No. 84-3528, 1985 WL 13586 (6th Cir. Aug. 9, 1985) .......................................... 36

Burge v. Parish of St. Tammany, 187 F.3d 452 (5th Cir. 1999) ....................................... 30

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...................................................... 3, 29, 30

Croley v. Matson Navigation Co., 434 F.2d 73 (5th Cir. 1970) ....................................... 31

Donovan v. CSEA Local Union 1000, Am. Fed'n of State, County and Mun.
    Employees, 594 F. Supp. 188 (N.D.N.Y. 1984), aff'd in part, rev'd in part,
    761 F.2d 870 (2d Cir. 1985) ..................................................................... 47, 48, 49

Donovan v. Local 10902, Commun. Workers of Am., 650 F.2d 799 (5th Cir. 1981) ...... 32

Gauck v. Meleski, 346 F.2d 433 (5th Cir. 1965) ............................................................. 31

Hodgson v. Local Union 6799, United Steelworkers of Am., 403 U.S. 333 (1971) ........ 46

Horizon Air Indus., Inc. v. Nat'l Mediation Bd., 232 F.3d 1126 (9th Cir. 2000) ............. 40

Hummel v. Brennan, 469 F. Supp. 1180 (E.D. Pa. 1979) ........................................... 36, 46

Hunt v. Cromartie, 526 U.S. 541 (1999) ........................................................................ 29

Kelly v. Local No. B-183, Int'l Alliance of Theatrical Stage Employees, 566 F. Supp.
    1199 (S.D.N.Y. 1983) ............................................................................................ 49

Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167 (5th Cir. 1990) ......... 31

Lindsey v. Sears Roebuck & Co., 16 F.3d 616 (5th Cir. 1994) ....................................... 29

Marshall v. Local 1010, United Steelworkers of Am., 664 F.2d 144 (7th Cir. 1981) ...... 32

Marshall v. Local Union 12447, United Steelworkers of Am., 591 F.2d 199
    (3rd Cir. 1978) .................................................................. 34, 35, 36, 47

Marshall v. Steelworkers, Local 15015, 98 L.R.R.M. 2493 (BNA)
    (N.D. Ala. 1978) ............................................................................. 36

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ...................... 30

McLaughlin v. Int'l Assoc. of Machinists, No. 4-86-620-E, 1989 WL 106711
    (N.D. Tex. Mar. 28, 1989) (Mahon, J.) ........................................... 36, 37

Myers v. Hoisting and Portable Local 513, 653 F. Supp. 500 (E.D. Mo. 1987)......... 36, 47

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) .................................. 30

Reich v. United Mine Workers of Am., No. 94-1691, 1995 WL 791950
    (D.D.C. Oct. 24, 1995) .................................................................. 48

Rizzo v. Children's World Learning Ctrs., Inc., 84 F.3d 758 (5th Cir. 1996)................... 29

Schade v. Md. State Bd. of Elections, No. C-04-97297 (Md. Cir Ct. of Anne
    Arundel Cty, Sept. 1, 2004) at 3, appeal dismissed, 382 Md. 520, 855 A.2d
    1245 (Md Ct. Ap. 2004) .......................................................................... 38

Shultz v. Local 420 Aluminum Workers, 74 L.R.R.M. 2281 (BNA) (N.D. NY
    1970) .......................................................................................... 36, 37

Taita Chem. Co., Ltd. v. Westlake Styrene Corp., 246 F.3d 377 (5th Cir. 2001)............. 30

TIG Ins. Co. v. Sedgwick James of Washington, 276 F.3d 754 (5th Cir. 2002) ........ 30, 31

Wirtz v. Hotel, Motel and Club Employees Union, Local 6, 391 U.S. 492 (1968) .... 31, 32

Wirtz v. Local 11, Int'l Hod Carriers, 211 F. Supp. 408 (W.D. Pa. 1962) ................ 37, 48

Wirtz v. Local 153, Glass Bottle Blowers Assoc., 389 U.S. 463 (1968) .................... 32, 33

Wise v. E.I. DuPont de Nemours & Co., 58 F.3d 193 (5th Cir. 1995) ............................ 30

## Statutes & Regulations

29 C.F.R. § 452.97 ................................................................................................ 3, 38

29 C.F.R. § 452.97(a) ............................................................................................... 4

29 C.F.R. § 452.98 ................................................................................................ 5, 42

29 C.F.R. § 452.107(c) ................................................................................. 5, 6, 42, 45

18 U.S.C. § 1030 ...................................................................................................... 41

18 U.S.C. § 2511 ...................................................................................................... 41

18 U.S.C. § 2701 ...................................................................................................... 41

29 U.S.C. § 402(k) ................................................................................................... 33

29 U.S.C. § 481(a) ..................................................................................................... 2

29 U.S.C. § 482(c) ................................................................................................... 30

42 U.S.C. §§ 15481(1)(A)(i) .................................................................................... 15

42 U.S.C. §§ 15481(1)(A)(ii) ................................................................................... 15

45 U.S.C. § 152, Ninth ............................................................................................. 40

## Court Rules

Fed. R. Civ. P. 30(b)(6) ........................................................................................ 3, 4

Fed. R. Civ. P. 56(c) ........................................................................................... 1, 29

Fed. R. Civ. P. 56(e) .............................................................................................. 30

Local Rules 56.4 and 56.5 ........................................................................................ 1

## **Administrative Decisions**

ERA Aviation, 27 NMB 321 (2000) ................................................................. 40

Minneapolis & St. Louis Ry Co. Locomotive Engineers, 3 NMB 168 (1954) ................. 40

United Air Lines, Inc., 22 NMB 288 (1995) ................................................... 40

## **Miscellaneous**

10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal
Practice and Procedure (3d ed. 2005) ............................................................. 31

**DEFENDANT ALLIED PILOTS ASSOCIATION'S
BRIEF IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(c) and Local Rules 56.4 and 56.5, Defendant Allied

Pilots Association ("APA") respectfully submits its brief in opposition to Plaintiff

Department of Labor's ("DOL") Motion for Summary Judgment.  As will be

demonstrated below, the DOL's motion should be denied.

## PRELIMINARY STATEMENT

This case arises out of the 2004 election of national officers by the APA, the

certified collective bargaining representative of the pilots of American Airlines.

Plaintiff's Brief in Support of Summary Judgment ("Pl. Br.") at 1, 2.  Given the highly

mobile, widely dispersed and computer literate membership of the APA, that election was

conducted via remote internet and telephone voting, a method the APA and other unions

had been using for some years.  Id. at 2.  An unsuccessful candidate protested the results

on a wide variety of grounds.  Id. at 8.  After an exhaustive investigation, the DOL

determined that there "has been no suggestion of malfeasance on the part of the APA."

Id. at 26.  Similarly, the DOL found no evidence of misconduct on the part of the entity

the APA had retained to conduct the election, the venerable American Arbitration

Association ("AAA"); the AAA's computer contractor, Get-A-Geek, Inc. ("GAG"),

which served as the election's computer system administrator, or the AAA's printing

contractor, Winson Surnamer Lithography ("WSL"), which produced the voting

instruction sheets for the election.  Ap. Br. at 1, 2, 3, 20, 21 n.5.

Instead, the DOL contends that the election violated the secret ballot requirement of the Labor Management and Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 481(a), because of the theoretical possibility, unrealized in this election, that personnel at AAA, GAG or WSL could have tampered with the system and discovered how individual voters had voted.  In making the charge, however, the DOL applies a standard far more stringent than the courts apply or the agency itself applies to polling place balloting and voting by mail -- both of which are equally or more vulnerable to the theoretical possibility of tampering -- and considerably more stringent than applied in American political elections.  The standard the DOL seeks to apply here would render it impossible to use the internet and telephone systems for a union election -- a stunning turnabout given that the DOL has already supervised and approved a union election using an internet/telephone voting system substantially similar to the AAA system used in the APA election.  If applied across the board, moreover, the DOL's stance would make it impossible to conduct *any* union election by any means, including methods specifically recommended by the DOL.

The instant motion must be denied because the DOL has failed even to address many of the facts material to this case.  In addition, the DOL has failed to carry its evidentiary burden to establish that the APA did not take the requisite reasonable steps/reasonable precautions to assure ballot secrecy in the election.

## <u>COUNTER STATEMENT OF MATERIAL FACTS</u>

Although the APA disputes a number of the "facts" the DOL presents as "undisputed," the APA's principal dispute with the DOL's factual presentation is that it

omits many, many facts that are material to the resolution of this dispute.  Accordingly,

the APA presents below a counter-statement of material facts and will identify in the

context of its presentation specific disputes with the "facts" proposed by the DOL.[1]

### The DOL's Ballot Secrecy Policy and Practice

1.      The DOL's basic policy on ballot secrecy in polling place and mail ballot elections

is set forth in 29 C.F.R. § 452.97, an interpretive regulation last updated in 1973.

Deposition of Mary Alice Cahir ("Cahir") at 39-40.  **Appendix ("App.") at 8-9**.[2]

2.      The regulation provides that ballot secrecy "may be assured" in the polling place

context "by the use of voting machines, or if paper ballots are used, by providing

voting booths, partitions or other physical arrangements, permitting privacy for the

voter while he is marking his ballot."  **Id.**

3.      Such methods are approved even though the DOL admits it is theoretically

possible for someone to violate ballot secrecy despite the use of such devices --

e.g. by installing a camera in the ceiling above the voting booth, machine or

partition.  Cahir at 42-43, 66.  **App. at 10-11, 29**.

4.      Notwithstanding that theoretical risk, as a matter of DOL policy, in order to

establish a ballot secrecy violation in a polling place election, it must be shown

that someone actually tampered with the presumed secrecy protection of the

voting booth, machine or partition.  Cahir at 43-44.  **App. at 11-12**.

---

[1]  A number of DOL's factual assertions are not supported by citation to any record evidence.  See, Pl. Br. at 6-7, Nos. 44, 49, 50, 51, 54.  Those assertions, then, are no different from the bald allegations of the Complaint and therefore cannot support a motion for summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

[2]  DOL official Mary Alice Cahir testified on matters of DOL policy regarding ballot secrecy as a Departmental spokesperson pursuant to Fed. R. Civ. P. 30(b)(6).  Cahir 18-20; Exhs. 2, 21.  **App. at 5-7; 344-45; 405-07**.

5.     In applying that policy, the DOL has declined to pursue claims involving an
       alleged violation of ballot secrecy arising out of the placement of voters' initials
       on their votes or the sequential numbering of ballots because those markings did
       not, in the cases at issue, provide a reasonable basis for concluding that secrecy
       had been violated.  Cahir at 99-100, 106-07; Exh. 27 at Stamp 03331; Exh. 28 at
       Stamp 03137.  **App. at 30-33; 503; 509**.[3]

6.     The DOL's ballot secrecy regulation admits that mail balloting "presents special
       problems in assuring secrecy," but provides that "secrecy may be assured" in a
       mail ballot by the use of the double envelope system.  29 C.F.R. § 452.97(a).

