# EXHIBIT "B"

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HON. ELAINE L. CHAO, SECRETARY, UNITED STATES DEPARTMENT OF LABOR, | § § § § | |
| Plaintiff, | § § | CASE NO. 4-05-CV-338-Y |
| v. | § § | |
| ALLIED PILOTS ASSOCIATION, | § § § | |
| Defendant. | § | |

**DECLARATION OF GERALD B. FELDKAMP
IN SUPPORT OF AMICUS BRIEF**

I, Gerald B. Feldkamp, declare as follows:

1. I am the Vice-President, Development of CCComplete, Inc., dba Allied Union Services. I make this declaration based on personal knowledge.

2. CCComplete is a corporation incorporated in the State of Oregon. I have been employed at CCComplete and held my present position since 1996. Since the first quarter of 2004, CCComplete, which performs computer services, and Allied Mailing and Printing, a corporation incorporated in the State of Michigan that provides printing and mailing services, have cooperatively been doing business as Allied Union Services. In this declaration, I will refer to these entities collectively as Allied Union Services.

3. In February 2000, CCComplete introduced a system called "BallotPoint" to support labor unions in conducting elections over the Internet, by telephone, or both. BallotPoint

**Declaration of Gerald B. Feldkamp in Support of Amicus Brief**                                        **Page 1**

has evolved over the course of more than six years of use by labor unions across the United States. The current Allied Union Services election service is a start-to-finish product that provides an election methodology and the hardware and software infrastructure needed to support a union conducting an election, including ballot authoring, document creation, document distribution, voter authentication, and ballot tabulation. The customers of BallotPoint do not purchase the infrastructure, but instead purchase the service, and Allied Union Services provides the support for elections that are run by the unions themselves. To date, the original BallotPoint system and its subsequent editions have been used in approximately 1,300 elections, including approximately 1,200 union elections and 100 National Mediation Board elections, and have processed approximately 700,000 votes.

4. BallotPoint is used by a wide variety of unions across the United States to conduct officer and contract ratification elections by both Internet and telephone. In addition, starting in September 2002 and continuing to the present, BallotPoint has been used to support the representation elections performed under the auspices of the National Mediation Board, which are conducted by telephone only.

5. A bonafide election is a multi-faceted event that requires the appropriate foundational construct, safeguards, controls, and verification to ensure the election's fidelity. Regardless of whether an election is conducted by in-person balloting, mail balloting, Internet balloting, or telephone balloting, no single one of the elements required to ensure an election's fidelity should be considered in isolation. Rather, it is the combination of these elements that gives rise to a safe, secure, confidential, and secret election process. The BallotPoint system

incorporates numerous proactive features and rigorous procedures that have been developed to safeguard and preserve the secret ballot.

6. Prior to conducting a union's first election, union election administrators provide information to Allied Union Services, to configure the BallotPoint election process to comply with that union's specific constitutional requirements and/or by-laws.

7. The first step in the current BallotPoint election process is for union election administrators to author the ballot. Union election administrators start by opening a ballot template within the Microsoft Word word processing program. They fill in the election-specific information, such as the name of the election, the polling start and end times, voter-eligibility criteria, the questions on which to vote, and the possible answers. Once completed, the ballot is stored in a database at Allied Union Services. At the same time, the BallotPoint system automatically creates – at a customer's option – drafts of instructional documents that will eventually be sent to notify voters of the election, and which describe when and how to vote. The voice-prompt script for telephone-based voting is also generated at this time. Union election administrators then proofread the documents and continue submitting revised versions of the ballot until satisfied that the ballot, the instructional documents, and the voice-prompt script read as intended. The administrators then record the telephone script (if telephone-voting will be used), and authorize the final product, including the packet of instructional materials to be sent to voters (if appropriate).

8. Every election is controlled by a database of members determined to be eligible to participate in the election. Union election administrators provide a list that is current as of the time of submission to Allied Union Services prior to mailing of the voter packet. Each member

**Declaration of Gerald B. Feldkamp in Support of Amicus Brief**  Page 3

is assigned up to two attributes that determine his or her eligibility to vote in particular elections or on certain questions in an election. Examples of such attributes include job classification, seniority, and place of employment. Members are also distinguished by what roles they play in an election. Most unions have election administrators, voters, and election chairs. Election administrators are responsible for running the election; voters vote in the election; and election chairs officiate and release results. The member-type is used to compartmentalize access to various parts of the BallotPoint system.

9. For customers who have purchased the option to have Allied Union Services print their voter packets, the following procedures apply: After the ballot and voter packet have been authorized, and Allied Union Services has received a list of voters eligible to vote in that election, the election-specific voter packets are printed and then mailed. Each packet is also voter-specific, in that it includes two access codes that are necessary to access the system to vote – a Voter Identification Number ("VIN") and a confidential Personal Identification Number ("PIN"). The union always supplies the VINs; the PINs are either supplied by the union, or generated randomly by Allied Union Services. If PINs are supplied by the union, the voter is required to change the assigned PIN before being permitted to vote.

