IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION
_____

| | | |
|---|---|---|
| HON. ELAINE L. CHAO, | § | |
| SECRETARY, UNITED STATES | § | |
| DEPARTMENT OF LABOR, | § | |
| Plaintiff, | § | |
| | § | CIVIL NO. 4:05-CV-338-Y |
| v. | § | |
| | § | |
| ALLIED PILOTS ASSOCIATION, | § | |
| Defendant. | § | |

**PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO SUMMARY JUDGMENT**

Respectfully Submitted,

RICHARD B. ROPER
UNITED STATES ATTORNEY

s/ Tami C. Parker
Tami C. Parker
Assistant United States Attorney
State Bar No. 24003946
Burnett Plaza, Suite 1700
801 Cherry Street, Unit 4
Fort Worth, Texas 76102-6882
Telephone: 817.252.5222
Facsimile: 817.978.6351

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

APA HAS FAILED TO DEMONSTRATE A
GENUINE ISSUE OF MATERIAL FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    APA's Disputes to Seven of Chao's Uncontested Facts Do Not
    Create a Genuine Issue of Material Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Chao Disputes Several Facts in APA's Counter Statement of Facts. . . . . . . . . . . . 5

    APA's Additional Facts are not Relevant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    The Five Facts in Chao's MSJ Brief that Lack a Specific Citation in the
    Record are Supported by APA's Admissions in its CSF. . . . . . . . . . . . . . . . . . . . 13

APA MISSTATES THE STANDARD APPLICABLE TO EVALUATING
ITS VOTING SYSTEM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Reasonableness is Not the Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    APA's Voting System was Not Reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    The Problems with the APA's System are Not Theoretical. . . . . . . . . . . . . . . . . . 21

THIS CASE IS RIPE FOR SUMMARY JUDGMENT DISPOSITION. . . . . . . . . . . . . 24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Bachowski v. Brennan*, 413 F. Supp. 147 (W.D.Pa. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Brock v. American Postal Workers Union South Jersey Area Local 526*,
        1986 WL 15272 (D.N.J.1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Brock v. Dist. 6, United Mine Workers of Am.*, 772 F.2d 905 (Table),
        No. 84-3828, 1985 WL 13586 (6th Cir. Aug. 9, 1985). . . . . . . . . . . . . . . . . . . . . . 16

*Chao v. Local 54, Hotel Employees and Rest. Employees Int'l Union*,
        166 F. Supp.2d 109 (D.N.J. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). . . . . . . . . . 8

*Donovan v. Air Transport Dist. Lodge No. 146*, 754 F.2d 621 (5th Cir. 1985). . . . . . . . . . 11

*Donovan v. CSEA Local Union 1000*, 594 F. Supp. 188 (N.D.NY 1984). . . . . . . . . . . . . 16

*Hodgson v. Local Union 6799, United Steelworkers of America, AFL-CIO*,
        403 U.S. 333 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Int'l Org. of Masters, Mates, & Pilots v. Brown*, 498 U.S. 466 (1991). . . . . . . . . . . . . . . . 15

*Marshall v. Local Union 12447, United Steelworkers of Am., AFL-CIO*,
        591 F.2d 199 (3d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-18

*Nunez v. Superior Oil Co.*, 572 F.2d 1119 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . 25

*Reich v. Dist. Lodge 720, Int'l. Ass'n of Machinists and Aerospace Workers, AFL-CIO*,
        11 F.3d 1496 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Reich v. United Mine Workers of Am.*,
        No. 94-1691, 1995 WL 791950 (.D.C. Oct. 24, 1995). . . . . . . . . . . . . . . . . . . . . . 23

*Ross v. Hotel Employees and Rest. Employees Int'l Union*, 266 F.3d 236 (3rd Cir.2001). 20

*Wirtz v. Local 11, Int'l Hod Carriers*, 211 F. Supp. 408 (W.D. Pa. 1962). . . . . . . . . . 23, 24

**FEDERAL STATUTES and REGULATIONS**

24 U.S.C. § 15481(1)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

24 U.S.C. § 15481(1)(A)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

29 U.S.C. § 401(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

29 U.S.C. § 402(k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

29 U.S.C. § 481(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

29 U.S.C. § 481(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

29 U.S.C. § 481(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

29 C.F.R. § 452.97. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**FEDERAL RULES**

Fed.R.Civ.P. 30(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION
_____

| | | |
|---|---|---|
| HON. ELAINE L. CHAO, | § | |
| SECRETARY, UNITED STATES | § | |
| DEPARTMENT OF LABOR, | § | |
| Plaintiff, | § | |
| | § | CIVIL NO. 4:05-CV-338-Y |
| v. | § | |
| | § | |
| ALLIED PILOTS ASSOCIATION, | § | |
| Defendant. | § | |

**PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO SUMMARY JUDGMENT**

Plaintiff, Hon. Elaine L. Chao, Secretary, United States Department of Labor (Chao or DOL), in reply to Defendant's, Allied Pilots Association (APA), Opposition to Summary Judgment, would respectfully show the Court the following:

**A.    APA Has Failed to Demonstrate a Genuine Issue of Material Fact.**

APA has failed to establish the existence of a genuine issue of material fact sufficient to defeat the appropriateness of summary judgment disposition of whether the remote Internet voting system used by the APA in its 2004 national officer elections (2004 elections) violated the LMRDA. Although APA argues that there are contested material facts, additional facts and/or facts not supported by specific citation to the record that preclude summary judgment, an examination of the substance of these complaints reveal that APA's arguments are without merit.

**Plaintiff's Reply - Page 1**

### 1.    APA's Disputes to Seven of Chao's Uncontested Facts Do Not Create a Genuine Issue of Material Fact.

Chao has identified seven facts listed as uncontested in her brief that the APA asserts are "disputed."[1]  As set forth below, none of these disputes demonstrate the existence of a genuine issue of material fact.