7.     In the double envelope system, the voter places his/her marked ballot in an inner
       envelope with no markings that could identify the voter (the "secret ballot
       envelope") and places that envelope in a larger return envelope that does identify
       the voter.  The voter then mails the package to the entity designated to receive
       ballots.  Cahir at 47-48; Deposition of Donna Jolyn Underwood ("Underwood") at
       103-04; Exh. 24 App. at 2-4.  **App. at 13-14; 140-41; 491-93**.[4]

8.     While the DOL recommends envelopes of a certain size for the double envelope
       system, it makes no recommendations as to the thickness of the envelopes;
       commercially available business envelopes of the requisite size are deemed
       acceptable.  Cahir at 130-35; Exh. 24 App. at 2-4.  **App. at 40-45; 491-93**.

---

[3] When the DOL determines not to pursue an election complaint further, it issues a Statement of Reasons setting forth the Department's official position on the charges brought to its attention.  Cahir at 10-11.  **App. at 3-4**.

[4] Ms. Underwood, the lead DOL investigator in the investigation of the 2004 APA election, testified as a Departmental spokesperson pursuant to Fed. R. Civ. P. 30(b)(6) on that investigation.  Underwood at 11, 17-19. **App. at 105, 107-09**.

9.      In developing its mail ballot policy, the DOL was cognizant of the fact that not all

ballots are received simultaneously by the entity designated to receive ballots, and

the ballots that come in have to be stored for a certain period of time prior to the

ballot tally.  Cahir at 48-49; Underwood at 104-05.  **App. at 14-15; 141-42**.

10.     While the receiving and storing entity is often the U.S. Postal Service ("USPS"), a

union need not use the USPS; ballots may be received and stored by the labor

organization itself or by an "independent agency."  Cahir at 49; Underwood at

105; 29 C.F.R. §§ 452.98, 107(c).  **App. at 15; 142**.

11.     During the entire time a returned double envelope ballot package is held in storage

pending the tally, the DOL assumes that the outer envelope containing the voter's

personal information and the inner envelope containing the voter's completed

ballot are physically linked -- i.e., literally touching each other.  Cahir at 54, 140-

41.  **App. at 20, 48-49**.

12.     The linkage between voter and vote in the double envelope system is actually

required because, prior to the tally, candidates must be permitted the opportunity

to challenge voters on eligibility grounds, a process normally performed at the

tally site just prior to the tally.  Cahir at 50-55, 142-45, 210-11.  **App. at 16-21,

50-53, 90-91**.

13.     That link must be maintained until eligibility challenges are decided because if an

eligibility challenge is successful, the particular vote of the challenged voter must

be removed and not counted in the official tally.  If the link were broken earlier, it

would be impossible to know which particular vote to remove.  **Id.**

14.    Although DOL regulations provide candidates the opportunity to have observers present at the preparation and mailing of ballots, the receipt of ballots by the counting agency and the vote tally itself to provide a check on ballot secrecy, there is no right to have an observer present during the period the ballots are stored.  29 C.F.R. § 452.107(c); Cahir at 269-70.  **App. at 101-02**.

15.    The DOL recognizes that, during the time mail ballots are stored prior to the tally, it is possible that someone could tamper with the ballots and invade ballot secrecy -- even if the USPS were the designated storage entity.  Cahir at 49-50; Underwood at 105-06, 213-14.  **App. at 15-16; 142-43, 194-95**.

16.    The mere theoretical possibility of such tampering does not, however, invalidate the double envelope system as a DOL approved method of ensuring ballot secrecy. Cahir at 50.  **App. at 16**.

17.    Invading the secrecy of the double envelope ballot package would not even require opening either of the envelopes.  Indeed, for $19.99, it is possible to buy "Envelope X-Ray Spray" over the internet, a product that "turns opaque paper temporarily translucent," thereby enabling a person to view the contents of an envelope.  The spray works to reveal how ballots have been marked even if one strictly follows the DOL's recommendations on the construction of the double envelope package.  When the spray evaporates, the envelope paper returns to its opaque state.  Declaration of Christine M. Jozwick and Exh. 1 thereto.  **App. at 574-77**.

18.     In mail ballot elections, the DOL will not proceed with a ballot secrecy complaint involving the period of storage unless it has specific evidence of an invasion of ballot secrecy during storage.  Cahir at 116-17, 119-20, 127-28; Underwood at 110.  **App. at 34-39; 144**.

19.     Although the secret ballot envelope is recommended, it is not required.  When it is missing, the DOL will not charge a ballot secrecy violation unless it finds evidence that secrecy was in fact compromised.  Cahir at 145-47, 150-152; Exh. 24 App. at 6.  **App. at 53-58; 495**.

20.     For instance, the DOL has found no violation in a ballot secrecy case where certain voters neglected to use secret ballot envelopes when vote counters turned their heads when opening such ballots, and there was no evidence to suggest that they could actually see how such voters voted.  Cahir at 151-52; Exh. 35 at Stamps 03420-21.  **App. at 57-58; 515-16**.

21.     In another case involving ballots without secret ballot envelopes, no secrecy violation was found even though the union's written election rules provided that such ballots be deemed void because there was no evidence indicating that the secrecy of any ballot lacking the secret ballot envelope was compromised.  Cahir at 154-56; Exh. 36 at Stamps 03441-42.  **App. at 59-61; 534-35**.

22.     The DOL has reached the same conclusion in a case involving almost 150 such ballots even though the evidence gathered in the DOL's investigation conflicted on whether observers could see how such voters had voted.  Cahir at 158-59; Exh. 37 at Stamp 03102.  **App. at 62-63; 544**.

23.    The DOL translated its policy prescriptions on ballot secrecy into practical advice in its 2001 publication "Conducting Local Union Officer Elections:  A Guide for Election Officials" ("Guide") -- a "how-to" manual for conducting union elections.  Cahir at 55-56; Exh. 24. **App. at 21-22; 409-96**.

24.    The Guide underscores the importance of the voter eligibility check to separate would-be voters in good standing, who are entitled to have their votes counted, from those not in good standing, whose votes are not to be counted.  Cahir at 58-59; Exh. 24 at 28. **App. at 23-24; 441**.

25.    The Guide also makes clear that "it is always better to allow a person to vote a challenged ballot (which will not be counted if the voter is later determined to be ineligible) than to risk denying an eligible member (whose name was improperly omitted from the eligibility list) the right to vote."  Cahir at 61; Exh. 24 at 29. **App. at 25; 442**.

26.    On the subject of ballot secrecy, the Guide declares that each voter should be given "an adequate opportunity to vote in secret," and makes clear that what is "adequate" will vary from situation to situation.  Cahir at 62-64; Exh. 24 at 39. **App. at 26-28; 452**.

27.    The Guide considers it so important that every potentially eligible voter be given a chance to cast at least a challenged ballot that it accepts the notion that the secrecy principle might, in certain circumstances, have to be sacrificed.  Exh. 24 at 49. **App. at 462**.

## The History, Design and Functions of
## <u>The AAA Election System Used in the 2004 APA Election</u>

28.     For almost 50 years, the AAA has been conducting union elections governed by

the LMRDA, using methods ranging from paper ballots and mail voting to touch

screen voting machines and telephone and internet voting.  Deposition of Jeffrey

Zaino ("Zaino") at 8-9, 17-18.  **App. at 198-201**.

29.     The AAA conducts hundreds of elections per year and prides itself on its

reputation as a neutral.  Prior to each election, the organization instructs its staff on

ways to maintain the integrity of the election and the AAA itself.  Zaino at 81.

**App. at 238**.

30.     Having learned that its competitors in the union election business were conducting

such elections via the internet and telephone and in response to requests from its

own client unions, in 1999-2000 the AAA decided to develop its own

internet/telephone voting system.  Zaino at 18.  **App. at 201**.

31.     Members of the AAA Information Systems Department and its Elections

Department spent six months working with AAA computer consultant GAG to

develop and test an internet/telephone system.  Zaino at 19, 24-25; Deposition of

Jon Ohmann ("Ohmann") at 56.  **App. at 202, 204-05; 282**.

32.     Based on their extensive experience conducting elections under the LMRDA,

AAA personnel defined for GAG the requirements for the system and worked

closely with GAG to develop the system.  Zaino at 24-25; Ohmann at 39-40.  **App.

at 204-05; 268-69**.

9

33.     At all times, AAA was intent on developing a system with security and privacy

        protections equivalent to or superior to those set forth in DOL's guidelines for

        conducting a mail ballot union election under the LMRDA.  Zaino at 25-26;

        Ohmann at 39-42.  **App. at 205-06; 268-71**.

34.     Prior to working with AAA on developing the system, GAG had developed,

        implemented and operated an electronic proxy voting system in the corporate

        context.  Ohmann at 38-39.  **App. at 267-68**.

35.     In order to develop an internet/telephone voting system for use in union elections,

        GAG significantly upgraded the security and privacy protections it had used in its

        corporate proxy voting system.  Ohmann at 38-39, 42-44, 53-54.  **App. at 267-68,

        271-73, 280-81**.

36.     By February 2006, the AAA had used its internet/telephone system in "a couple of

        hundred" union elections.  Zaino at 107.  **App. at 247**.

37.     In order to ensure security, the AAA internet/telephone voting system required not

        one but two personal identification numbers for a voter to access the system, and

        only one of those numbers would actually appear on voting information sheets

        sent to the voters.  This feature was designed to protect against the risk that, if the

        information sheet were misdirected or intercepted, someone other than the voter

        could cast the voter's vote.  Zaino at 26-28.  **App. at 206-08**.

38.     One of the required identification numbers was to be a number the voter had

        committed to memory; in the case of the 2004 APA National Officer election, that

        number was the individual pilot's employee identification number ["EIN"] at

American Airlines.  The other number was to be a personal identification number ("PIN") randomly generated by AAA and WSL for use solely in the particular election at issue.  Zaino at 27-28, 61-62.  **App. at 207-08, 223-24**.

39.  A new set of PINs was issued in the event of a rerun election.  Deposition of Richard Moyed ("Moyed") at 52.  **App. at 333**.

40.  As AAA knew from its long experience in conducting union elections, the risk of unauthorized voting or invasions of ballot secrecy due to misdirected or intercepted mail were common risk factors in mail ballot elections; the electronic system was designed to eliminate the ballot delivery middleman.  Zaino at 27; Ohmann at 94-97.  **App. at 207; 310-13**.