10. Voting is accomplished through the use of the telephone or Internet, and instructions for both methods are included in the voter packets. To vote, union members call a toll-free number or log on to a secure website that, among other things, prevents a third party from intercepting communications by encrypting the information passed between the voter's web browser and the BallotPoint system. An eligible voter accesses the voting system by providing his or her VIN and PIN. When a member accesses the system by either telephone or Internet, the

system verifies the access codes against the membership database, and may require the member to change his or her PIN. The system then presents the ballot to the voter. Once the member votes on the candidates or issues, the vote is recorded, and the system speaks (in the case of telephone voting) or displays to the voter (in the case of Internet voting) a unique ballot confirmation number.

11. For many unions, voter eligibility changes during the course of an election. For instance, members who were eligible to vote when voter packets were sent out, but retire thereafter, may be ineligible to vote. For those unions whose constitutions or by-laws require them to update voter eligibility before the conclusion of elections (which are often held over a period of several weeks), if a member votes and later becomes ineligible, the system deletes that member's vote.

12. Once an election is concluded, BallotPoint tabulates the results. The results are not available to the voting membership until they are officiated and released by the union. This process requires both a union election chair and a union election administrator to securely log in together to BallotPoint via a standard web browser, view the results of the election (which BallotPoint tabulates automatically when requested jointly by the chair and the administrator), and certify the election on an official form. Observers may be present with the election chair and administrator, and up to 10 witnesses may sign the official certification of the election. Once certified, the results can be released to the membership. How an individual member voted is never released and no one other than four members of the Allied Union Services technical staff (and of course the voter) has access to that information. Through Allied Union Services's Service Agreements with its clients, the company and its employees are contractually bound to

**Declaration of Gerald B. Feldkamp in Support of Amicus Brief**                              Page 5

hold secret and not disclose to the union or any third party any information that could connect a voter with his or her vote.

13. BallotPoint allows the voter's identity and the vote to be linked electronically to enable handling of certain circumstances in union elections. As noted above, some unions require that votes be removed when a previously eligible voter is found to be ineligible prior to tallying the vote count. Further, some unions' bylaws permit members to change their votes prior to the end of the election; that is, the voters may change their previous selections up until the deadline for voting and the last selection governs.

14. The BallotPoint voting system outlined in the previous paragraphs has evolved over the six years of its operation, but at its core has always been the same methodology. Allied Union Services has designed and is in the process of implementing a new version of BallotPoint, based on the principles in the following three paragraphs.

15. First, all members will be assigned unique, randomized Voter Identification Numbers and confidential Personal Identification Numbers to be generated by Allied Union Services. Before any member votes for the first time under the new system, he or she will have to change the assigned, randomized PIN generated by Allied Union Services to a permanent PIN of his or her choosing. Once the permanent PIN is set, only the voter will know this PIN, the correspondence between the VIN and PIN, and the identity of the voter. Not even Allied Union Services staff will know this information.

16. Second, after logging in to the BallotPoint website using a valid VIN and permanent PIN, every member will be able to view a log of activity on that member's account. The dates and times of all logins, PIN changes, and votes that have occurred on that member's

**Declaration of Gerald B. Feldkamp in Support of Amicus Brief**                                     Page 6

BallotPoint account will be displayed. In addition, and at the option of the union, the member may also view the content of BallotPoint's record of ballots previously cast by that member. To display the content of a ballot, the voter must provide the confirmation number that was generated by BallotPoint for that particular user for that particular ballot. Without both the PIN and the confirmation number, the vote-content will not be displayed.

17. Third, with respect to the computer system housed at Allied Union Services, the table of voters and the table of votes will be separated into two distinct databases that reside on different computers and that, while interconnected by the Internet, operate under very strict protocols that define and limit the exchange of data between these computers. People with the privilege to log into the operating system of one computer will not have the privilege to log into the operating system of the other computer, thus preventing any individual from being able to view both the name of a voter and how that person voted. The number of people with operating system log-in privileges to either computer will be strictly limited. By contract with union clients and strict rules within Allied Union Services, persons with access to either voter identifying information or votes cannot share this information. The only access to the two types of information together is across a secure Internet channel using the voter's VIN to tag information passed back and forth regarding that particular voter. The vote-recording computer knows the VIN and the vote-content, but not the identity of the voter. The voter-identity computer knows the VIN and the voter's identity, but not the vote-content. When combined with the strict protocols that prohibit passing of voter identity or vote content between computers, this permits the vote and the voter to be linked without any one person or computer knowing both pieces of information. In the absence of collusion between two or more easily

**Declaration of Gerald B. Feldkamp in Support of Amicus Brief**                                                          Page 7

identifiable persons, it will not be possible for anyone in the election process to identify both a voter and his or her vote.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed at Portland, Oregon, this 2th day of June, 2006.

_____
Gerald B. Feldkamp