APA first argues that the DOL "is wrong when it declares that there was a 'link' between voter and vote."  Opposition at 16, n.5 (citing Chao's Brief in Support of Summary Judgment (MSJ Brief) at 6, Uncontested Fact (UF) No. 43).  However, APA does not dispute that two tables existed for the 2004 APA National Officer Elections: one with APA members' personal information and a unique identifying number, and one that contained the votes cast by those members and the same unique identifying number.  *See* Opposition at 13, Counter Statement of Fact (CSF) Nos. 51-52.  APA offers no dispute that by comparing that information, it was possible to link an APA member with his or her vote. *Id.*, at 17, CSF No. 67.  Whether such system should be described as creating a "link" between the APA member and his or her vote, or described as making that information "linkable" is a question of semantics, and does not create a genuine issue of material fact.

Second, APA argues that "[t]he DOL is incorrect in asserting that an APA voter could not tell if someone else had viewed his or her vote."  Opposition at 16, n.6 (citing MSJ Brief at 6, UF No. 47).  The facts admitted in APA's CSF supporting this footnote

---

[1]  In a footnote, APA complains that one of the DOL's assertions regarding the ability of certain employees of the American Arbitration Association (AAA) or GetAGeek to use the information available in the control book to see how a particular member voted "can only be accurate in the theoretical sense." Opposition at 22, n.11.  Chao has not construed this contention as a factual challenge to the accuracy of the assertion that there were persons who could in fact determine how an individual member voted.

**Plaintiff's Reply - Page 2**

clearly belies its accuracy of this challenge.  *See* Opposition at 16, CSF No. 64 (noting that "[a]lthough an individual voter returning to the system to review or change his/her vote *could not tell if someone else had simply viewed his/her vote . . .* )"  *Id.*  That the APA voter could tell whether someone *changed* his or her vote has no bearing on the fact that APA member could not tell whether someone had viewed his or her vote.

Third, APA argues that "the DOL is incorrect when it asserts that AAA and [GetAGeek] could not determine if someone other than a rightful APA member accessed the system to see how individual voters had voted."  Opposition at 17, n.7 (citing MSJ Brief at 6, UF No. 46).  However, APA has presented no evidence to contradict the fact that persons with an APA member's employee identification number (EIN) and personal identification number (PIN) could log onto the APA's website, enter that information, and identify how that APA member voted.  As the designer of the system noted, he would have no way of knowing that person was not the rightful voter.  Appx. 3 to MSJ Brief at 063, 066.  That all log-ins into the system were recorded thus allowing the administrator to see any "suspicious" activity does not negate the flaws in a system that allowed persons to easily, and without significant risk, identify an APA member with his or her vote.

Fourth, APA complains that "[i]n contrast to the DOL's contention, [Winson Surnamer, APA's printing subcontractor] did not have access to a 'document' containing the information."  Opposition at 19, n.8 (citing MSJ Brief at 5, UF No. 39).  That APA does not consider the term "document" broad enough to encompass an electronically stored table of information does not create a genuine issue of material fact.  It is undisputed that

Winson Surnamer had access to APA members' PINs, EINs, and other personal information.  *See* Opposition at 18, CSF Nos. 71-74 (admitting that APA transmitted to Winson Surnamer APA members' home addresses, domiciles, and EINs, and that Winson Surnamer generated the PINs and transmitted that information to the AAA).

Fifth, APA argues that "[i]n contrast to the DOL's claim, the book was kept exclusively in the AAA election office, not in the AAA's offices at large, and was only available to certain AAA election staff."  Opposition at 19, n.9 (citing MSJ Brief at 5, UF No. 37).  Chao believes that the facts set forth in her Uncontested Facts Nos. 37 and 38 accurately reflect the facts of this case, although Chao is not opposed to the insertion of "election" into Uncontested Fact No. 37 such that it reads "but was available around the AAA *election* office for use" for more precision.  However, this challenge to Chao's Uncontested Fact does not create a genuine issue of *material* fact.

Sixth, APA argues that "Mr. Ohmann did not 'have' the personal information as claimed by the DOL."  Opposition at 20, n.10 (citing Uncontested Fact No. 40).  There is no dispute that Ohmann was provided with, and had access to, the information that was stored electronically in databases, including APA members' PINs, EINs, and other personal information.  *See* Appx. 3 to MSJ Brief at 059-060 (Deposition of Ohmann at pp. 72-73) and Appx. 9 to MSJ Brief at 115.  As with APA's challenge to UF No. 43, this argument is one of semantics, and does not create a genuine issue of *material* fact.

Finally, APA takes issue with Chao's assertion that Jeff Zaino of the AAA was aware of DOL's concerns regarding the electronic system before the 2004 elections.

Opposition at 26, n.12. APA argues that Zaino was "actually aware only of a potential problem with the change vote feature." *Id.* Zaino's knowledge of potential problems with the electronic system is not relevant to the question of whether APA's system in fact violated Title IV's requirement of a secret ballot, thus it does not create a genuine issue of material fact. In any event, APA misrepresents Chao's statement in the Uncontested Fact, which stated that "Jeff Zaino, Vice President of Elections with the AAA, was aware prior to the 2004 elections *that the change vote feature* in AAA's remote Internet voting system presented potential voter secrecy problems which could run afoul of Title IV of the LMRDA." MSJ Brief at 2, UF No. 10. (Emphasis added).[2]

### 2.    Chao Disputes Several Facts in APA's Counter Statement of Facts.

Although they do not rise to the level of creating a genuine issue of material fact, Chao takes exception to inferences drawn from testimony of the DOL's Fed.R.Civ.P. 30(b)(6) witness, Mary Alice Cahir, and cited as "facts" by the APA. For example, in response to a hypothetical question, Cahir testified that, notwithstanding the theoretical possibility that someone might install a camera in the ceiling to defeat the secrecy of the vote in a voting booth, there must be "some suggestion that somebody has done something funny to defeat the privacy of the voting booth." *See* Appx. 1 to Opposition at 11-12. It cannot reasonably be inferred from that testimony that the DOL has taken the position that

---

[2] Similarly, APA's complaint that the DOL "made no effort to convey any continuing dissatisfaction with the AAA system" is irrelevant. Opposition at 39, n. 14. APA does not challenge the fact that the DOL made the AAA and APA aware of the Department's concerns regarding the system prior to the election. *See* MSJ Brief at 2-3, UF Nos. 10, 12-13. The burden was on the union to ensure that the voting system they used complied with the LMRDA.