41.  For security purposes, the AAA voting system employed two geographically separate computer servers, a series of firewalls for both servers and industry standard encryption to protect against illicit access by outsiders.  Underwood at 151-52, 188; Zaino at 29; Ohmann at 45, 48, 63; Exh. 13 at Stamp 02248.  **App. at 166-67; 185; 209; 274, 276, 284; 389**.

42.  In order to access the system in the 2004 APA election, a voter needed to know the web address of and the log-in instructions for the AAA's web server housed in the AAA's offices in New York City; the voter also needed to know the correct identifier for the APA election.  Underwood at 152, 167; Zaino at 32, 43-44; Moyed at 53; Exh. 13 at Stamp 02248.  **App. at 167, 177; 211, 215-16; 334; 389**.

43.  Having reached the APA election portion of the AAA web server, which was protected by a firewall, the voter encountered a framed "page" with a top region

containing an AAA graphic, a side region containing the voting mechanism itself and a middle region, which served as the main content page. Ohmann at 33. **App. at 263**.

44.   Because the top "region" contained no confidential information of any sort, it was not encrypted. The side region processed the voter's vote, and the middle region was the actual content portion of the "page"; accordingly, they were encrypted to an industry standard SSL level. Underwood at 64-65, 125, 185; Ohmann at 32-36, 79-81; Exh. 15 at Stamp 00197. **App. at 122-23, 156, 184; 262-66; 297-99; 401**.

45.   The AAA web server neither contained nor stored any information pertaining either to voters or their votes. Ohmann at 48-50. **App. at 276-78**.

46.   Instead, when a voter successfully arrived at the APA voting site on the AAA web server and then entered his/her two required forms of identifying information, the web server transmitted this information to an entirely different computer server operated by GAG via a secure and encrypted transmission. Zaino at 45; Ohmann at 45, 48. **App. at 217; 274, 276**.

47.   At all relevant times, the GAG server was located in New York City in a location different from AAA's web server and was protected by its own firewall. The server also had a call log which registered when the server was accessed, and a server log which registered what was taking place in the server. Underwood 201-02; Zaino at 39, 78-81; Ohmann at 46, 61, 63, 77-78. **App. at 192-93; 214, 235-38; 275, 283-84, 295-96**.

48.     When the GAG server received the voter's encrypted transmission, it automatically checked the identifying information against a computer "table" containing personal information pertaining to voters to ensure that the would-be voter was in fact an actual, authorized voter. Zaino at 66-67; Ohmann at 69-73. **App. at 226-27; 287-91**.

49.     If the personal information transmitted matched the information stored on the GAG server "table," the GAG server transmitted back to the AAA web server in encrypted form an electronic ballot with the union offices at issue and the candidates for each office, and the server displayed the ballot for the voter, also via an encrypted transmission. Ohmann at 71-72, 79-81. **App. at 289-90, 297-99**.

50.     Once the voter clicked in his/her choices on the various races and hit the "submit" button, the information traveled in encrypted form back to the AAA web server and then was transmitted, also in encrypted form, to the GAG server. Ohmann at 50-51, 82-83. **App. at 278-79, 300-01**.

51.     At the GAG server the actual vote did not enter the "table" where voters' personal information was stored. Instead, it went to a separate table, thereby electronically separating information identifying the voter from the substance of his/her vote. Underwood at 50-52, 178, 199; Ohmann at 64-65, 102-03; Exh. 15 at Stamp 00196; Exh. 19 at Stamp 02005. **App. at 119-21, 181, 190; 285-86, 314-15; 400; 403**.

52.     Upon the initial loading of the voter information onto the system, the GAG server had automatically assigned to each voter's entry a unique, secret identifying

number; when that voter cast a vote, the same number was automatically assigned to the vote's entry in the voter table.  Underwood at 155, 168; Ohmann at 72-75, 122; Exh. 19 at Stamp 02005.  **App. at 170, 178; 290-93, 323; 403**.

53.     The unique, secret identifying number system had two main functions.  First, consistent with pertinent DOL rules and regulations, the number enabled the system to do a voter eligibility check and remove the votes of ineligible voters prior to the tally of the votes.  Zaino at 53. 94.  **App. at 222, 246**.

54.     Shortly before the actual tally of the votes in the 2004 APA election, the APA electronically transmitted to AAA the then current list of eligible voters. Underwood at 153-54; Ohmann at 78; Moyed at 21-22.  **App. at 168-69; 296; 330-31**.

55.     The AAA, in turn, delivered that list electronically to GAG's system administrator Jon Ohmann, who entered the list into the GAG server.  The system itself automatically, and without any observation by Ohmann, rendered inactive the votes of those voters whose names did not appear on the current eligibility list. Underwood at 154-55; Zaino at 53; Ohmann at 78-79, 115.  **App. at 169-70; 222; 296-97, 321**.

56.     The system was able to perform this eligibility check and vote removal only because it was able automatically to connect the personal information table with the vote table by means of the unique, secret numbers the system had assigned to the two different tables.  Ohmann at 91-92, 104, 114-15.  **App. at 308-09, 316, 320-21**.

57.    The second reason for the unique, secret numbers was to enable voters to review and, if desired, change their votes prior to the deadline for casting votes.  Id.; Zaino at 48, 52.  **App. at 220-21**.

58.    Like other contractors that conduct internet/telephone voting in union elections, AAA made available to the APA the change vote option; and, like a number of other unions, the APA elected to use that option.  Zaino at 46-47; Ohmann at 87-88; Moyed at 77-79.  **App. at 218-19; 304-05; 341-43**.

59.    The Help America Vote Act of 2002 ("HAVA"), as amended, 42 U.S.C. §§ 15481(1)(A)(i) and (ii), requires that each voting system used in an election for federal office permit a voter to verify his/her vote and also to change that vote before the ballot is cast and counted.

60.    The DOL takes the position that such developments in federal election law constitute a subject matter "outside of the mission and responsibility of the DOL." Underwood 23-24, Exh. 2.  **App. at 110-11; 344-45**.

61.    In order to review or change a vote, an APA voter would revisit the APA election site on the AAA web server and again enter, through an encrypted and secure transmission, the two personal identifiers.  The AAA web server would then transmit this information to the GAG web server in an encrypted, secure transmission; the GAG server would check that information against the information stored in the voter table and, if it matched, would transmit back to the AAA server in an encrypted, secure transmission the voter's previously voted

15

ballot for viewing by the voter.  Zaino at 47-48; Ohmann at 86-87.  **App. at 219-20; 303-04**.[5]

62.     When the ballot was delivered, the voter would have the option of changing his/her vote, revoting the ballot in the same manner, or leaving the ballot as before.  **Id.**

63.     The DOL has conceded that the ballot secrecy requirement is not violated when a voter views or reviews his or her own vote.  Cahir at 237.  **App. at 96**.

64.     Although an individual voter returning to the system to review or change his/her vote could not tell if someone else had simply viewed his/her vote, the voter was able to discern if someone had changed his/her vote in the process of viewing it -- a security feature that does not exist in the mail ballot context.  Zaino at 110-11.  **App. at 248-49**.[6]

65.     The AAA system logged every instance when a voter changed a vote or resubmitted a vote but did not log the way in which the vote was changed.  Underwood at 195-97; Zaino at 78-79, 84; Ohmann at 90-91, 117.  **App. at 187-89; 235-36, 239; 307-08, 322**.

66.     At the designated end of the voting period, GAG's Ohmann prompted the system automatically to remove the unique, secret identifying number from the vote table,

---

[5]  As demonstrated in the above discussion of the unique, secret number system, the DOL is wrong when it declares that there was a "link" between voter and vote.  Pl. Br. at 6, No. 43.  The number did not in fact "link" the two repositories of information but made them "linkable."  The system required further operations actually to "link" them.

[6]  Thus, The DOL is incorrect in asserting that an APA voter could not tell if someone else had viewed his or her vote.  See Pl. Br. at 6, No. 47.

making it impossible for anyone, through any method, to connect a voter with his or her vote.  Underwood at 156-57, 180, 200; Zaino at 90; Ohmann at 92.  **App. at 171-72; 243; 309**.

67.     At no time during the election were the unique, secret identifying numbers provided to anyone at either AAA or APA.  Although it was possible for system administrator Ohmann to gain access to the numbers by "backtracking" into the system electronically, he never had reason to do so and never did do so.  Neither did he make any compilation, either in electronic form or hard copy, of the unique, secret identifying numbers.  Cahir at 240; Underwood at 155-57, 188-89, 201-02; Zaino at 76; Ohmann at 73, 76.  **App. at 97; 170-72, 185-86, 192-93; 234; 291, 294**.

68.     Because the AAA system registered <u>all</u> log-ins to the APA election portion of the AAA web server, system administrator Ohmann was able to monitor usage of the system and learn if a particular computer was gaining frequent access to the system, thus alerting him to attempts to tamper with the system or invade ballot secrecy.  Underwood at 152; Zaino at 78-79; Ohmann at 88-90.  **App. at 167; 235-36; 305-07**.[7]

69.     Although Ohmann regularly monitored system usage throughout the election, no suspicious patterns emerged.  Underwood at 184; Ohmann at 88-89; Exh. 15 at Stamps 00197-98.  **App. at 183; 305-06; 401-02**.

---

[7]  Thus, the DOL is incorrect when it asserts that AAA and GAG could not determine if someone other than a rightful APA member accessed the system to see how individual voters had voted.  Pl. Br. at 6, No. 46.

70.     The system also registered and logged every time system administrator Ohmann

        accessed the GAG server.  Although GAG offered DOL the GAG server call logs

        during the investigation of the APA election, the DOL declined to examine them.

        Underwood at 201-02; Exh. 19 at Stamp 02006.  **App. at 192-93; 404**.

### PIN Development, Distribution and Security

71.     Prior to the election, the APA electronically supplied to AAA a list of voters,

        along with their home addresses, domiciles and EINs.  Zaino at 65-66, 87-88;

        Moyed at 19.  **App. at 225-26, 240-41; 329**.

72.     Upon receipt of the information, AAA transmitted it electronically to its printing

        contractor, WSL, an entity it had used for such tasks for some 25 years, and WSL

        used that information to print and address the voting instruction sheets to be

        mailed to the voter list provided by the APA.  Id.; Declaration of Ruth Randall

        ("Randall Decl.") ¶¶ 2-6.  **App. at 578-79**.

73.     Before composing those instruction sheets, the printing company devised and

        assigned randomly to each voter a ten digit PIN number.  That number was printed

        on the voting instruction sheets (but the EINs did not appear on the sheets).

        Moyed at 70; Randall Decl. ¶¶ 5, 9-10.  **App. at 335; 578-79**.

74.     The PIN numbers were also added to the electronic records previously provided,

        and a single hard copy of this compilation, including the PIN and EIN for each

        voter, was printed out and provided to the AAA for use as a control book.  Id.;

        Zaino at 74.  **App. at 232**.