**Plaintiff's Reply - Page 5**

"it must be shown that someone *actually tampered* with the presumed secrecy protection of the voting booth, machine or partition" before they can be found inadequate to protect ballot secrecy, as suggested by APA.  Opposition at 3, CSF No. 4 (emphasis added). Similarly, Cahir's agreement that the very use of a third party to safeguard ballots would not, in and of itself, raise concerns in the absence of facts that there was a problem with the third party, nor does it translate into APA's assertion that "the DOL will not proceed with a ballot secrecy complaint involving the period of storage unless it has specific evidence of an invasion of ballot secrecy during storage."  Opposition at 7, CSF No. 18.

**3.    APA's Additional Facts Are Not Relevant.**

The APA states that its "principle dispute with the DOL's factual presentation is that it omits many, many facts that are material to the resolution of this dispute."  Opposition at 2-3.  It then provides a "counter statement" of 126 facts it believes are relevant to resolution of this matter.  The majority of these facts can be roughly separated into the following categories: (1) alleged flaws in approved voting methods, particularly booth voting and mail ballots;[3] (2) alleged facts regarding other elections utilizing electronic voting where the DOL has declined to challenge the electronic system;[4] (3) the particulars of how the APA's electronic system worked, including efforts to maintain ballot secrecy;[5] and (4) the

---

[3]  *See, e.g.,* CSF Nos. 3, 6-22, 40.  This argument is discussed *infra*, at pp. 7-10.

[4]  *See, e.g.,* CSF Nos. 5, 20-22, 28, 93-116.  This argument is discussed *infra*, at pp. 11-13.

[5]  *See, e.g.,* CSF Nos. 31-58, 61-62, 65-70.  Although APA provides its own statements as to how its system worked, it does not contradict Chao's statement of facts.  Moreover, although APA details the efforts taken to try to ensure ballot secrecy, they are irrelevant when secrecy was not in fact preserved.

**Plaintiff's Reply - Page 6**

absence of evidence of actual malfeasance on the part of APA and its contractors and subcontractors.[6]  Chao disagrees that these facts are relevant, and in any event they do not show the existence of a genuine issue of material fact.[7]

> a)   **Alleged Flaws in Other Voting Methods Do Not Negate the Breach of Ballot Secrecy In APA's Remote Internet Voting System.**

APA's primary argument is not that its system protected the secrecy of APA members' and their votes.  Rather, the APA argues that there are flaws in every voting system, and that the remote Internet voting system used in its 2004 elections was "no less secure than the double envelope system," a system of voting approved by the DOL. Opposition at 46.  It is the validity of this assertion, APA argues, that creates a genuine issue of material fact precluding summary judgment.  *See* Opposition at 46.  Chao disagrees.

As discussed above, APA has not demonstrated that a genuine issue of material fact exists with respect to the architecture of the remote Internet voting system used in the 2004

---

[6]  *See, e.g.,* CSF Nos. 29, 70, 88, 90, 122-125.  As explained in Chao's MSJ Brief, the absence of malfeasance, and the purported neutrality of the election administrators are irrelevant.  *See* MSJ Brief at 22-23, 26-27.

[7]  APA also lists as a "relevant" fact an excerpt from the Help America Vote Act of 2002, as amended, 24 U.S.C. §§ 15481(1)(A)(i) and (ii) (HAVA), and argue that this excerpt demonstrates that "Congress itself has seen fit to *require* [a change-vote] feature in federal political elections.  Opposition at 15, CFS No. 59; *see also id.* at 39, n. 14.  However, HAVA does not support the suggestion that Congress would support the type of linkability necessary to the change-vote feature used in the 2004 APA elections.  Rather, in explaining the requirements of voting systems, Congress stated the system must allow a voter to change their vote *before* the ballot is cast and counted.  *See id.*  This cannot be read as providing tacit approval for a voting system that would link a voter with his or her vote such that the voter, or someone with the voter's information, could come back *after* the ballot was cast, look at it, and, if desired, change that ballot.  *See id.*  Moreover, HAVA does not address remote Internet voting, and does not purport to change the legal standards for political elections.

elections.  Although it has argued that neither Ohmann nor certain employees of AAA and

GetAGeek used APA members' PINs and EINs to access the system and determine

whether and/or how APA members voted, APA does not dispute that these persons *could*

identify APA members with their votes.[8]  *See supra* at 2-4.  Similarly, while APA suggests

that Ohmann could detect "suspicious" activity, *see* Opposition at 34, it has offered no

evidence that persons provided with APA members' PINs and EINs could not use this

information in a manner which breached the secrecy of the ballot for some APA members

but would not create "suspicion."  APA has not shown that any other voting system,

including mail ballot elections, allows such easy access to members' votes.[9]  Whether the

purported ability to detect suspicious activity, coupled with the other purported security

measures, preserves ballot secrecy is a conclusion for this Court to draw on the basis of the

undisputed evidence.

Chao respectfully submits that while mail balloting is *not* the standard, in

considering the evidence presented by the APA, that evidence failed to establish that APA's

---

[8]  That these persons perhaps did not actually access APA members' votes does not render the fact that they were provided all the information necessary to access that information system "theoretical."

[9]  Chao notes that mail balloting is not the standard by which the APA's remote Internet system must be judged.  The standard is the plain language of the LMRDA, which requires voting by secret ballot.  While the DOL has specifically adopted regulations allowing the political election practice of double-envelope mail balloting, *see* 29 C.F.R. § 452.97, and while the APA's system can be *analogized* to mail balloting, the DOL has not lowered, and cannot lower, the strict ballot secrecy standard set by Congress and interpreted by the Courts.  By notice and comment rulemaking, the DOL determined that there were adequate safeguards in double-envelope mail balloting to preserve ballot secrecy; safeguards not present in the instant system.  Although the APA attempts to point out flaws in that system, the DOL is entitled to deference in that conclusion.  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).  Moreover, any alleged flaws in that system would not justify APA's use of an admittedly flawed system which clearly runs afoul of the LMRDA.