75.   WSL then archived all voter information in a secure, password protected computer

      archive and a backup CD-Rom.  That file was only accessible by a single

      employee of WSL, who never looked at any individual entry.  Randall Decl. ¶¶

      11-12.  **App. at 579**.[8]

76.   Neither the control book nor the WSL archive contained any record of voters'

      votes.  Underwood at 99.  **App. at 138a**.

77.   The AAA used the control book solely to respond to requests by voters for

      misplaced PIN numbers during the election, and no electronic version of the book

      was made available to any AAA personnel.  Underwood at 66-67; Zaino at 36, 74,

      88-89.  **App. at 124-25; 212, 232, 241-42**.

78.   At no time did anyone from the AAA provide a list of PINs or even any individual

      PIN to any APA officers, or staff.  Cahir at 245; Underwood at 71, 101, 111-12,

      157-58; Moyed at 24.  **App. at 98; 127, 139, 145-46, 172-73; 332**.

79.   After its creation, the control book never left the AAA election office, a suite of

      offices and cubicles separated by a door from the rest of the AAA enterprise.

      Zaino at 74-75, 115, 117.  **App. at 232-33, 253, 255**.[9]

80.   The control book was kept in the very back of the election suite, an area which

      could be approached only by passing the office of AAA Election Department Vice

---

[8]  In contrast to the DOL's contention, WSL did not have access to a "document" containing the information.  See
Pl. Br. at 5, No. 39.  Moreover, given the security measures taken by WSL, AAA, and GAG, the DOL's assertion
that WSL employees could use PINs and EINs to access the system and determine how individual voters voted can
be accurate only in the theoretical sense.  Pl. Br. at 6-7, No. 50.  As a matter of actual fact, no such access took
place.  Cahir at 240.  **App. at 97**.

[9]  In contrast to the DOL's claim, the book was kept exclusively in the AAA election office, not in AAA's offices at
large, and was only available to certain AAA election staff.  Pl. Br. at 5, No. 37.

President Jeffrey Zaino and the work spaces of AAA Elections Supervisor Maria Gonzales and AAA Elections Department Administrative Aide Linda Johnson. Zaino at 8, 38, 74-75, 116. **App. at 198, 213, 232-33, 254**.

81. At no time did the AAA election suite contain a copying machine. Zaino at 116. **App. at 254**.

82. Throughout the election period only Zaino, Gonzales, Johnson and two long term temporary AAA election workers with significant experience working in AAA conducted elections had access to the control book. Zaino at 74-76; 111-13. **App. at 232-34, 249-51**.

83. System administrator Ohmann had no access to the control book (his home office was at all times located in North Carolina), although the data contained in the book was also stored on GAG's New York City server's voter table. Ohmann at 8, 15, 76-77. **App. at 260-61, 294-95**.[10]

84. Throughout the election, AAA maintained a phone bank staffed by Ms. Gonzales, Ms. Johnson and/or the two temporary workers to field calls from APA voters seeking to replace misplaced PINs. Zaino at 23. **App. at 203**.

85. When APA voters called for that purpose, AAA election personnel required the voters to produce numerous pieces of identifying information, including the last four digits of the voter's social security number. Underwood at 170-71; Zaino at 29-30, 70-74, 114-15; Exh. 13 at Stamp 02252. **App. at 179-80; 209-10, 228-32, 252-53; 393**.

---

[10] Thus, Mr. Ohmann did not "have" the personal information as claimed by the DOL. Pl. Br. at 5, No. 40.

86.   Before supplying any PINs to requesting voters, either Ms. Gonzales, Ms. Johnson or Mr. Zaino would verify the voter's identity and personal information with Debbie Thorn, the Assistant to the APA's Election Coordinator Richard Moyed. Zaino at 29-30, 72-74, 114-15; Moyed at 8.  **App. at 209-10, 230-32, 252-53; 327**.

87.   After verification, the AAA officials would procure the requested PIN number from the control book and provide the replacement PIN number by mail to the requesting voter.  Toward the end of the voting period, the AAA officials provided such information telephonically or via email -- in each case, only after verifying telephone numbers and/or email addresses with Ms. Thorn.  **Id.**

88.   The DOL investigation found no failure on the part of the AAA to validate properly the identities of APA members seeking replacement PINs.  Underwood at 121-23, 163.  **App. at 152-54, 174**.

89.   At the end of each working day, Linda Johnson would store the control book in a locked cabinet in the election suite, lock the cabinet key in her desk drawer, lock the desk drawer and take the drawer key home with her for the evening.  Zaino at 75, 117-19.  **App. at 233, 255-57**.

90.   As a result of its investigation, the DOL developed no information to indicate that the control book was not adequately secured or that persons other than properly authorized AAA election personnel had access to the book.  Underwood at 165-66.  **App. at 175-76**.

91.   At no time did any of the five AAA election officials with access to the control book or the WSL employee with access to the compilation in computerized form

ever enter the AAA voting system in order to attempt to discern how any APA voter had voted. At no time did GAG's Jon Ohmann use his access to the GAG server to attempt to discern how any APA voter had voted. Cahir at 240; Underwood at 67, 96; Randall Decl. ¶ 12. **App. at 97; 125, 138; 579**.

92. Any attempt by any of the AAA or WSL personnel to enter the system for any purpose would have been tracked by the system, and subject to the regular monitoring of GAG's Ohmann. See supra at 17-18, Nos. 68-70.[11]

**The Department of Labor's Experience with and Oversight of Remote Internet/Telephone Voting**

**The Supervised SWAPA Election**

93. In November 1999, the Southwest Airlines Pilots Association ("SWAPA") conducted an election of union officers by means of an electronic voting system. The election was protested, *inter alia*, on ballot secrecy grounds, and the DOL's investigation concluded that the system's safeguards "were inadequate to guarantee secrecy of voting." Cahir at 163-64; Exh. 39. **App. at 64-65; 547-48**.

94. SWAPA agreed to rerun the election under DOL supervision and successfully sought permission from the DOL to conduct it via a different telephone and remote internet system. Cahir at 165-70; Exh. 40 at 1-2. **App. at 66-71; 549-50**.

95. The voting system used in the supervised rerun was developed by CC Complete, Inc. ("CCC"). Like the AAA system here, the CCC system required two personal

[11] Given the security measures in place at AAA, the DOL's assertion that AAA or GAG employees or unidentified other persons "could" use the information contained in the control book to log onto the system or the GAG server and tell how individual voters voted can only be accurate in the theoretical sense. See, Pl. Br. at 6, Nos. 48, 49; 7, Nos. 51, 54. As a matter of actual fact, no such usage occurred. Cahir at 240. **App. at 97**.

identifiers to cast a vote and also used the same linkable dual computer table structure (one for voters' personal information; one for their votes); as in the AAA election, those tables were accessible by CCC personnel.  The CCC system also used a change vote feature.  Cahir at 262; Declaration of Gerald B. Feldkamp ("Feldkamp Decl.") at ¶ 4.  **App. at 100; 582-83**.

96.   The 2001 SWAPA election was held under the supervision of Investigator Paul Hall of the DOL's Dallas, TX District office and concluded on March 2, 2001.  Mr. Hall's report on the election was approved by Debra J. Hall, District Director, on March 14, 2001.  Cahir at 172-75; Exh. 42.  **App. at 72-75; 551-53**.

97.   All told CCC has used its system in more than 1,200 union elections, including subsequent SWAPA elections, and most of those elections used the change vote feature.  Although the DOL knows that SWAPA has continued to use electronic voting since 2001 and knows about the accessibility of the dual computer table structure by CCC personnel, the Department has never determined that any subsequent SWAPA election or any election using the CCC system raised ballot secrecy problems.  Cahir at 180-82; Feldkamp Decl. ¶¶ 3, 5, 8-9.  **App. at 76-78; 581-84**.

98.   The National Mediation Board ("NMB"), a federal agency tasked, *inter alia*, with conducting union representation elections under the Railway Labor Act, uses a telephone voting system in those elections developed by CCC.  29 NMB No. 90 (Sept. 25, 2002); Feldkamp Decl. ¶¶ 6-7.  **App. at 563-69; 584**.

99.     The NMB voting system has the same linkable dual computer table feature as the
        AAA voting system.  **Id.**

100.    The DOL regards information regarding that NMB system as "outside of the
        mission and responsibility of the DOL."  Underwood 23-24; Exh. 2.  **App. at 110-
        11; 344-45**.

### The 2003 APA Miami Domicile Election

101.    In 2003, the APA held an election at its Miami domicile using much the same
        AAA voting system as used in the 2004 National Officer election.  Cahir at 183-
        85; Moyed at 10.  **App. at 79-81; 328**.

102.    Although a protest was filed with the DOL after that election, the protest did not
        concern ballot secrecy.  Nevertheless, the DOL interviewed GAG's Jon Ohmann
        concerning the architecture of the AAA system.  On the basis of the interview
        report, on July 10, 2003, the chief of DOL's Office of Labor Management
        Standard's ("OLMS") Division of Enforcement opined that the change vote
        feature of the system raised ballot secrecy concerns and recommended that Mr.
        Ohmann be told that the DOL advised against the use of a change vote feature in
        the future.  Cahir at 185, 188, 197-98; Exh. 44.  **App. at 81-84; 554-56**.

103.    The DOL delivered that recommendation to Mr. Ohmann, but did not direct
        Ohmann to inform either the AAA or the APA, and Mr. Ohmann did not inform
        either.  Cahir at 200-01; Zaino at 92; Ohmann at 105; Exh. 46.  **App. at 85-86;
        244; 317; 557-58**.

104.   During the same time period, the OLMS Enforcement Division Chief called upon
       Mary Alice Cahir, an OLMS investigator, to respond to queries concerning remote
       internet voting in union elections.  Cahir at 202; Exh. 47.  **App. at 87; 559-60**.

105.   In one such response on September 16, 2003, Ms. Cahir made no mention of any
       DOL recommendation against the use of the change vote feature.  Cahir at 207-08,
       210; Exh. 48.  **App. at 88-90; 561-62**.

106.   In her response, moreover, Ms. Cahir indicated that the DOL had very little
       experience with or knowledge of remote internet voting.  Exh. 48.  **App. at 561**.

107.   The first time the APA learned that the DOL had any concerns about the change
       vote feature came after the nomination round for the 2004 National Officer
       election had been completed in a February 11, 2004, letter from the DOL's Dallas
       District Director Hall to the APA's Election Coordinator.  Cahir at 218-19; Moyed
       at 71; Exh. 10.  **App. at 92-93; 336; 383**.

108.   In that letter, Director Hall made no mention of any concern with the AAA system
       as a whole but opined that the change vote feature presented a "potential problem"
       concerning ballot secrecy and invited further discussion on the topic.  Exh. 10.
       **App. at 383**.