**Plaintiff's Reply - Page 8**

remote Internet voting system was as secure as a mail ballot system.  This is true even giving APA all reasonable inferences from the evidence.  Instead, for all the similarities between mail ballot elections and the remote Internet voting system used by the APA, the distinctions between those systems are where the APA's system fails.  In a properly designed mail ballot election, voters place their ballots inside one envelope bearing no identifying information, then place that ballot inside another envelope which contains the voter's identifying information, then place that package in the mail.  *See* Appx. 16 to Opposition at 491.  Those packages are stored until the election is over.  *See generally id*., at 494.  Then, and only then, are the outer envelopes removed.  *Id.*, at 495.  At that point, however, the candidates are allowed to have "observers" present to ensure that the outer envelope is separated from the inner envelope, that the inner envelopes are opened and the ballots counted in a manner where the identity of the voter on the outer envelope cannot be linked with the inner envelope.  *See* 29 U.S.C. § 401(c).  To access those packages, someone must either tamper with the United States mail, or gain access to the storage facility where the votes are held,[10] rifle through multiple envelopes, and attempt to surreptitiously ascertain how a specific voter voted.[11]

---

[10] Unions generally use the United States Postal Service to hold incoming ballots, thus generally alleviating most concerns with regarding the security of the ballots during storage.  Appx.1 to Opposition at 49 and Appx. 16 to Opposition at 463 (stating that observers "must be also be allowed to accompany election officials when the returned ballots are picked up from the post office. . ."), and 490 (suggesting arrangements to be made with the Postal Service).  However, the DOL does not mandate the use of the Postal Service.  *See id.* at 49.  That said, any third party storing the ballots is required to comply with the requirements of the LMRDA, including safeguarding the ballots.  *See id.*, at 36.

[11] Although mail ballot elections may present challenges to ballot secrecy, any systemic problem in those elections is generally visible and can be quantified.  For example, observers can view whether a union used envelopes so thin that the ballots can be read through the outer and inner envelopes, and a

However, in contrast to a properly designed mail ballot election, the remote Internet voting system employed by the APA here allowed multiple persons, without the need to handle or rifle through hundreds or thousands of envelopes, without the threat of being observed taking and/or returning envelopes, without the concern that the $19.99 spray available over the Internet might not work, or might leave chemical traces or residue, were instead given the information necessary to log onto a computer and see whether and/or how a particular member voted.  The APA did not implement a system that was secure, only to have it breached in a manner outside the control of the union.  Rather, it used a system that was inherently insecure in its openness, thus running afoul of the ballot secrecy requirement of the LMRDA.  The third party responsible for storing the ballots, AAA, "stored" them in such a manner that multiple persons within its own organization, persons within two of its subcontractors, and any APA member who for whatever reason was able to obtain another APA member's PIN, could look into the "storage" and identified members with their votes. The only assurance APA members had that this did not occur was representations by APA contractors that they were "neutral," and could monitor any "suspicious" activity in the system.  This simply is not enough to provide APA members with political election-grade protection to which they are entitled.

---

challenge can be raised to that system.  In discharging the duties mandated by Congress to investigate any timely claims regarding such a system, the DOL can look at the actual envelopes, interview observers, etc.  As reflected in the elections cited by APA, problems also arise when, for example, a  number of voters return their ballots without the inner envelope.  In such cases, the union is tasked with ensuring that any such ballots are removed in a manner where the outer envelope is discarded without viewing the inner ballot.  If there is a systemic problem, however, such a union's failure to include the inner envelope or use of envelopes that are so thin that the ballot can be read through the envelopes, then, upon a proper challenge by a union member, the DOL would be authorized to investigate and challenge the election.

**Plaintiff's Reply - Page 10**

b)    **Instances Where DOL Has Declined to Challenge Elections on the Basis of Ballot Secrecy Are Inapposite.**

APA's complaint that there were instances where the DOL declined to challenge union elections other elections is misplaced, and does not create a genuine issue of material fact. *See, e.g.*, 5, 20-22, 28, 93-116. As noted in the MSJ Brief, "[t]he DOL's authority under section 402 does not authorize the DOL to challenge *all* violations of section 401 discovered while investigating the member's complaint. *See* MSJ Brief at 10 (*citing Donovan v. Air Transport Dist. Lodge No. 146*, 754 F.2d 621, 627 (5th Cir. 1985). Rather, the DOL's inquiry is generally limited to those matters that complainants timely presented to union officials pursuant to the union's internal grievance procedures. *Id.* at 10-11 (citing *Hodgson v. Local Union 6799, United Steelworkers of America, AFL-CIO*, 403 U.S. 333, 341 n.6 (1971)).

Here, APA presents no evidence that the complaints in the two APA elections referenced in its brief where the same remote Internet voting systems were used raised questions similar enough to the matters at issue in the instant case to merit a full review of the system.[12] *See* Opposition at 24-27. Moreover, APA acknowledges that the system used

---

[12] APA admits that the complaint regarding the 2003 APA Miami Domicile Election did not allege ballot secrecy, so it was not an issue properly before the DOL. *See* Opposition at 24, CSF No. 102. In the 2004 APA Dallas/Fort Worth Domicile Election, although ballot secrecy was raised by the complainant, it was raised in a narrow fashion, namely, that the password fields in the remote Internet voting system were not protected, thus allowing subsequent voters using the same computer to perhaps to recall the prior voter's password. *See* Appx.1 to Opposition at 115-116 (Deposition of Mary Alice Cahir). The DOL inquired about that aspect of the system, determined that the password fields were in fact protected, and thus found no violation of the Act. *See* Appx. 7 to Opposition at 348-349. Thus, it is misleading to assert that "the DOL found no secrecy flaws," when the APA is clearly aware that only a limited secrecy issue was before the agency. Opposition at 39.

in the SWAPA elections was designed by a different company.  *See* Opposition at 22, CSF

No. 95.  While the APA may be correct in its representation that: (1) SWAPA has

continued to use electronic voting since 2001, and (2) the DOL has never determined that

any subsequent SWAPA election, or any election using the CCC system, raised ballot

secrecy problems, *see* Opposition at 23, CSF No. 97, APA ignores the fact that the DOL

has never determined that the CCC system used by SWAPA raised ballot secrecy problems

because that issue has not been before the DOL.  *See* Appx. to Opposition at 77 (deposition

of Cahir noting that there were no ballot secrecy complaints in SWAPA elections from

2001 to 2005).  Thus, APA presents no evidence that the DOL was aware of the

architecture of the CCC's system and the linkage between voters and their votes prior to an

exchange of correspondence with the organization in 2005. [13]  Further, APA presents no

competent summary judgment evidence to support its bald allegation that the DOL was

aware of the technical aspect of how that electronic voting system worked at the time of the

2001 supervised election, and how ballot secrecy was implicated.  *See* Opposition at 39.