109.   Immediately upon receiving the letter, Mr. Moyed provided a copy to the AAA's
       Jeffrey Zaino and also called Mr. Zaino to discuss the "potential problem"
       referenced by Ms. Hall.  Zaino at 92-94; Moyed at 71-72.  **App. at 244-46; 336-
       37**.

110. Mr. Zaino assured Mr. Moyed that the AAA system, including the change vote feature, was compliant with the LMRDA, assured Mr. Moyed that AAA had previously discussed the system with DOL representatives and promised Mr. Moyed that he would discuss the letter with Director Hall herself.  Moyed at 72-74. **App. at 337-39**.

111. Within two days of the Hall letter, Mr. Zaino and his superior Kenneth Egger telephoned Mr. Hall and discussed the AAA voting system in detail.  Director Hall memorialized the conversation in a memorandum to the file.  Moyed at 73; Exh. 11. **App. at 338; 384-87**.

112. Subsequent to her conversation with Messrs Zaino and Egger, neither District Director Hall nor any other employee of the DOL brought to Mr. Moyed or any other APA official any continuing concern about the AAA's election system or its change vote feature.  Cahir at 222-23; Underwood at 135-39; Moyed at 72. **App. at 94-95; 161-65; 337**.[12]

### The 2004 APA Dallas/Ft. Worth Domicile Election Complaint

113. Contemporaneously with the 2004 National Officer election, the APA also conducted an election for officers at its Dallas/Ft. Worth ("DFW") domicile. Underwood at 13. **App. at 106**.

---

[12]  The DOL claims that Mr. Zaino was aware prior to the 2004 election that the AAA system presented "potential voter secrecy problems."  Pl. Br. at 2, No. 10.  Mr. Zaino was actually made aware only of a potential problem with the change vote feature.  Although the DOL attempts to cast aspersions on the APA for doing little or nothing in response to the Hall letter, by bringing the issue to the AAA, the APA took it to an expert organization with the benefit of almost 50 years' experience conducting LMRDA elections.  See, Pl. Br. at 3, Nos. 15-16.

114.   The DFW election used the same AAA voting system as the National Officer election, including the change vote feature, and concluded on April 1, 2004. Underwood at 33-35, 48; Exh. 3 at Stamp 02402. **App. at 114-16; 347**.

115.   A defeated candidate in the DFW election protested that election to the DOL and included in his complaint a charge that the internet voting system violated the LMRDA's ballot secrecy requirement.  Underwood at 25, 29, 35; Exh. 3 at Stamps 02403, 02408. **App. at 112-13, 116; 348, 353**.

116.   The DOL investigated the complaint and specifically found no violation of ballot secrecy.  Underwood at 37-38; Exh. 3 at Stamp 02404. **App. at 117-18; 349**.

## The 2004 APA National Officer Election Complaint

117.   On October 15, 2004, the defeated presidential candidate in the 2004 APA National Officer election lodged a complaint with the DOL.  Underwood at 117-18; Exh. 9. **App. at 148-49; 597-632**.

118.   That Complaint included six enumerated categories of charges, only one of which involved ballot secrecy, and the DOL decided not to pursue any of the non-secrecy charges.  Exh. 9; see the Complaint in this lawsuit. **App. at 597-632**.

119.   In his complaint to the DOL, the complainant charged DOL itself with misconduct, *inter alia*, by allegedly colluding with the APA to "reinterpret" District Director Hall's February 11, 2004, letter to the APA.  Underwood at 129-30; Exh. 9 at Stamp 00033. **App. at 159-60; 629**.

120.   The "secret ballot" section of the complaint set forth eight particular charges, including a charge that candidates were not permitted observers for the election.

DOL investigators concluded that the complainant had not lodged the observer charge with the APA in a timely manner and therefore did not investigate that charge.  Underwood at 69, 126-27; Exh. 9 at Stamps 00002-10.  **App. at 126, 157-58; 598-606**.

121.    DOL investigators investigated the remaining ballot secrecy charges in the complaint and found that only one had any substance.  Specifically, DOL investigators found that Pitney Bowes, which mailed out the voting instruction sheets for the AAA, had inadvertently glued together a small number of those mailings, thus delivering to certain APA members' instruction sheets containing the PINs of other members.  However, the DOL concluded that not enough PINs were misdirected to have affected the outcome of the election and therefore brought no claim on that subject in this lawsuit.  Underwood at 119-27; Plaintiff's Response to Defendant's First Set of Interrogatories, Exh. 7 at 23 (Response to Interrogatory No. 15).  **App. at 150-58; 377**.

122.    After exhaustive investigation, the DOL uncovered no evidence that anyone had used another person's PIN and EIN to view the other's vote or to vote on behalf of another.  Underwood at 152-53.  **App. at 167-68**.

123.    As a result of its investigation, the DOL uncovered no evidence to suggest that any APA officer, staff member or voter saw how any individual voter had voted.  Underwood at 73-77, 85-86.  **App. at 128-34**.

124.   As a result of its investigation, the DOL found no basis to conclude that any APA

officer or staff member had engaged in any misconduct.  Underwood at 91-92.

**App. at 135-36**.

125.   As a result of its investigation, the DOL found no evidence on which to conclude

that anyone affiliated with AAA or GAG engaged in any misconduct or linked

voters with their votes.  Underwood at 92-93, 103.  **App. at 136-37, 140**.

126.   The DOL is not charging in this lawsuit that the telephone voting system used in

the 2004 election had any ballot secrecy problems.  Underwood at 116-17; Exh. 8.

at 1.  **App. at 147-48; 381**.

## ARGUMENT

## I.   THE GOVERNING LEGAL STANDARDS

### A.   The Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is only

appropriate when the movant demonstrates that no genuine issue of material fact is in

dispute and that it is entitled to judgment as a matter of law. Hunt v. Cromartie, 526 U.S.

541, 552 (1999); Fed. R. Civ. P. 56(c).  In order to meet its burden the movant must

identify "those portions of [the record] which it believes demonstrate the absence of a

genuine issue of material fact." Celotex Corp., 477 U.S. at 323; Fed. R. Civ. P. 56(c).

When a party moves for summary judgment on an issue on which it bears the burden of

proof at trial, it must demonstrate the absence of a material fact dispute as to that

particular issue.  Rizzo v. Children's World Learning Ctrs., Inc., 84 F.3d 758, 762 (5th

Cir. 1996); Lindsey v. Sears Roebuck & Co., 16 F.3d 616, 618 (5th Cir. 1994).  If the

movant fails to carry this burden, the motion must be denied, regardless of the non-movant's response. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Burge v. Parish of St. Tammany, 187 F.3d 452, 465 (5th Cir. 1999).  In this case, the DOL has the burden of establishing by a preponderance of the evidence that 1) the APA election violated the LMRDA, and 2) that the violation may have affected the outcome of the election.  29 U.S.C. § 482(c).

    In assessing a summary judgment motion, the Court must accept the evidence of the non-moving party and draw all justifiable inferences in favor of that party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); Taita Chem. Co., Ltd. v. Westlake Styrene Corp., 246 F.3d 377, 385 (5th Cir. 2001).  In other words, the Court must give credence to evidence favoring the non-moving party and require that evidence supporting the movant be uncontradicted and unimpeached and come from disinterested witnesses.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) (citations omitted).  Unsubstantiated assertions by the movant are not competent summary judgment evidence.  Celotex, 477 U.S. at 324.

    Only if the movant has initially shown "that there is an absence of evidence to support the non-moving party's cause," Celotex, 477 U.S. at 325, does the burden shift to the non-moving party to establish the existence of a genuine issue for trial.  See Matsushita, 475 U.S. at 585-587; Wise v. E.I. DuPont de Nemours & Co., 58 F.3d 193, 195 (5th Cir. 1995).  In order to meet this burden, the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587; TIG Ins. Co. v. Sedgwick James of Washington, 276 F.3d

754, 759 (5th Cir. 2002).

When, as in this case, a party's reasonableness is at issue, see infra at 31-38, courts are reluctant to resolve such issues on summary judgment. See e.g., Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir. 1990); Croley v. Matson Navigation Co., 434 F.2d 73, 75 (5th Cir. 1970) ("Summary judgment will not usually be as feasible in negligence cases, where the standard of the reasonable man must be applied to conflicting testimony . . . .) (citations omitted); Gauck v. Meleski, 346 F.2d 433, 437 (5th Cir. 1965) ("Because of the peculiarly elusive nature of the term 'negligence' and the necessity that the trier of fact pass upon the reasonableness of the conduct in all the circumstances in determining whether it constitutes negligence, it is the rare personal injury case which can be disposed of by summary judgment . . . .); 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure, § 2729 (3d ed. 2005).

In this case, summary judgment is not warranted because the DOL ignores the lion's share of the facts material to this case and has failed to carry its evidentiary burden.

## B.     The Applicable Standard in this Case is Whether the APA Took Reasonable Steps/Reasonable Precautions to Assure Ballot Secrecy

The APA takes no issue with the DOL's demonstration that one of the LMRDA's principal purposes was "'to protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government.'" Pl. Br. at 13, quoting Wirtz v. Hotel, Motel and Club Employees Union, Local 6 ("Local 6"), 391 U.S. 492, 497 (1968).  Neither does the APA dispute that free and fair elections

are essential to achieving that goal or that the secret ballot is an important ingredient of a free and fair election.  Pl. Br. at 13-14.  The APA fully accepts the notion that in enacting the election provisions of the LMRDA, Congress' model was "political elections in this country," Pl. Br. at 15, quoting Local 6, 391 U.S. at 504, a subject matter of little interest to the DOL.  See supra at 15, Nos. 59-60.

In its brief, however, the DOL neglects to mention other critical underpinnings of the LMRDA's election provision.  For instance, while Congress intended to eliminate "revealed abuses in union elections," that purpose was to be balanced against Congress' "long-standing policy against unnecessary governmental intrusion into internal union affairs."  Wirtz v. Local 153, Glass Bottle Blowers Assoc., 389 U.S. 463, 471 (1968) (emphasis added); Donovan v. Local 10902, Commun. Workers of Am., 650 F.2d 799, 801 (5th Cir. 1981).  Congress was certainly cognizant of the fact that voiding and requiring a rerun of a union election would be significantly disruptive of the union's affairs.  E.g., Marshall v. Local 1010, United Steelworkers of Am., 664 F.2d 144, 150 (7th Cir. 1981).  Accordingly, Congress vested Title IV enforcement authority in the Secretary of Labor "to insure that serious violations would not go unremedied and the public interest go unvindicated."  Local 6, 391 U.S. at 498-99 (emphasis added).

In construing the LMRDA, moreover, the Supreme Court has sounded another significant call for caution:

> We have cautioned against a literal reading of congressional labor legislation; such legislation is often the product of conflict and compromise between strongly held and opposed views, and its proper construction frequently requires consideration of its wording against the background of its

> legislative history and in light of the general objectives
> Congress sought to achieve.