As to the ballot secrecy cases where the DOL declined to find a violation of ballot

secrecy, Chao asserts that none of the investigations referenced by APA are relevant to the

question of, or establish a genuine issue of material fact with respect to, whether APA's

remote Internet voting system violated the LMRDA.  The referenced cases do not reflect

systemic problems with voting methods used by the unions, as is the case here, but rather

---

[13]  The DOL did seek information regarding CCC's system in 2005.  *See* Appx. 33 to Opposition
at 586 (noting in a February 11, 2005, letter to the DOL that CCC had received a request for information
regarding the architecture of its electronic system from the DOL on February 2, 2005).

**Plaintiff's Reply - Page 12**

instances where *voters* failed to fully comply with those methods but the DOL was satisfied that secrecy had not been breached.[14]  Unlike the instant case, the scope of any problem with ballot secrecy in those matters could be readily ascertained and quantified.

### 4.    The Five Facts In Chao's MSJ Brief that Lack a Specific Citation in the Record Are Supported By APA's Admissions in its CSF.

APA complains of five Uncontested Facts in the MSJ Brief which lack a specific citation to the record.  *See* Opposition at 3, n.1.  Chao notes that the accuracy of those facts is supported by APA's own admissions in its CSF, and thus there is no genuine issue of material fact.  Specifically, Chao's statement in Uncontested Fact No. 44 is supported by CSF No. 61.  *Compare* MSJ Brief at 6, UF No. 44 *with* Opposition at 15, CSF No. 61 (both noting that the electronic system compared the databases containing APA members' personal information and vote information to allow a voter to view and/or change his or her vote).  Chao's statements in UF Nos. 49, 50 and 51, (*see* MSJ Brief at 6-7), that Ohmann, employees of AAA, and employees of Winson Surnamer with access to APA members' PINs and EINs could use that information to identify whether and how a particular member voted is supported by APA's CSF Nos. 71-74, and 83 (*see* Opposition at 18, 20), which admit that Ohmann and certain employees of AAA and Winson Surnamer had that

---

[14]  *See* Opposition at 7, CSF No. 20 and Appx. 19 to Opposition at 515-516 (addressing a complaint of breach of ballot secrecy where "the election committee opened and counted [seven] ballots that had been returned without the secrecy envelope," but "officials were careful to turn their heads so as not to see how the ballot had been marked"), Opposition at 7, CSF No. 21 and Appx. 20 to Opposition at 534-535 (addressing a complaint of breach of ballot secrecy where "ballots returned without secret envelopes were erroneously counted"), and Opposition at 7, CSF No. 21 and Appx. 21 to Opposition at 544 (addressing a complaint of breach of ballot secrecy where "between 134 and 150 ballots that were returned without use of secret ballot envelope were counted tally").

information, and CSF No. 61 (*see* Opposition at 15), which acknowledges that those were the two pieces of identifying information necessary to access the system.[15]  Finally, Chao's statement that by cross-referencing the membership database with the vote database, Ohmann could determine who an APA members voted for, is demonstrated by the undisputed evidence that Ohmann had access to both systems, *see* MSJ Brief at 7, UF 53, and in APA's protest that he did not utilize that access.  *Compare* MSJ Brief at 7, UF No. 54 *with* Opposition at 45 (noting that "[a]lthough [GetAGeek] systems administrator Ohmann could have theoretically invaded secrecy without the need for EINs and PINs [his] own entries into the GAG server were also logged").

## B.      APA Misstates the Standard Applicable to Evaluating Its Voting System.

### 1.      Reasonableness is Not the Standard.

Contrary to APA's assertion, the LMRDA's requirement that union subject to its provisions elect their national officers by secret ballot is not subject to a reasonableness standard.  *See* Opposition at 31-38.  Instead, LMRDA elections must be conducted by secret ballot in a manner strictly conforming to the procedures used in political elections. Congress clearly stated its requirement, in plain language, that union officer elections must be conducted by "secret ballot," 29 U.S.C. § 481(a), and defined that requirement as voting "in such a manner that the person expressing such choice cannot be identified with the

---

[15]  The APA argues that in addition to needing the PIN and EIN of the APA member, a person attempting to link an APA member with his or her vote "would have to gain access to a computer, have to use that computer to access the AAA election website and the APA election portion of the website." Opposition at 44.  APA offers no evidence that employees of AAA, WSL, or GetAGeek did not have full access to all of these "requirements."

choice expressed."  29 U.S.C. § 402(k).

Where Congress intended to make reasonableness a consideration under the

LMRDA, it expressly said so.  *See, e.g.,* Section 401(e) of the LMRDA, 29 U.S.C. § 481(e)

(providing in pertinent part:

> a *reasonable* opportunity shall be given for the nomination of candidates and
> every member in good standing shall be eligible to be a candidate and to hold
> office (subject to section 504 of this title and to *reasonable* qualifications
> uniformly imposed) and shall have the right to vote for or otherwise support
> the candidate or candidates of his choice  . . . )

(Emphasis added); *see also, e.g.,* Section 401(c), 29 U.S.C. § 481(c), (requiring labor

organizations to comply with "all *reasonable* requests of any candidate to distribute by mail

or otherwise at the candidates expense campaign literature . . . ") (Emphasis added).

Indeed, as a New Jersey district court noted in interpreting a different provision of the

LMRDA:

> The use of a reasonableness standard and similar qualifying language in other
> provisions of Section 481, strongly indicates that had Congress intended to
> incorporate a degree of flexibility into the election notice provision it would
> have done so explicitly.  *See Int'l Org. of Masters, Mates, & Pilots v. Brown,*
> 498 U.S. 466, 476 n. 10, 111 S.Ct. 880, 112 L.Ed.2d 991 (1991) . . . ; *see
> also, Brock v. American Postal Workers Union South Jersey Area Local 526,*
> 1986 WL 15272 (D.N.J.1986) (observing that 'it appears likely that where
> the drafters wished to include a reasonableness standard, they did so
> explicitly.  The fact that no such standard is expressly included in the
> provisions for mailing notices indicates that no such standard was intended').