Local 153, 389 U.S. at 468.  Overlooking this cautionary direction, the DOL applies an

all too literal reading of the statute that would hold the APA to a level of theoretical

perfection in the conduct of elections that flies in the face of the court decisions which

have set the actual standard for establishing violations of the LMRDA's ballot secrecy

requirement and is inconsistent with the DOL's own policies and practices.

   The core of the problem lies in the DOL's reading of the LMRDA's definition of

"secret ballot," codified at 29 U.S.C. § 402(k):

> "Secret ballot" means the expression by ballot, voting
> machine, or otherwise, but in no event by proxy, of a choice
> with respect to any election or vote taken upon any matter,
> which is cast in such a manner that the person expressing
> such choice cannot be identified with the choice expressed.

The DOL has chosen to interpret this provision literally so as to render violative of the

LMRDA any voting system that does not eliminate every theoretical risk of identifying a

voter with his/her vote.  Thus, the DOL contends that the AAA election system violates

the LMRDA because certain employees of AAA, GAG and WSL could theoretically

have tampered with the AAA internet voting system to learn how individual voters voted,

Pl. Br. at 21-22 -- even though the DOL concedes that its lengthy investigation unearthed

no evidence indicating that any of those persons did any such thing.  See supra at 17-18,

Nos. 67-70; 21-22, Nos. 90-91; 28-29, Nos. 122-25.

   As properly construed by the courts, however, the statute simply does not deem

theoretical risks to ballot secrecy to be violations of the LMRDA.  That much is made

clear by the two leading cases on the ballot secrecy requirement, <u>Brennan v. Local 3489,</u>
<u>United Steelworkers of Am.</u>, 520 F.2d 516 (7th Cir. 1975), and <u>Marshall v. Local Union</u>
<u>12447, United Steelworkers of Am.</u>, 591 F.2d 199 (3rd Cir. 1978), on which the DOL
heavily relies but misconstrues.  <u>See</u> Pl. Br. at 15-16, 23, 31-32.

 <u>Local 3489</u> involved an election in which no effort was made to provide for ballot
secrecy.  The voting was conducted in a 60' x 20' room with only a single open table
available for marking ballots.  520 F.2d at 521-22.  When the majority of voters voted,
they were "jammed together . . . elbow to elbow," making it easy to see each other's
votes, and that was the case even when a voter chose to mark his/her ballot against a wall
rather than at the table.  <u>Id.</u> at 522.  Based on these facts, and the lack of any
encouragement to the voters to shield their votes, the court held that there had been "no
observation" of the secret ballot requirement.  <u>Id.</u>  The court rejected the defendant's
argument that voters could have taken it upon themselves to vote in an unpopulated area
of the room because the statute required a mandatory secret ballot, not a permissive secret
ballot.  <u>Id.</u>

 <u>Local 12447</u> revisited the distinction between a mandatory and permissive secret
ballot.  The election at issue was once again held in a single room, this time containing a
number of tables.  591 F.2d at 201.  Although two cardboard boxes were taped to each
table to allow for some privacy, the union officials administering the election did not
instruct the voters to use the boxes to shield their ballots, and a number of voters did not
do so.  <u>Id.</u> at 201-02.  Based on the setup of the room, moreover, it was possible for

voters to observe how others were marking their ballots even with the privacy shields. Id. at 202.

The legal issue to be determined, like that in <u>Local 3489</u>, was whether the secret ballot requirement was satisfied when a union did not *require* each voter to use the facilities available for secret balloting. Id. at 203. Relying on <u>Local 3489</u>, the <u>Local 12447</u> court held that the statute did not provide for a permissive secret ballot but a mandatory secret ballot. Id. at 201, 203-04. In that particular sense, the DOL is correct when it declares that "the secrecy requirement is construed strictly," Pl. Br. at 15 -- i.e., as opposed to permissively.

But the DOL is simply wrong when it attempts to apply its purported "strict" construction more broadly to mean that a union is required to eliminate any theoretical possibility of compromising ballot secrecy. As the <u>Local 12447</u> court declared, its concern was with the lack of a *requirement* that voting be held by secret ballot. Id. at 205. As for how a union was to conduct a secret ballot, relying directly on <u>Local 3489</u>, the <u>Local 12247</u> court defined the union's duty as follows: a "union is required to take <u>all</u> <u>reasonable</u> <u>steps</u> to assure that every voter marks his ballot in secret." Id. at 204 (emphasis added). <u>See</u> <u>also</u>, <u>id.</u> at 205: "A union must . . . take <u>every</u> <u>reasonable</u> <u>precaution</u> to ensure that the facilities available for balloting are used in a manner similar to their use in political elections in this country, i.e., in such a manner that voters cannot be identified with their choices." (Emphasis added).

In the wake of <u>Local 3489</u> and <u>Local 12447</u>, the "all reasonable steps" / "every reasonable precaution" standard has become the governing judicial standard for

determining whether a voting system employed in a union officer election complies with the LMRDA's ballot secrecy requirement.  See McLaughlin v. Int'l Assoc. of Machinists, No. 4-86-620-E, 1989 WL 106711 at *4 (N.D. Tex. Mar. 28, 1989) (Mahon, J.) (union required to use "all reasonable means . . . to ensure that members were permitted and required to vote in secret and to otherwise ensure the integrity of the voting process"), (attached hereto as Exh. 1); Myers v. Hoisting and Portable Local 513, 653 F. Supp. 500, 509 (E.D. Mo. 1987) (union must take "every reasonable precaution to provide and ensure secret ballot facilities are used"); Hummel v. Brennan, 469 F. Supp. 1180, 1191 (E.D. Pa. 1979) (directly quoting Local 12447 on "reasonable steps" standard); Marshall v. Steelworkers, Local 15015, 98 L.R.R.M. 2493, 2494 (BNA) (N.D. Ala. 1978) (union must "take all reasonable means to assure that a person's choice cannot be discovered") (attached hereto as Exh. 2).  If there were any doubt as to whether "reasonable steps" was to be understood to require the elimination of all theoretical risk to ballot secrecy, that doubt was removed in Shultz v. Local 420 Aluminum Workers, 74 L.R.R.M. 2281 (BNA) (N.D. NY 1970), when the court unequivocally declared that "ideal surroundings" are not required (attached hereto as Exh. 3).

That the applicable standard is indeed a reasonableness standard and not a "perfection" standard is also evident in the caselaw deciding actual ballot secrecy cases. For instance, although cramped polling quarters and the lack of dividers to protect voter privacy can in certain circumstances constitute a lack of reasonable steps to ensure ballot secrecy, the Sixth Circuit in Brock v. District 6, United Mine Workers of Am., 772 F.2d 905 (Table), No. 84-3528, 1985 WL 13586 (6th Cir. Aug. 9, 1985) at *5, affirmed a

district court's finding of no violation because the union had taken other precautions to ensure ballot secrecy, and there was no evidence that any voter attempted to see another's ballot (attached hereto as Exh. 4).  See also, McLaughlin, 1989 WL 106711 at *2, 3 (claim of overcrowding of polling place was not supported by the evidence and testimony that voters could see how other voters voted was undermined by bias and evidence suggesting that a witness to such conduct voluntarily displayed her completed ballot); Local 420, 74 L.R.R.M. at 2281-82 (although open space ballotplace was not "ideal" for "absolute" secrecy, there was adequate space and opportunity to preserve ballot secrecy).

Similarly, while the use of numbered ballots, along with the signing of a dues ledger to indicate which members received such ballots "was a practice that could lead to possible abuses which might lead to the identification of the voter with the choice expressed," the court in Wirtz v. Local 11, Int'l Hod Carriers, 211 F. Supp. 408, 412 (W.D. Pa. 1962), held that because the numbered ballots and the marked dues ledger were kept separate and were never in the possession of the union's officers, the ballot secrecy requirement was not violated.  The dispositive fact was that "[s]o far as the conduct of the election was concerned the votes of the members were, in fact, secret."  Id. at 412-13.

Notwithstanding its perfectionist stance here, moreover, the DOL has taken quite a different tack in its own enunciated policies and its application of them.  The DOL's own Guide for conducting union elections, for instance, requires that voters be given an "adequate opportunity to vote in secret."  See supra at 8, No. 26.  When the agency recommends the use of ballot booths, voting machines and dividers as ways of "assuring

ballot secrecy" in polling place elections, it does so knowing that it is theoretically possible to invade secrecy even with those safeguards and therefore requires evidence of such invasion in order to pursue a ballot secrecy charge. See supra at 3-4, Nos. 2-5. And while the DOL knows that sequentially numbered ballots or ballots marked with voters' initials can compromise ballot secrecy, Ap. Br. at 30, it has found no violation in cases presenting these features when evidence was lacking to suggest that secrecy was in fact invaded. See supra at 4, No. 5.

By the same token, the DOL has explicitly recognized that mail ballots present "special" secrecy problems. 29 C.F.R. §452.97.[13] Notwithstanding the manifest vulnerabilities of even the double envelope system, see supra at 4-7, Nos. 7-19, the DOL has found no secrecy violations in any number of potentially compromising situations, including those where the secret ballot envelope was not used, when evidence was lacking to establish that secrecy had actually been compromised. See supra at 7, Nos. 20-22.

III.    **THE APA TOOK ALL REASONABLE STEPS, APPLIED EVERY REASONABLE PRECAUTION TO ASSURE BALLOT SECRECY IN THE 2004 ELECTION**

At the very heart of the DOL's claim in this case is the notion that because the AAA system provided the theoretical possibility -- albeit never realized -- of linking a

---

[13] The DOL's perspective is entirely consistent with that of the experts in such matters. See, e.g., Schade v. Md. State Bd. of Elections, No. C-04-97297 (Md. Cir Ct. of Anne Arundel Cty, Sept. 1, 2004) at 3, appeal dismissed, 382 Md. 520, 855 A.2d 1245 (Md Ct. Ap. 2004) ("[A]ll experts agree the use of paper ballots is the least accurate of all systems and lends itself to the most chicanery. … . [T]he paper ballot, as far back as the early 1800's, was insecure and could be manipulated very easily") (Attached hereto as Exh. 5); see also, Building Confidence in U.S. Elections, Report of the Commission on Federal Election Reform at 35, 46 (2005) ("Absentee ballots remain the largest source of potential voter fraud"). **App. at 572-73.**

voter with his/her vote prior to the official tally of votes (when even that possibility was eliminated), the election must be deemed to violate the LMRDA's ballot secrecy requirement. The actual question to be determined, however, is whether the system, even with the possibility of such linkage, constitutes a reasonable means of ensuring ballot secrecy.