*Chao v. Local 54, Hotel Employees and Rest. Employees Int'l Union*, 166 F. Supp.2d 109,

113 (D.N.J. 2001).  However, Congress provided no qualifying language in requiring ballot

secrecy.  Rather, as noted in *Marshall v. Local Union 12447, United Steelworkers of Am.,*

*AFL-CIO*, 591 F.2d 199, 203 n.10 (3d Cir. 1978) ("Local Union 12447 "), "[t]he definition

Plaintiff's Reply - Page 15

[of ballot secrecy] is phrased in *mandatory* terms: the ballots must be marked in such a manner that the voter cannot be identified with his choice." *Id.* at 203; *see also Donovan v. CSEA Local Union 1000*, 594 F. Supp. 188 (N.D.NY 1984) ("There is no question that a secret ballot is mandatory.").

Although courts have in fact used the term "reasonableness" in criticizing certain unions' failure to protect ballot secrecy, APA has confused the language used by courts in reviewing challenged elections with the standard established by Congress.  A review of the cases where that language has been employed demonstrates that it is generally used to criticize the absence of even basic measures to protect the secrecy of the ballot.  *See*, *e.g.*, *Local 12447*, 591 F.2d at 203) (concluding that even where there was no evidence that someone actually saw the votes, the election violated the LMRDA where it was possible to do so, and "reasonable steps" were not taken to ensure members voted in secret).  None of the cases cited by APA establish that courts have established a standard different for ballot secrecy than that established by Congress, and APA failed to cite one case where a systemic breach of secrecy was found that allowed multiple persons to easily identify voters with their votes, but was held to comply with the LMRDA because, notwithstanding such a systemic breach, the union took "reasonable steps" to preserve ballot secrecy.[16]

_____

[16]  The closest APA comes to reaching this point is an unpublished Sixth Circuit case. Opposition at 36.  In *Brock v. District 6, United Mine Workers of Am.*, 772 F.2d 905 (Table), No. 84-3828, 1985 WL 13586 (6th Cir. Aug. 9, 1985), the DOL challenged a union's election for, *inter alia*, a breach of ballot secrecy.  In concluding the district court's decision that secrecy had not been breached was not clearly erroneous, the Sixth Circuit noted that notwithstanding the shortcomings of the polls, the conduct of the election was visible, and measures taken a "teller" assured the court that secrecy was in fact preserved.  *See* Exh. 4 to Opposition at *6. In contrast, the conduct of the APA's election was not visible, and required APA members to simply accept the word of the election administrator that the

**Plaintiff's Reply - Page 16**

In sum, courts have obligated unions to do everything within their control to ensure that voters vote in secret. The fact that some malfeasant may surreptitiously take steps to overcome those measures, such as placing a camera in the ceiling or using a can of spray bought for $19.99 over the Internet to read through the outer and inner envelopes of a mail ballot, does not necessarily implicate the methods used by the union, although, of course, evidence of the same might nonetheless invalidate an election. It is the adequacy of the methods used by the unions that are at the heart of the LMRDA. *Accord Id.* (noting that the statutory standard for secrecy *"focuses on the adequacy of the method* by which voting was conducted. Once it is shown that that method was deficient because voters could have been identified with their choices, a violation of the LMRDA has been established") (Emphasis added). The method used by the APA in its 2004 elections was inadequate to protect ballot secrecy, and under the LMRDA the election must be set aside.

Similarly, language from a DOL publication cited by APA does not support its argument that this Court should apply a reasonableness standard notwithstanding the plain meaning of the LMRDA. *See* Opposition at 33, 37. In a document entitled "Conducting Local Union Officer Elections, A Guide for Election Officials," the introductory paragraph to the section of polling places notes that:

> Election day is the culmination of a lengthy process of planning and preparation that began with the notice of nominations. Weeks before the voting is scheduled to occur, election officials should have selected the polling locations(s) and the hours of voting, taking into consideration whether the location and times provide members an adequate opportunity to

---

secrecy of their ballots had been preserved.

**Plaintiff's Reply - Page 17**

vote in secret.

Appx. 16 to Opposition at 452.  However, the informal language used by the DOL to make this 67-page document user-friendly is not a formal DOL regulation, and cannot reasonably be read as establishing a "reasonableness" requirement to ballot secrecy.  Rather, that document expressly states that "[e]lection officials *must* not only make arrangements for balloting in secret but *must* also insure that members *actually* use the secret balloting facilities provided."  *Id.*  Morever, a review of the other language from the Guideline reveals the importance of ballot secrecy, and how limited the circumstance where the supremacy of that principle will be overcome:

> Every effort must be made to preserve the secrecy of challenged ballots which have been resolved as eligible.  However, in the rare instance where this is not possible (such as in an election where only one challenged ballot is cast and that voter has been determined to be eligible after all other ballots have been counted), it is more important to count a ballot than to preserve secrecy if the ballot could affect the outcome of any race.

Appx. 16 to Opposition at 462.

**2.    APA's Voting System Was Not Reasonable.**

Moreover, even if reasonableness was the standard, the electronic voting system used by APA in the 2004 elections did not meet that standard.  Specifically, it is not reasonable to adopt a voting system with the admitted ballot secrecy flaws of the instant system.  Notwithstanding APA's assertions regarding the amount of time spent and care that may have been spent designing the system at issue, the undisputed evidence shows that the basic architecture of the system made it possible for numerous persons to identify an APA member with his or her vote, in violation of the LMRDA.  Specifically, it is