At the outset, it should be noted that the capacity to link a voter with his/her vote is not just a vagary of the AAA system but is a required feature of any LMRDA electoral system. See supra at 5, Nos. 12-13. By definition, then, "linkability" per se cannot constitute an LMRDA violation. Second, the DOL itself supervised and approved the 2001 SWAPA election with linkable computer tables and the change vote feature. See supra at 22-23, Nos. 93-96. The agency has also knowingly permitted subsequent elections using the CCC system that is identical in the structural sense to the AAA system. See supra at 23, No. 97. In addition, the DOL found no secrecy flaws in the AAA system itself in the protested 2004 APA DFW domicile election. See supra at 26-27, Nos. 113-16.[14] Finally, it is pertinent to the reasonableness calculus that the NMB, a federal agency with an obligation to protect ballot secrecy in representation elections no

---

[14]  The evidence adduced in this case reveals deep contradictions in the DOL's own views regarding internet voting. While the Department actually supervised and approved the use of such system in the 2001 SWAPA election and asks this Court to defer to its "special knowledge" on such matters, Pl. Br. at 17, it has disclaimed sufficient knowledge to render advice on internet voting to those requesting it. See supra at 25, No. 106. Similarly, although one OLMS official has opined that the Department should recommend against the use of the change vote feature – even though Congress itself has seen fit to require the feature in federal political elections, see supra at 15, No. 59 -- shortly thereafter another OLMS official specifically chosen to respond to public inquiries did not include any such recommendation in her response to such inquiries. See supra at 24-25, Nos. 102-05. Finally, while the DOL would make much of the fact that its Dallas District Director raised with the APA the "potential problems" of the change vote feature and invited discussion on the topic, Pl. Br. at 21, it makes no mention of the fact that the discussion did ensue, and the District Director thereafter made no effort to convey any continuing dissatisfaction with the AAA system. See supra at 25-26, Nos. 107-12.

less demanding than the LMRDA requirement, has adopted an electoral system with the same dual, linkable computer tables feature as the AAA election system.  <u>See</u> <u>supra</u> at 23-24, Nos. 98-100.[15]

A.     <u>The AAA System is as Secure as or More Secure than the Double Envelope System</u>

The APA would also submit that the acid test of the reasonableness of the AAA system in protecting ballot secrecy would be to compare the critical features of that system with a system the DOL has already concluded "assures ballot secrecy": the mail ballot double envelope system.  <u>See</u> <u>supra</u> at 4, No. 6.  The DOL itself concedes in its brief that the comparison is apt.  <u>See</u> Pl. Br. at 24-25.  While the DOL complains that the AAA system employs two computer tables that can potentially be linked, the double envelope system involves an actual rather than merely a potential linkage.  Indeed, the very purpose of the double envelope system is to create a unified physical package conjoining the personal identity of the voter (set forth for all to see on the outer envelope) and the voter's vote, with the two separated only by two thin layers of paper.  <u>See</u> <u>supra</u> at 4-5, Nos. 7, 11-13.  The package may permissively be even less secure than that because the inner "secret ballot" envelope <u>is</u> <u>not</u> <u>required</u>, leaving only a single thin layer of paper as all that separates the identity of voter from his vote -- hardly a substantial protection against secrecy invasions.  <u>See</u> <u>supra</u> at 7, No. 19.

---

[15]  In conducting representation elections, NMB is obligated to ensure that those elections are conducted under "laboratory conditions" in order to guarantee that the choice of a representative is free of "interference, influence, or coercion."  <u>E.g.</u>, <u>Horizon Air Indus., Inc. v. Nat'l Mediation Bd.</u>, 232 F.3d 1126, 1133 (9th Cir. 2000); 45 U.S.C. § 152, Ninth.  Ballot secrecy is a crucial component of "laboratory conditions," <u>see</u>, <u>e.g.</u>, <u>United Air Lines, Inc.</u>, 22 NMB 288 (1995); and the NMB has found such conditions violated when as few as one voter's vote could be identified.  <u>ERA Aviation</u>, 27 NMB 321 (2000); <u>Minneapolis & St. Louis Ry Co. Locomotive Engineers</u>, 3 NMB 168, 171 (1954).  In short, the ballot secrecy requirement enforced by the NMB is no less stringent than that imposed by the LMRDA.

Both the AAA and the mail ballot systems are theoretically vulnerable to secrecy incursions at two points in time:  between the time a voter votes and the time the vote arrives at the place to which it is to be delivered, and during the time the vote is stored prior to the tally.  In the AAA system, security for the first period takes the form of firewalls, industry standard encryption, and the regular monitoring of the system by the system administrator to prevent intrusion and to detect any intrusions that may have evaded the security system.  See supra at 11-13, Nos. 41, 43-44, 46-50; 17-18, Nos. 68-70.  Delivery, moreover, is instantaneous, so the time period involved can be measured in seconds.

The time involved in submitting a mail ballot is, of course, much longer, and it has long been recognized that interception and ballot tampering are major concerns in such a system.  See supra at 38 n.13.  The DOL offers no evidence to suggest that there is any special active security protection for mailed ballots in LMRDA elections during the delivery process, and the Agency relies instead on the *in terrorem* effect of certain criminal laws to dissuade tampering.  Pl. Br. at 24-25.  That contention, however, constitutes a distinction without a difference because criminal laws also target tampering with electronic transmissions and stored electronic communications.  See, 18 U.S.C. § 2511 (interception and disclosure of wire, oral or electronic communications); 18 U.S.C. § 2701 (unlawful access to stored electronic communications); 18 U.S.C. § 1030 (covering fraud and related activity involving computers).

Both systems also have theoretical vulnerabilities during the period voted ballots are stored pending the ballot tally.  Significantly, during that period, in the mail ballot

system voter and vote remain physically <u>linked</u> in the double (or possibly single) envelope package.  In the AAA system, however, voter and vote are actually kept separate in two different computer tables, which are only <u>linkable</u> if someone manages to bring data from the two tables together.  <u>See</u> <u>supra</u> at 13, No. 51.  In both systems, the theoretical vulnerabilities include both potential external and internal threats.  A mail ballot vote is vulnerable during the storage period to outsiders invading the place of storage and using any number of methods to breach the security of the ballot envelopes. Ballot secrecy in a mail ballot, then, vitally depends on the particular measures taken to safeguard the stored ballots, and those measures can either be reasonable or not. Although the DOL puts great stock in the ability of the Postal Service to store ballots securely, see Pl. Br. at 24-25, that faith is problematic because there is no requirement that ballots be stored by the Postal Service, and the DOL expressly permits mail ballots to be received and stored by third parties (e.g., an organization like the AAA) or even by the union itself.  29 C.F.R. §§ 452.98, 452.107(c).

The AAA system is potentially vulnerable to external threats in the form of computer hackers or of persons who somehow manage to procure the PINs and EINs of voters.  However, the AAA system employs two separate servers in different locations and uses industry standard firewalls and encryption to prevent or deter the former.  <u>See</u> <u>supra</u> at 11-13, Nos. 41, 43-44, 46-50.  The DOL investigation found no lapses in that system.  <u>See</u> <u>supra</u> at 28-29, Nos. 122-25.  Both the AAA and WSL, moreover, took any number of measures to ensure that PIN numbers were safeguarded, including elaborate procedures to regulate the delivery of replacement PINs, and the DOL found no lapses

42

there either.  See supra at 18-22, Nos. 71-92.  Even in the event a PIN were to go awry,

the AAA system had an additional layer of security.  Because the AAA system logged

every instance a computer accessed the system, the system administrator could track

suspicious patterns of access.  See supra at 12, No. 47; 17, Nos. 68-69.[16]  The GAG

system administrator has testified without contradiction that he regularly monitored the

system during the election process and found no such suspicious patterns.  See supra at

17, No. 69.  The DOL was offered the system's call logs to do its own review on the

subject, but declined the opportunity.  See supra at 18, No. 70.[17]

   Both systems, finally, theoretically face internal threats to ballot secrecy in the

sense that in each system, the personnel of the entity storing the ballots could potentially

tamper with ballots under their care.  In the case of the mail ballot, storage entity

employees with physical custody of the ballots could apply any number of methods to

pierce the security of the double envelope system.  See supra at 6, Nos. 15, 17.  That

effort would be even easier if the secret ballot envelope is not employed -- and it is not

even required.  See supra at 7, No. 19.  Although the DOL opines, without any factual

---

[16]  DOL merely declares that the gluing together and misdirecting of voter instruction envelopes containing PINs constitutes a breach of ballot secrecy.  Pl. Br. at 22 n.6.  However, the DOL has admitted that even if the error constitutes a violation, it would not be actionable because not enough PINs were misdirected to have affected the outcome of the election.  Id.  Because the DOL found no evidence that anyone ever attempted to use these misdirected PINs and does not even attempt to argue that the AAA's system access tracking system was in any way inadequate to catch attempted misuse of the misdirected PINs, DOL's naked assertion that the error constitutes a breach is just that: a naked assertion rather than a proven fact.

[17]  The DOL attempts to make much of the fact that in the AAA system, an individual voter could not tell if someone else had viewed his/her ballot.  Pl. Br. at 6, 22.  The situation is no different in a mail ballot election.  Once a voter mails off his/her ballot, he/she has no further contact with it and no way to discern if it has been tampered with.  Unlike a mail ballot voter, however, a voter using the AAA system could in fact tell if his/her vote had been improperly viewed if, in the course of the viewing, the viewer had changed that vote.  See supra at 16, No. 64.  Thus, the AAA system gives the voter a means of confirming the security of his/her ballot not available to the mail ballot voter.

support, that it would be "difficult" for a tamperer to open and reseal ballot envelopes without detection, Pl. Br. 24, that method is not even necessary because for only $20, an aerosol spray is available with which to achieve the same result without detection. See supra at 6, No. 17.

While there is theoretical risk in the AAA system as well, an internal invasion of ballot secrecy actually would be more difficult to muster. First, unlike the custodians of a mail ballot, who have in their care a physical package identifying both voter and vote, no AAA, WSL or GAG employee ever had physical custody of any ballot. On the contrary, the most that any of the first two categories of persons had was access to a compendium of PINs and EINs, and access to the AAA control book and the WSL computer file was carefully guarded. See supra at 18-22, Nos. 71-91. Unlike the double envelope package, moreover, the control book did not actually contain any voter's vote. See supra at 19, No. 76. Thus, even if an AAA or WSL employee were able to pierce the security of the control book in order to glean PINs and EINs, that employee would need to do far more in order to compromise ballot security.