**Plaintiff's Reply - Page 18**

undisputed that the system contained a link between the APA member and his or her vote, through the use of a unique identifying number attached to the two databases containing voters' information.  It is undisputed that Ohmann *could* exploit this link by comparing the databases.  It is also undisputed that employees of the AAA and Winson Surnamer were purposely provided with the information necessary to identify an APA member with his or her vote, specifically APA members' PINs and EINs.  APA presented no evidence that it took all reasonable steps to minimize encroachment into ballot secrecy, although the evidence appended to its own Opposition suggested at least two measures addressing some of the DOL's concerns with the openness of the instant system were being utilized as early as 2001.  *See* Appx. 33 to Opposition at 582 (Declaration of Gerald B. Feldkamp, Vice-President, Development of CCComplete, Inc., dba Allied Union Services) (noting that in their system, "[p]rior to voting for the first time, members were required to change their assigned PIN to a new PIN of their choosing, [and] [v]oters were not allowed to review their votes through a subsequent login," but could merely replace the previous vote").[17]

APA's arguments that "[t]he DOL has chosen to interpret this provision literally so as to render violative of the LMRDA any voting system that does not eliminate every theoretical risk of identifying a voter with his/her vote," and that application the LMRDA's requirement of a secret ballot would "render it impossible to use the [I]nternet and

---

[17]  Chao does not suggests that incorporating these measures into the remote Internet voting system used by APA would cure the defects in the system with respect to ballot secrecy.  Rather, Chao notes these measures to show that, accepting APA's reasonableness standard, they failed to use reasonable measures already in use in the market place to preserve ballot secrecy.  Thus, notwithstanding the care that may have gone into designing the system used by APA, it simply does not adequately preserve ballot secrecy in union elections subject to the LMRDA.

**Plaintiff's Reply - Page 19**

telephone systems for a union election," are conclusions that are not supported by the evidence, do not create a genuine issue of material fact, and do not establish the "reasonableness" of their remote Internet voting system.  Opposition at 2, 33.  Indeed, APA's own brief documents numerous occasions where the DOL has declined to challenge elections where there were missteps that created situations where a voter could be identified with his or her vote.  *See, e.g.,* CSF at 20-22, 93-116.  Thus, clearly Chao is not interpreting this provision in a manner that would disallow all forms of voting.  Rather, Chao challenges the instant election because the *system* itself fundamentally breached the ballot secrecy requirements imposed by Title IV of the LMRDA, in a way that cannot be quantified or cured.  APA has presented no evidence suggesting that it is impossible to design an remote Internet voting system that complies with the statutory requirements of the LMRDA. Although APA is correct that the Supreme Court has "cautioned against a literal reading of congressional labor legislation," *see* Opposition at 32-33,

> This cautionary note does not suggest, however, that courts should ignore well-settled principles of statutory construction in applying the provisions of the LMRDA.  The ultimate aim of statutory construction is to accurately discern the meaning and effect intended by Congress.  As a basic precept of statutory construction, where the plain meaning of a statute is unambiguous and admits of no exceptions, the express language of the provision is generally presumed to accurately reflect Congress's intent.  *See Ross v. Hotel Employees and Rest. Employees Int'l Union,* 266 F.3d 236, 243 (3rd Cir.2001) ("In any case turning on statutory interpretation, our goal is to ascertain the intent of Congress.  To accomplish this goal, we begin by looking at the statute's language.  If the language is plain, we need look no further.") (internal citation omitted).

*Local 54*, 166 F. Supp. at 115.  Congress's attempt to minimize interference with union elections does not obviate the plain text of the LMRDA requiring a secret ballot.  *Accord*

**Plaintiff's Reply - Page 20**

*Reich v. Dist. Lodge 720, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO*, 11

F.3d 1496, 1498-99 (9th Cir. 1993) (describing Congress's goal of "minimal governmental

interference" with union elections, except where LMRDA violation affecting outcome

exists).[18]

### 3.    The Problems With the APA's System Are Not Theoretical.

APA attempts to convince this Court that the DOL's concerns with the electronic

system used in the 2004 elections are "theoretical" in nature, and that Chao is demanding

perfection.  APA complains that employees of AAA, GetAGeek, and Winson Surnamer

could only "theoretically have tampered with the AAA internet voting system to learn how

individual voters voted."  Opposition at 33.  It further complains that other, approved,

voting methods also have flaws that can be exploited, and thus argues that Chao is holding

the APA to too high a standard.  These arguments miss the point.

As an initial matter, employees of AAA, GetAGeek, and Winson Surnamer did not

have to "tamper" with the AAA system to identify how APA members voted.  The change-

vote feature of the 2004 elections allowed them to simply get on the Internet, input the

information they were provided, and call up the vote of a particular APA member.  It is

undisputed that the APA member would not know this had occurred.  APA's subcontractor,

GetAGeek, would take notice of this activity only if it rose to the level of suspicious.  The

---

[18]    The APA's assertion that the National Mediation Board ("NMB") uses an electronic voting system similar to the one used its 2004 elections is immaterial. See Def. Br. at 39-40 & n.15.  It is clear from APA's own proffered evidence that the systems are not the same, and that CCC has built in additional protective measures. *See supra* at 11-12.  The NMB is not a division of the DOL, it not governed by the strict language Congress wrote into the LMRDA to govern union elections, and the DOL is not bound by the NMB's decision that electronic voting is appropriate in elections it governs.

**Plaintiff's Reply - Page 21**

DOL could discharge its obligation to investigate an allegation against such a system only by accepting the word of the programmer who created the system that the system accurately recorded each and every one of his "log-ins" as well.  Further, as discussed above, the alleged "flaws" in other voting methods are generally not systemic problems.  Congress, through the LMRDA, and the DOL, through its regulations, have ensured that various protections were available to minimize the risks of systemic breaches of ballot secrecy in those voting methods, protections which were not in place in the 2004 election.  As the district court in *Bachowski v. Brennan*, 413 F. Supp. 147, 150, 151 (W.D.Pa. 1976), noted in rejecting the DOL's reasons for not challenging a breach of secrecy in an election:

> [I]t appears contrary to the intent of Congress, and indeed irrational, to consider as technical violations those which affect secrecy of the ballot and potentially may influence or affect how a voter votes.  These are vital and substantive infringements of the Congressionally guaranteed right to a free and fair election. . . . Technical violations, not capable of influencing the voter's choice, or not interfering with an honest count and tabulation, may be disregarded; but lack of secrecy can not be countenanced in the light of the clear intent expressed.