That employee would have to gain access to a computer, have to use that computer to access the AAA election website and the APA election portion of that website and then, pretending to be an authorized voter, have to enter the appropriate PIN and EIN. In that way, a tampering employee would be able to access one and only one voter's vote. See supra at 11-13, Nos. 42-50; 15-16, Nos. 61-62. Any attempt to learn the votes of other voters would require a separate access to the system -- unlike the situation in a mail ballot election, where an internal tamperer could hold in one hand at one time any

44

number of ballot packages.  Even then, every effort of the tampering employee to access the AAA system would be automatically logged and tracked, making it very easy for the system administrator to identify the tamperer's efforts to pierce ballot secrecy.  See supra at 17, Nos. 68-69.  Although GAG systems administrator Ohmann could have theoretically invaded secrecy without the need for EINs and PINs, Ohmann's own entries into the GAG server were also logged, leaving a trail to follow in the event any suspicion was raised concerning his activities (and no such suspicion has been raised).  See supra at 12, No. 47; 18, No. 70.

In the final accounting, the DOL's claim that the AAA system is less secure than the mail ballot actually has less to do with linkability than with: 1) a naked assertion that the computer "tables" could have been illicitly accessed without leaving any evidence of same, and 2) a contention that the presence of observers at a mail ballot election provides a level of security not available in the AAA system.  Pl. Br. at 26.  The former assertion, however, is simply incorrect because the AAA logged all access to the system, and system administrator Ohmann regularly monitored the logs for telltale signs of illicit activity .  See supra at 17, Nos. 68-69.

The problem with the DOL's observer theory is that, while observers have a right to be present at certain junctures in a mail ballot election (i.e., at the preparation and mailing of ballots, their receipt by the counting agency and the tally, 29 C.F.R. § 452.107(c)), Pl. Br. at 24, they have no right to "observe" the storage function, i.e., the days and nights when the ballots are simply held by the entity designated to receive them.  See supra at 6, No. 14.  Thus, observers provide no protection at all during the time

period the theoretical vulnerability of the ballots is at its highest.  To the extent that the

DOL may be suggesting that the AAA system is violative of the LMRDA because it

somehow limited observer rights, no such claim can be advanced in this lawsuit because

the DOL has already determined that the union complainant did not raise the issue in a

timely manner to the union.  See supra at 27-28, No. 120.  Accordingly, the DOL is

precluded from raising any such claim here.  Hodgson v. Local Union 6799, United

Steelworkers of Am., 403 U.S. 333, 341 (1971).

        In the end, the DOL recognizes the double envelope mail ballot system as a

reasonable method of assuring ballot secrecy even without the use of the secret ballot

envelope and despite the system's manifest vulnerabilities.  As a matter of material fact,

the AAA system is no less secure than the double envelope system and, in several

significant respects, is actually more secure.  Because that is the case, the DOL has not

carried and cannot carry its evidentiary burden to establish that the AAA system is not a

"reasonable" means of preserving ballot secrecy or that it violates the LMRDA's ballot

secrecy requirement.

> **B.      None of the Cases Upon Which the DOL Relies to Attack the
>          Reasonableness of the AAA System's Ballot Secrecy Protections
>          Actually Supports that Effort**

        None of the cases the DOL offers to suggest the purported unreasonableness of the

AAA system's security actually does so.  On the contrary, all of them provide a vivid

contrast to the elaborate AAA secrecy protection devices.  Cases like Local 3489 are

inapposite because they dealt with situations where no effort was made to provide a

secret ballot.  See also, Hummel, 469 F. Supp. at 1182 (voting area had regular seats

46

crowded together; union made no effort to provide for secret ballot); <u>Myers</u>, 653 F. Supp.

at 509 (voters sat in chair rows, marked ballots in their laps; "no facilities were provided

to permit secret voting"), cited in Pl. Br. at 16-17.  Cases like <u>Local 12447</u> are similarly

inapposite because, at best, they involved elections where a secret ballot was permitted

but not required.

Although the DOL is correct that the duty to protect ballot secrecy applies even if

a third party is used to conduct the election, Pl. Br. at 22-23, the case the DOL cites in

support of the proposition actually underscores the reasonableness of the secrecy

provisions of the AAA system.  In fact, the case illustrates precisely what illicit "linking"

of a voter with his/her vote really means, or, as the DOL frames the issue, when that

linkage is fully "realized."  Pl. Br. at 25.  In <u>Donovan v. CSEA Local Union 1000, Am.</u>

<u>Fed'n of State, County and Mun. Employees</u>, 594 F. Supp. 188 (N.D.N.Y. 1984) <u>aff'd in</u>

<u>part,</u> <u>rev'd in part</u>, 761 F.2d 870 (2d Cir. 1985), the mail ballot at issue was a perforated

card, the top half of which contained the voter's personal information, and the bottom

half the ballot; the double envelope system was not used, and voters were to mail back

the perforated card intact to the third party administrator.  594 F. Supp. at 195.  In other

words, at all times the voters knew full well not that it was theoretically possible to link

their identities with their votes, but that the two were actually and physically conjoined,

with no method prescribed to separate the two or even to obscure either.  Not only did the

<u>Local 1000</u> administrator receive the ballots in "linked" form but the "linked" ballots

were actually reviewed by a union official in a predetermined plan to "validate" them.

<u>Id.</u>

In one sense, <u>Local 1000</u> is yet another variation on the "no effort to protect secrecy" cases and is distinguishable on this ground alone.  Beyond that, it only illustrates that a continuous, unbroken linkage between voter and vote manifest to each and every voter cannot constitute a reasonable means of preserving ballot secrecy.  That determinative feature simply has no equivalent in the AAA system.

Finally, the DOL attempts to analogize the AAA system to a voting system that utilizes sequentially numbered ballots with a corresponding numbered voter registry.  Pl. Br. 30.  That analogy, however, will simply not hold.  At the outset, it should be recalled that the DOL itself has determined that sequentially numbered ballots do not constitute a *per se* violation of ballot secrecy.  <u>See</u> <u>supra</u> at 4, No. 5.  At least one court has agreed, as long as the numbered ballots are kept separate from the registry -- much as the voters and their votes are kept in separate computer "tables" in the AAA system.  See <u>Local 11</u>, 211 F. Supp at 412-13.

The particular cases on which the DOL relies for this purported analogy also have no logical connection to the AAA system because both dealt with conscious schemes to identify voters with their votes.  In <u>Reich v. United Mine Workers of Am.</u>, No. 94-1691, 1995 WL 791950 (D.D.C. Oct. 24, 1995), cited in Pl. Br. at 30, the ballots were sequentially numbered and were distributed sequentially to voters by union officials at the same time that the voters were required to sign a sequentially numbered registry, also maintained by the same union officials.  <u>Id.</u> at *4 (attached hereto as Exh. 6).  Not only <u>could</u> those union officials match the two to determine how individual voters voted, but

the union always intended to do so and actually did do so when a union committee checked the ballots against the registry to determine their validity.  Id.

The second case, Kelly v. Local No. B-183, Int'l Alliance of Theatrical Stage Employees, 566 F. Supp. 1199 (S.D.N.Y. 1983), Pl. Br. at 30, is even further afield. Kelly involved a transparent scheme of voter/vote identification whereby voters signed in by sequential numbers and were issued ballots precisely 100 numbers higher than their sign-in numbers.  566 F. Supp. at 1201.  When union members asked the union president to cut off the corners of the ballots where the numbers appeared in order to provide some semblance of secrecy, the president refused.  Id.  The court rejected the union's efforts to explain away the evident scheme as "unpersuasive" and simply not credible.  Id. at 1201 n.3, 1202.

While the two numbering cases may provide useful analogies to the Local 1000 decision, they have no applicability here because the two AAA computer "tables" were always intended to be kept separate and were in fact kept separate except when the computer system itself, with no human observation, linked them for the purpose of removing the votes of ineligible voters.  The only other time the tables were linked was when a voter went back onto the system to review or change his/her vote; and the DOL has already conceded that a voter's review of his/her own vote cannot constitute a ballot secrecy violation.  See supra at 16, No. 63.  Thus, none of the cases on which the DOL relies involved a voting system comparable in any meaningful way to the AAA system. On the contrary, the vivid contrast between these transparently un-secret systems and the

AAA system is further evidence that the AAA system took all reasonable steps, every reasonable precaution to assure ballot secrecy.

### CONCLUSION

For the reasons stated above, the DOL's motion should be denied because numerous disputes of material fact exist, and the DOL has failed to meet its evidentiary burden for establishing an LMRDA violation. Accordingly, the case should be set for trial on the merits.

Respectfully submitted,

s/ Sanford R. Denison
SANFORD R. DENISON
Texas Bar No. 05655560
BAAB & DENISON, LLP
Stemmons Place, Suite 1608
2777 N. Stemmons Freeway
Dallas, Texas 75207
(214) 637-0750; (214) 637-0730 Fax

EDGAR N. JAMES (admitted *pro hac vice*)
D.C. Bar No. 333013
STEVEN K. HOFFMAN (admitted *pro hac vice*)
D.C. Bar No. 384696
DAVID P. DEAN (admitted *pro hac vice*)
D.C. Bar No. 437030
JAMES & HOFFMAN, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500; (202) 496-0555 Fax

Counsel for Defendant Allied Pilots Association

Dated:  June 14, 2006

50

## CERTIFICATE OF SERVICE

I hereby certify that on the 14TH day of June, 2006 I electronically filed the

forgoing document with the clerk of court for the U.S. District Court, Northern District of

Texas, using the electronic case filing system of the court.  The electronic case filing

system sent a "Notice of Electronic Filing" to the following attorneys of record who have

consented in writing to accept this Notice as service of this document by electronic

means:

> TAMI C. PARKER
> Assistant United States Attorney
> Burnett Plaza, Suite 1700
> 801 Cherry Street, Unit 4
> Fort Worth, Texas 76102

> s/ Sanford R. Denison
> SANFORD R. DENISON

CASE INDEX

OPPOSITION BRIEF EXHIBITS 1 – 6 (attached)

McLaughlin v. Int'l Assoc. of Machinists, No. 4-86-620-E, 1989 WL 106711 (N.D. Tex. Mar. 28, 1989) (Mahon, J.)

Marshall v. Steelworkers, Local 15015, 98 L.R.R.M. 2493 (BNA) (N.D. Ala. 1978)

Shultz v. Local 420 Aluminum Workers, 74 L.R.R.M. 2281 (BNA) (N.D. NY 1970)

Brock v. District 6, United Mine Workers of Am., 772 F.2d 905 (Table), No. 84-3528, 1985 WL 13586 (6th Cir. Aug. 9, 1985)

Schade v. Md. State Bd. of Elections, No. C-04-97297 (Md. Cir Ct. of Anne Arundel Cty, Sept. 1, 2004), appeal dismissed, 382 Md. 520, 855 A.2d 1245 (Md Ct. Ap. 2004)

Reich v. United Mine Workers of Am., No. 94-1691, 1995 WL 791950 (D.D.C. Oct. 24, 1995)