Here, the APA offers no refutation of the evidence presented by the DOL that the outcome of the 2004 elections may have been affected, particularly given the evidence adduced by the APA itself that APA members had concerns that their votes may not have been secret. *See* MSJ Brief at 31, n.9 (citing the results of an APA survey regarding the 2004 elections). Thus, the problems with APA's system were not just "theoretical," and may have influenced APA members' choices.

Finally, contrary to the APA's suggestion, the system at issue here is in fact analogous to a system which utilizes sequentially numbered ballots and a corresponding

numbered voting registry, and consideration of the analogies between those systems reveal the very real problems with the APA's system.  Specifically, for all intents and purposes, the tables utilized by APA's remote Internet voting system correspond to sequentially numbered ballots and a corresponding numbered voting registry.  At a minimum, at least one person, Ohmann, had access to both tables—the table with APA members' votes (*i.e.*, the sequentially numbered ballots) and table with the APA members' identifying information (*i.e.*, the corresponding registry)—such that he could identify each voter along with his or her vote cast.  The APA's suggestion the DOL must show that the tables were *actually* coordinated is not supported by the law.  *See, e.g., Reich v. United Mine Workers of Am.* ("*Reich v. UMWA*"), No. 94-1691, 1995 WL 791950 at *6, FN 11 (D.D.C. Oct. 24, 1995) (finding a breach of the statutory requirement of voting by secret ballot where the *ability* existed to identify how members voted, notwithstanding that the fact that this ability was utilized only once to invalidate a ballot cast by an eligible member) (attached as Appx. 11 to MSJ Brief at 123).[19]

Similarly, APA's citation to the DOL's policy regarding sequentially numbered ballots, and to *Wirtz v. Local 11, Int'l Hod Carriers*, 211 F. Supp. 408, 412 (W.D. Pa.1962) ("*Local 11*"), does not assist it in defending its voting system.  With respect to the DOL's view, while the APA is correct that sequentially numbered ballots *on their own* for

---

[19] APA errs in its argument that decisions cited by Chao finding breach of ballot secrecy in elections utilizing sequentially numbered ballot are inapposite.  *See* Opposition at 48-49; *see also* MSJ Brief at 29-30.  Contrary to its assertion, none of those cases turn on whether the union actually *intended* to or *did* invade secrecy, although those issues were discussed.  *Id.*  The LMRDA is not a criminal statute; intent is not required.  The courts in those cases set aside the elections because the unions *could* identify the voter along with his or her vote.  *Id.*

**Plaintiff's Reply - Page 23**

purposes of accounting for the ballots, *accord* Appx. 16 to Opposition at 448 (requiring

unions to account for all ballots printed), do not constitute a violation, they *do* violate the

LMRDA when they are coupled with a corresponding numbered registry.  Consideration of

the totality of decision in *Local 11* supports this position.  In *Local 11*, the court found no

violation of ballot secrecy where each voter received a sequentially numbered ballot and the

voter's name was recorded on a separate written list kept by a "watcher," *but* the actual

ballots and list corresponding to the number issued on the ballots were held by another

party.  *See Local 11*, 211 F.Supp. at 412.  The court expressly stated that "if the list were

kept by the officials in charge of the election the ballots would not have been secret in that

the person expressing a choice *could* have been identified with the choice expressed."  *Id.*

(Emphasis added).  As noted, Ohmann had access to both tables, whether the AAA

"intended" that those tables be kept separate or not.  *See* Opposition at 49.

## C.    This Case is Ripe for Summary Judgment Disposition

The question of whether the remote Internet voting system used by the APA in its

2004 national officer election is, of course, fact dependent.  However, as established above,

APA has failed to demonstrate that there are genuine issues of fact left for trial.  Rather,

while APA has added details regarding the remote Internet voting system, including how

and why it was designed and the security measures the designers included in the system, it

has not shown a dispute as to the basic architecture of the system.  Specifically, there is no

dispute that multiple persons from different organizations had access to the information

which would allow them to identify APA members with their vote.  This is not a matter

where material facts turn on witnesses' credibility.  Instead, APA challenges the DOL's

motion for summary judgment with an argument, and presentation of facts, alleging that

their remote Internet voting system was "as good as," if not better, than other approved

methods of union voting.  Summary judgment is appropriate, as this Court can decide from

the record whether the APA's remote Internet voting system violated the LMRDA.  That

this Court will have to draw inferences from the various facts presented by the parties does

not preclude the appropriateness of summary judgment disposition.  *See Nunez v. Superior*

*Oil Co.*, 572 F.2d 1119, 1123-1124 (5th Cir. 1978).

**D.    CONCLUSION**

The voting system used by the APA in its 2004 elections violated the LMRDA by

using a change-vote feature which allowed APA members to be identified with their votes.

The outcome of the election may have been affected.  As soon as practicable, and if at all

possible before the 2007 APA elections, the 2004 elections must be re-run under the

supervision of the DOL.

Respectfully Submitted,

RICHARD B. ROPER
UNITED STATES ATTORNEY

s/ Tami C. Parker
Tami C. Parker
Assistant United States Attorney
State Bar No. 24003946
Burnett Plaza, Suite 1700
801 Cherry Street, Unit 4
Fort Worth, Texas 76102-6882
Telephone: 817.252.5222
Facsimile:  817.978.6351

OF COUNSEL:
HOWARD M. RADZELY
Solicitor of Labor

KATHERINE E. BISSELL
Associate Solicitor, Civil Rights
and Labor-Management Division

SHARON E. HANLEY
Counsel for Labor-Management
Programs

COUNSEL FOR PLAINTIFF
SECRETARY, DEPARTMENT OF
LABOR

DANIELLE L. JABERG
Attorney

EVAN H. NORDBY
Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of July, 2006, I electronically filed the foregoing Reply to Defendant's Opposition to Motion for Summary Judgment with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing (ECF) system of the Court.  The electronic case filing system sent a Notice of Electronic Filing to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

SANFORD R. DENISON
Baab & Denison, LLP
Stemmons Place, Suite 1608
2777 N. Stemmons Freeway
Dallas, TX 75207

EDGAR N. JAMES
STEVEN K. HOFFMAN
DAVID P. DEAN
James & Hoffman, P.C.
1107 17th Street, N.W., Suite 510
Washington, D.C. 20036-4704


s/ Tami C. Parker
Tami C. Parker
Assistant United States Attorney